## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RUSSEL "JOEY" JENNINGS, by** | : | |
| **and through his parents/guardians,** | : | |
| **Richard and Susan Jennings,** | : | |
| | : | |
| **RINALDO SCRUCI, by and** | : | |
| **through his guardian, Luciana** | : | |
| **Dudich,** | : | |
| | : | |
| **ROBERT B. CARSON, by and** | : | |
| **through his guardian, Marilyn** | : | |
| **Hollis,** | : | |
| | : | |
| **LAUREN LOTZI, by and through** | : | |
| **her sibling/guardian, Linda Lotzi,** | : | |
| **and her sibling, Patty Degen,** | : | |
| | : | |
| **BETH LAMBO, by and through** | : | |
| **her parents/guardians, Joseph and** | : | |
| **Carina Lambo,** | : | |
| | : | |
| **MARIA KASHATUS, by and** | : | |
| **through her parents/guardians,** | : | |
| **Thomas and Margaret Kashatus,** | : | |
| | : | |
| **DAVID NAULTY, by and through** | : | **CIV. NO.:** |
| **his parent/guardian, Nielene** | : | |
| **Bogansky,** | : | |
| | : | **COMPLAINT** |
| **MAUREEN JORDA, by and** | : | |
| **through her sibling/guardian,** | : | |
| **Georgine Jorda,** | : | |
| | : | |
| **JANINE WINSOCK, by and** | : | |
| **through her sibling/guardian, Ann** | : | |
| **Meszczynski,** | : | |
| | : | |
| **CYNTHIA MARTIN, by and** | : | |
| **through her guardian, Thomas** | : | |
| **Kashatus,** | : | |
| | : | |
| **TERRY D. HETRICK, by and** | : | |
| **through his sibling/substitute** | : | |
| **decision maker, Pamela Dougherty,** | : | |

1

SHARON MCCABE, by and           :
through her sibling/guardian,   :
Irene McCabe, and               :
                                :
VIOLA "VIANNE" CAYE, by         :
and through her sibling/substitute :
decision maker, Linda Murphy,   :
                                :
                                :
            Plaintiffs,         :
                                :
        v.                      :
                                :
                                :
TOM WOLF, as Governor of the    :
Commonwealth of Pennsylvania,   :
                                :
TERESA D. MILLER, as the        :
Secretary of the Pennsylvania   :
Department of Human Services,   :
                                :
KRISTIN AHRENS, as Deputy       :
Secretary of the Pennsylvania   :
Office of Developmental Programs, :
                                :
SUE RODGERS, as the Facility    :
Director at Polk Center,        :
                                :
MARK J. GEORGETTI, as the       :
Facility Director at White Haven :
Center,                         :
                                :
PENNSYLVANIA DEPARTMENT :
OF HUMAN SERVICES,              :
                                :
PENNSYLVANIA OFFICE OF          :
DEVELOPMENTAL PROGRAMS, :
                                :
POLK CENTER, and                :
                                :
WHITE HAVEN CENTER              :
                                :
                                :
            Defendants.         :            January 24, 2020

## COMPLAINT

**AND NOW, COME the Plaintiffs, RUSSEL "JOEY" JENNINGS**, by and through his parents/guardians, Richard and Susan Jennings; **RINALDO SCRUCI**, by and through his guardian, Luciana Dudich; **ROBERT B. CARSON**, by and through his guardian, Marilyn Hollis; **LAUREN LOTZI**, by and through her sibling/guardian, Linda Lotzi, and her sibling, Patty Degen; **BETH LAMBO**, by and through her parents/guardians, Joseph and Carina Lambo; **MARIA KASHATUS**, by and through her parents/guardians, Thomas and Margaret Kashatus; **DAVID NAULTY**, by and through his parent/guardian, Nielene Bogansky; **MAUREEN JORDA**, by and through her sibling/guardian, Georgine Jorda; **JANINE WINSOCK**, by and through her sibling/guardian, Ann Meszczynski; **CYNTHIA MARTIN**, by and through her guardian, Thomas Kashatus; **TERRY D. HETRICK**, by and through his sibling/substitute decision maker, Pamela Dougherty; **SHARON MCCABE**, by and through her sibling/guardian, Irene McCabe; **and VIOLA "VIANNE" CAYE**, by and through her sibling/substitute decision maker, Linda Murphy; by their attorney, and seek the enforcement of their federal rights to prevent their severe injury, including extreme mental distress, gross physical harm, and even possibly death, and aver the following:

## JURISDICTION

1.      This action is for declaratory and injunctive relief under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, the Rehabilitation Act of 1973, 29 U.S.C. § 794(a) ("Section 504"), the Medical Assistance Program authorized by 42 U.S.C. 1396, et seq., and the United States Constitution.

2.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1342, and 1343. Plaintiffs' claims for declaratory and injunctive relief are authorized under 28 U.S.C. §§ 2201-02 and 42 U.S.C. § 1983 and the waiver of state sovereign immunity enacted in 42 U.S.C. § 2000d-7(a)(I) and various Medicaid federal statutes and regulations incorporated into Pennsylvania law.  At all times relevant to this action, Defendants have acted under color of state law.

**VENUE**

3.      Venue lies in the Middle District of Pennsylvania pursuant to 28 U.S.C. § 1391(b), because White Haven Center, where many in the proposed plaintiff class reside, is located in Luzerne County which is within the area covered by the Middle District, and the family and guardians of the residents of White Haven Center and Polk Center reside throughout the Commonwealth of Pennsylvania.

**NAMED PLAINTIFFS**

4.      The Plaintiff, **RUSSEL "JOEY" JENNINGS**, by and through his parents/guardians, Richard and Susan Jennings, believes that White Haven is the least restrictive and most appropriate environment available to meet his needs. Joey is a 27-year-old individual with autism, intellectual disability, and co-morbid psychiatric disorders. After several failed placements in the "community," where he was isolated and lonely, and where he suffered severe injuries, Joey has thrived at White Haven.

5.      **RINALDO SCRUCI**, by and through his guardian, Luciana Dudich, believes that Polk is the least restrictive and most appropriate environment available to meet his needs. Rinaldo had a seizure shortly after birth which left him severely cerebral palsied. He is non-ambulatory and his feet and hands are curled. He is completely non-verbal and expresses his needs with grunts and pointing gestures, which requires that the person working with him know him well to decipher what he wants or needs. He requires complete care including bathing, dressing, eating, toileting, being placed in bed, and anything else that he wants or needs during the course of the day. After a failure at a group home where he received inadequate activities and services, he has fared extremely well at Polk.

6.      **ROBERT B. CARSON**, by and through his guardian, Marilyn Hollis, believes that Polk is the least restrictive and most appropriate environment available to meet his needs. Robert has intellectual disability, autistic spectrum disorder, and impulse control disorder. He is non-verbal. After a group home did not work out, Robert has done exceptionally well at Polk where he is more integrated than when he was in the group home.

7.     **LAUREN LOTZI**, by and through her sibling/guardian, Linda Lotzi, and her sibling, Patty Degen, believes that White Haven is the least restrictive and most appropriate environment available to meet her needs. Lauren has severe/profound intellectual and physical disabilities, neurodevelopmental disorder, spastic quadriplegia, cerebral palsy, and epilepsy. She is non-communicative and non-ambulatory. Lauren also has degenerative osteoarthritis of the spine, fibrocystic breast disease, and an eating disorder that requires that she be specially fed to prevent aspiration. Lauren receives breathing treatment several times per day in addition to a vibrating vest which breaks up the mucous in her lungs. Lauren can feel pain, but cannot tell others that she is in pain. She needs a mechanical lift to move her from bed to wheelchair and she needs specialized equipment for bathing. She also needs familiar staff who can understand her non-verbal communication. Her parents were unable to care for her in the "community" where they valiantly made the effort at their home, but she has done very well at White Haven.

8.     **BETH LAMBO**, by and through her parents/guardians, Joseph and Carina Lambo, believes that Polk is the least restrictive and most appropriate environment available to meet her needs. Beth is severely autistic and likely profoundly intellectually disabled. She is bipolar and suffers from epilepsy seizure disorder, sinus arrhythmia, mitral valve prolapse, hyperprolactinemia, dysmenorrhea, and gastritis with peptic ulcer. She has a feeding tube. Beth has severe self-injurious behavior which includes punching herself, biting, pulling out her hair, and throwing herself on the floor. She has done very well at Polk where she receives 2-to-1 staff monitoring. Beth does not do well with change and she requires the familiar surroundings and staff at Polk.

9.     **MARIA KASHATUS**, by and through her parents/guardians, Thomas and Margaret Kashatus, believes that White Haven is the least restrictive and most appropriate environment available to meet her needs. Maria has profound intellectual and developmental disabilities. She requires 24-hour nursing care and extensive medical care. She cannot feed herself, cannot talk or express pain, and is unable to walk or stand by herself. After a number of failed attempts at placement in a group home, Maria receives a much higher quality of life at White Haven.

10.     **DAVID NAULTY**, by and through his parent/guardian, Nielene Bogansky believes that White Haven is the least restrictive and most appropriate environment available to meet his needs. David is severely/profoundly intellectually disabled. Attempts to place David in

group homes were unsuccessful because they could not manage his aggressive behavior. While in the "community," David suffered a placement in a state hospital where he was housed for six years with forensic cases including rapists and murderers. White Haven has been able to handle his aggressive behavior.  David has lived very well at White Haven.

11.   **MAUREEN JORDA**, by and through her sibling/guardian, Georgine Jorda, believes that White Haven is the least restrictive and most appropriate environment available to meet her needs. Maureen suffered severe brain damage at birth. She cannot walk or talk. She has cerebral palsy and a seizure disorder. Maureen's legs were also severely damaged by medical malpractice. She has a feeding tube. The experienced and competent staff at White Haven are able to provide for her every need. At White Haven she enjoys road trips with staff and other activities. She needs the full-time care that is provided by the aides and nursing staff at White Haven. The direct care staff at White Haven know when she is in pain and know when she needs something. If Maureen was to be surrounded by unfamiliar and less competent staff in the "community," she would go into deep depression and would deteriorate rapidly.

12.   **JANINE WINSOCK**, by and through her sibling/guardian, Ann Meszczynski, believes that White Haven is the least restrictive and most appropriate environment available to meet her needs. Janine has never developed beyond an intellectual capacity of 18 months of age. Janine has intellectual disability, bipolar one disorder, severe autism, severe paranoia, severe edema, blindness, and other medical conditions. Janine was a threat to herself and to other children in the household. Janine has received excellent care at White Haven, and she has fared very well there.

13.   **CYNTHIA MARTIN**, by and through her guardian, Thomas Kashatus, believes that White Haven is the least restrictive and most appropriate environment available to meet her needs. Cynthia suffered from several serious illnesses as a child including spinal meningitis and tuberculosis. Her intellectual disability caused her to be placed in the Cerebral Palsy Daycare Center. At 11-years-old, she was placed in a nursing home. Cynthia was destructive and exhibited self-injurious behavior, including pulling out her hair and tearing her clothing. At age 14, Cynthia was admitted to White Haven Center where she began the process of improving her developmental skills. Cynthia has thrived at White Haven. She enjoys numerous opportunities to attend activities outside a residential unit both on and off the WHC campus.

14.     **TERRY D. HETRICK**, by and through his sibling/substitute decision maker, Pamela Dougherty, believes that Polk is the least restrictive and most appropriate environment available to meet his needs. Terry has lived at Polk for nearly sixty (60) years. Terry has a mental age of one (1) year five (5) months with an IQ of less than 15. His diagnosis is profound intellectual disability, impulse control disorder, PDD-NOS, osteopenia, cleft palate, GERD, hypertension, hypothyroidism, and chronic gastritis. Terry is incontinent and wears disposable briefs which need to be changed every two (2) hours. Terry has little safety awareness which requires a very structured environment with a 24-hour awake staff. Since he is non-verbal, the staff needs to be very familiar with him to be able to sense the changes in his behavior that may be signs of discomfort or illness. Terry has no teeth and all his food must be pureed.  He requires trained and familiar staff to set up his meals and to assist with his eating. Terry exhibits uncontrollable tantrums and requires assistance of 3 to 4 staff members just to calm him down and to keep them safe. Terry is very comfortable with and enjoys the companionship of his cottage mates and his familiar staff. He has great freedom of movement in his large living area. He enjoys a variety of recreational activities on campus. Terry would not be happy or safe in a "community" setting.

15.     **SHARON MCCABE**, by and through her sibling/guardian, Irene McCabe, believes that Polk is the least restrictive and most appropriate environment available to meet her needs. Sharon was probably injured in birth during a forceps delivery. Sharon had a tendency to slap other children, was moody, and would break windows with her fist. She would bite, kick, scratch, tear clothing, and throw chairs. Sharon has had a very good life at Polk which includes a simulated community where she works at a restaurant and she attends live entertainment, dances, and movies. She was unable to adjust to the decreased structure of the Community Readiness Cottage, just as she would be unable to adjust to a much less structured "community" placement.

16.     **VIOLA "VIANNE" CAYE**, by and through her sibling/substitute decision maker, Linda Murphy, believes that Polk is the least restrictive and most appropriate environment available to meet her needs. Vianne suffered a fall at 18-months-old which probably resulted in a cerebral hemorrhage. She was diagnosed as being profoundly intellectually disabled with a mental age of two (2). She is non-verbal, legally blind, and needs total assistance in ambulating. She has no teeth and her food must be carefully chopped up, and she requires eating assistance. She would destroy books, toys, and other things at home as she did not have an

understanding of the value of items. When she is upset, she kicks objects, stumps her feet, and points to and taps her head. Her parents attempted to raise her at home, but she was too dangerous to other children in the house. Her only communication is using guttural noises that can only be understood by those most familiar with her. She caused a younger brother to fall down the cellar stairs and she also cut him in the face with a razor blade. Vianne has overall done very well at Polk, but she has demonstrated increased behavioral issues and aggression every time that they have changed her environment by moving her to a different cottage. She needs to be very comfortable and adjusted to her living area, her routine, her friends, and her staff. She participates in many on-grounds and off-grounds activities at Polk, but this requires careful supervision. She needs continuous skilled care which can only be adequately received at a home like Polk. Her physical, emotional, mental, and medical needs cannot be sufficiently met in a group home environment.

## **DEFENDANTS**

17.    The Defendant, **TOM WOLF** (Thomas Westerman Wolf), is the Governor of the Commonwealth of Pennsylvania.  Governor Wolf is sued in his official capacity only.

18.    The Defendant, **PENNSYLVANIA DEPARTMENT OF HUMAN SERVICES** ("DHS"), is a public entity covered by Title II of the Americans with Disabilities Act 42 U.S.C. § 12131(1).  It receives federal funds under § 504 of the Rehabilitation Act, 29 U.S.C. § 794.  DHS administers services for millions of Pennsylvania's citizens, including individuals and families with low incomes; people with mental illnesses, developmental disabilities, or late-onset disabilities; people who are blind, visually impaired, deaf, hard of hearing, or deaf-blind; parents needing childcare services, child support and healthcare for children; and families with catastrophic medical expenses for their children.  DHS is the largest agency in Pennsylvania.  DHS operates the Office of Developmental Programs.

19.    The Defendant, **TERESA D. MILLER**, is the Secretary of the Pennsylvania Department of Human Services ("DHS").  Ms. Miller is sued in her official capacity. Defendant Miller is ultimately responsible for ensuring that Pennsylvania operates its delivery of services to individuals with disabilities in conformity with the United States Constitution, the ADA, the ADA implementing regulations, section 504 of the Rehabilitation Act of 1973 as

amended, 29 U.S.C. § 794(a), and section 504's implementing regulations.

20.      The Defendant, **PENNSYLVANIA DEPARTMENT OF HUMAN SERVICES OFFICE OF DEVELOPMENTAL PROGRAMS** ("ODP"), is a public entity covered by Title II of the Americans with Disabilities Act 42 U.S.C. § 12131(1).  It receives federal funds under § 504 of the Rehabilitation Act, 29 U.S.C. § 794.  ODP funds services and supports for eligible Pennsylvania residents with developmental disabilities.  The ODP was created "to support Pennsylvanians with developmental disabilities to achieve greater independence, choice and opportunity in their lives" and "to continuously improve an effective system of accessible services and supports."

21.      The Defendant, **KRISTIN AHRENS**, is Deputy Secretary of the ODP.  Ms. Ahrens is sued in her official capacity.  Defendant Ahrens operates Pennsylvania's system of services to individuals with developmental disabilities and is ultimately responsible for ensuring that eligible Pennsylvania residents with developmental disabilities receive services and supports effectively and in accordance with the United States Constitution, the ADA, the ADA implementing regulations, section 504 of the Rehabilitation Act of 1973 as amended, 29 U.S.C. § 794(a), and section 504's implementing regulations.

22.      The Defendant, **POLK CENTER** ("Polk" or "PC"), is a residential facility in Northwestern Pennsylvania that provides, among other things, habilitation, behavioral, and medical services and supports for individuals with developmental and intellectual disabilities. Polk opened in 1897.  With its 2,000-acre campus setting, it includes living areas, sheltered workshops, vocational building, school building, chapel, healthcare center, auditorium, and recreational facilities.  It is located in Polk, Venango County, Pennsylvania.  "An interdisciplinary team of staff provides a wide array of quality services to the adults who make Polk Center their home." Polk is a public entity covered by Title II of the Americans with Disabilities Act 42 U.S.C. § 12131(1).  It receives federal funds under § 504 of the Rehabilitation Act, 29 U.S.C. § 794.

23.      The Defendant, **SUE RODGERS**, is the Facility Director at Polk.  As Facility Director, Ms. Pickens is responsible for ensuring the health and safety of all the residents of Polk.  In particular, Ms. Rodgers supervises the 24-hour supported living, medical care, and developmental activities of all residents at Polk.

24.     The Defendant, **WHITE HAVEN CENTER** ("White Haven" or "WHC"), is a residential facility that provides, among other things, habilitation, behavioral, and medical services and supports for individuals with developmental and intellectual disabilities.   White Haven was established in 1956. With its campus-like setting on 192 acres, it includes residential cottages, therapy rooms, healthcare services center, multi-purpose rooms, swimming pool, and recreational and entertainment facilities.  It is located in White Haven, Luzerne County, Pennsylvania.  WHC is a public entity covered by Title II of the Americans with Disabilities Act 42 U.S.C. § 12131(1).  It receives federal funds under § 504 of the Rehabilitation Act, 29 U.S.C. § 794.

25.     The Defendant, **MARK R. GEORGETTI**, is the Facility Director at White Haven.  As Facility Director, Mr. Georgetti is responsible for ensuring the health and safety of all the residents of WHC. In particular, Mr. Georgetti supervises the 24-hour supported living, medical care, and developmental activities of all residents at WHC.

## CLASS ACTION ALLEGATIONS

26.     Pursuant to Fed. R. Civ. P. 23(a) and (b)(2), the named Plaintiffs bring this action on behalf of themselves and all other persons similarly situated.

27.     The named Plaintiffs bring this action pursuant to the Civil Rights Act, 42 U.S.C. § 1983; the Americans with Disabilities Act, 42 USC § 12132; § 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504"), and the waiver of state sovereign immunity enacted in 42 U.S.C. § 2000d7(a)( 1), various Medicaid federal statutes, and regulations incorporated into Pennsylvania law and the United States Constitution, on behalf of a Class consisting of themselves and all other persons who are residents of Polk Center and White Haven Center as of January 1, 2020.

28.     The proposed class consists of all residents who reside or resided at the Polk Center or White Haven Center, at any time since January 1, 2020, or at any time during this litigation.

29.      Joinder of the entire Class is impracticable because the Class Members are

numerous, including hundreds of residents, and are persons with severe or profound developmental disabilities. Virtually all, if not all, Class Members are unable to give their consent except through guardians or family members.

30.     The named Plaintiffs' claims are typical of the claims asserted on behalf of the Class.

31.     The named Plaintiffs do not have any interests that are adverse or antagonistic to any claims or potential claims of the Class.

32.      The named Plaintiffs will fairly and adequately protect the interests of the members of the Class.

33.     The named Plaintiffs are committed to the vigorous prosecution of this action and have retained counsel competent and experienced in this type of litigation.

34.     The named Plaintiffs do not seek monetary damages. Hence, the burden and expense of prosecuting this litigation makes it unlikely that members of the Class would or could prosecute individual actions. If individual actions were pursued by Class Members, prosecution of those individual claims would be impracticable and inefficient.

35.     This Court is the most appropriate forum for adjudicating the claims at issue, which principally arise under federal law.

36.     The Plaintiffs do not anticipate any difficulty in the management of this action as a class action.

37.     There are many questions of law and fact common to the Class, which predominate over any questions which may affect individual members. The predominant common questions of law and fact include, among others:

(a) Whether Defendants are liable for violation of the Civil Rights Act, 42 U.S.C. § 1983;

(b) Whether Defendants are liable for violation of the Americans with Disabilities Act, 42 U.S.C. § 12132;

(c) Whether Defendants are liable for violation of § 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504");

(d)  Whether Defendants are liable for violation of various Medicaid federal statutes and regulations incorporated into Pennsylvania law;

(e)  Whether Defendants are liable for violations of the United States Constitution; and

(f)  Whether named Plaintiffs and Class Members are entitled to equitable and injunctive relief.

38.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

39.     Plaintiffs seek declaratory and injunctive relief, attorneys' fees and expenses as permitted by law, on behalf of themselves and the Class.


## **COMMON FACTUAL ALLEGATIONS**

40.     All of the Plaintiffs reside at Polk Center ("PC") or White Haven Center ("WHC"), or resided there as of January 1, 2020.

41.      Almost all of the Plaintiffs have lived in their homes at PC and WHC for many years, with most of those residents having lived there for more than 20 years.  Many of these individuals have resided at these Centers for over 40 years.

42.     Polk is an Intermediate Care Facility for Individuals with Intellectual Disabilities ("ICF/IDD") that is operated by the Commonwealth of Pennsylvania, and currently serves approximately 194 residents.

43.     White Haven is an Intermediate Care Facility for Individuals with Intellectual Disabilities ("ICF/IDD") that is operated by the Commonwealth of Pennsylvania, and currently serves approximately 112 residents.

44.     Polk Center and White Haven Center focus on providing an everyday life for the people residing there based upon the Pennsylvania Office of Developmental Programs' "Everyday Lives" principles, and these Centers strive to make each person's living arrangements home-like, cozy and individually decorated. Some residents of these Centers work at jobs of their choosing, while others participate in the Senior Center or life skills education.

45.     Each year, everyone who lives at the Centers participates in a person-centered planning meeting that focuses on their dreams, aspirations, abilities, needs, and desires. Participants at this meeting include anyone who is involved in a person's life such as family members, special friends, residential support staff, physicians, nurses, and clergy. From this, an "Individualized Support Plan" (ISP) is developed to provide tailored medical, spiritual, social, vocational, educational and rehabilitative services, as well as considerations for community inclusion.

46.     At the Centers, many new milestones have been reached that contribute to a safe, healthy, free, and integrated environment. For example, at White Haven, there has been the establishment and continuance of a restraint-free environment.  White Haven Center's "People on the Go Program", the "Pasta Program" for people with Autism, and "Workplace Harmony" are just a few more examples of the supportive individualized integrated home that exists at the Centers.

47.     An Intermediate Care Facility for Individuals with Intellectual Disabilities("ICF/IID") (formerly referred to as an Intermediate Care Facility for the Mentally Retarded or "ICF/MR") is regulated by the Centers for Medicare and Medicaid Services ("CMS") in conjunction with the State's licensing agency.  Part of that regulatory process includes routine surveys by CMS and the Commonwealth's licensing agency to ensure quality treatment and services are provided by ICF/IID-certified facilities, like Polk or White Haven Centers.

48.     Eligibility for residence in a Pennsylvania developmental center requires a developmental disability that is a severe, chronic disability of an individual, which is attributable to a mental impairment, physical impairment, or combination of both; is likely to continue indefinitely; results in a combination of functional limitations in major life activities; reflects the need for a combination of special interdisciplinary care or treatment of lifelong or extended duration; and includes, but is not limited to, developmental disabilities, autism, cerebral palsy, epilepsy, spina bifida, and other neurological impairments.

49.     All of the Plaintiffs are diagnosed as in need of state-run ICF/IID institutional

care and have been appropriately designated as eligible for state-operated ICF/IID-level of care.

50.     Many, if not all, of the individuals residing at the Polk have been diagnosed with profound or severe intellectual disabilities. Almost all individuals residing at Polk have been diagnosed with additional disabilities, including seizure disorders, autism, cerebral palsy, vision difficulties, and hearing impairments.

51.     Most, if not all, of the individuals residing at the White Haven have been diagnosed with profound or severe intellectual disabilities. Almost all individuals residing at WHC have been diagnosed with additional disabilities, including seizure disorders, autism, cerebral palsy, vision difficulties, and hearing impairments.

52.     The primary service needs of individuals at Polk and White Haven Centers require a variety of services and supports. Some broad areas of service are described below:

(a)  Extensive Personal Care - This need refers to people who require total assistance and care provided by direct service staff who are specially trained on individualized programs developed by residents' treating professionals, including physicians, nurses, physical therapists, occupational therapists, speech language pathologists, and many other licensed clinicians who treat residents at the Centers.

(b)  Significant Health Care Services - Treating professionals at Polk and White Haven have determined that significant nursing intervention and monitoring are required to effectively treat residents who have significant health care needs.  This service includes the need for 24-hour monitoring and immediate availability of treating professionals for intermittent pressure breathing, inhalation assistive devices, tracheotomy care, or treatment for recurrent pneumonias or apnea.

(c) Ambulation – Many residents at PC and WHC are non-ambulatory or require assistance with ambulation.

(d) Significant Behavioral Support – Many residents at PC and WHC require significant behavioral support. This need addresses individuals who have behaviors that require intervention for the safety of themselves or others, as developed by psychologists and medical personnel and implemented in conjunction with direct service staff.

53.     On or about August 14, 2019, defendant Miller announced the closure of Polk Center and White Haven Center, which was projected to take about three (3) years.

54.     Prior to 2019, all PC and WHC residents were consistently evaluated by their treating professionals and determined to be in need of ICF/IID services, and the best setting for Plaintiffs to receive those services was at PC or WHC as determined by the professional judgment of these professionals.  Subsequent to Defendants' announcement of their intent to close the PC and WHC, outside biased professionals with far less familiarity with the Plaintiffs have or will routinely and inappropriately state that Plaintiffs would best be served in alternative settings, including settings that do not provide ICF/IID-level of care.  Most, if not all, of these statements by outside professionals supporting placement in the "community" are not, or will not be, based upon sound and unbiased professional judgments consistent with accepted professional standards.

55.     The Defendants incorrectly and unfairly assume that a community-based facility should be automatically considered the most integrated type of living arrangement under ADA standards.  In reality, the "institutional" care at Polk and White Haven, at least for the Plaintiff Class, presents a more integrated approach to living based upon individual circumstances and needs.

56.     While many residents' interdisciplinary teams have agreed that the residents' needs are better served at their current ICF/IID, social workers have more recently been sending or will be sending letters or making other communications that schedule interdisciplinary meetings promoting community placements.  Such communications are or will be based upon a political agenda to close all Centers rather than upon sound and unbiased accepted professional judgments.

57.     Community placements are being sought for residents regardless of their needs. "Community" placement is inappropriate for most, if not all, residents of Polk and White Haven, yet, nonetheless the Defendants are pursuing an alternative "community" residence for all the Plaintiffs.

58.     Plaintiffs have the right to receive ICF/IID-level of services from the Commonwealth of Pennsylvania.

59.     All Plaintiffs have had, or imminently will have, their rights to receive ICF/IID level services at Polk or White Haven Centers denied.  The policies and practices of the Commonwealth have or will deceive, frighten, and coerce residents of PC and WHC into inappropriately surrendering their rights to receive this superior level of care.

60.     Many Polk and White Haven residents have lived in the community at some time.  Such placements have proven to be unsuccessful.  For example:

(a)  The Plaintiff, Russel "Joey" Jennings was in and out of six (6) different group homes where they failed to manage his challenging behaviors, which included property destruction, self-abuse, hitting, biting, scratching, and elopement into traffic. He was very isolated and lonely, and seemed like a prisoner in solitary confinement "in the community." His care was so deficient that he was admitted to five (5) different psychiatric wards, and he languished in one of those psychiatric wards for five (5) months when no other home was willing to take him. He suffered many mysterious bruises, a broken eye socket, and lacerations. He went unbathed for weeks at a time and was forced sleep on a bare mattress in his street clothes. As a result of his "community" experience, Joey was toxically overmedicated as a chemical restraint and suffered permanent Parkinsonian like tremors, the disfigurement of female-like breasts, psychotic breaks with reality, serotonin syndrome, and intractable insomnia. Joey was rescued when he was admitted to White Haven. He is more integrated at White Haven then in the "community" because he now has multiple opportunities to socialize at parties, dances, barbecues, movies, amusement parks, and restaurants.

(b)  The Plaintiff, Rinaldo Scruci, did not receive adequate activities and services when he was in a group home. At Polk, in contrast to the group home, Rinaldo has been included in many activities and is much more integrated than he was in the "community." He now likes to make throw rugs in which he takes great pride. He loves the people at Polk and is very happy with his surroundings. He is able to move around scooting in his wheelchair, which would not be an option in a much more confined setting as usually exist in the "community." Moving Rinaldo to the "community" would cause him immeasurable harm especially because his new staff would not know what all of his gestures and expressions mean. Rinaldo needs to remain in the home that he has known for the past 54 years.

(c)  The Plaintiff, Robert Carson, experienced inadequate care in the "community" because the staff there did not know how to handle his outrage when he hit, head-butted, pinched, and screamed. Also, the group home constantly had different staff workers which resulted in inconsistent care for Robert. In the group home, he still repeatedly soiled himself and he was very unhappy all the time. At Polk, Robert is very happy and he has many more activities, and he is much more integrated than in the group home. He engages in weekly activities that include going to the canteen to purchase snacks with his own spending money, evening bingo in the recreation room, evening social with other residents, wagon rides Friday nights in the summer, dances in the evening with snacks, church services, dining out, picnics, going out to observe holiday decorations, yearly formal dance, camping, shopping, and many off-grounds outings. Also, Robert has superior healthcare at Polk where there are nurses on staff 24-hours-a-day along with a few doctors being present every day. The direct care staff of Polk make Robert feel loved and provide him the unique individualized care that can only come from those persons who know him well. Disrupting his life and routine at Polk will result in a return of his abusive and self-injurious behaviors.

(d)  The Plaintiff, Lauren Lotzi, could not receive adequate care in the "community" with her parents, as she regressed and became increasingly harder to handle while experiencing falls, tantrums, seizures, weight gain, difficulty bathing and dressing, wandering in the day and night, difficulty regulating medications, difficulty with eating, and difficulty with toilet hygiene. She would elope from her home which was very dangerous because she was incapable of telling anyone her name or address, or in recognizing the danger of traffic. After moving to White Haven, she is comfortable and well-adjusted.

61.     There has been, and there is a continuing further risk of, a loss of professionals and other staff at Polk and White Haven Centers due to a perceived lack of job security.  Such losses have and will result in larger caseloads for existing staff, and thus less time and care for each resident. The actions of the Defendants in announcing closure will result in the deterioration of services at Polk and White Haven, including the loss of irreplaceable valuable staff. The Defendants will then use this fact to try to justify the closure of Polk and White Haven.

62.     There has been, and there continues to be a further risk of, a loss of some services

at Polk or White Haven due to downsizing and eventual closure.  This has and will result in inferior care in violation of Plaintiffs' rights and will ultimately inappropriately force residents to leave Polk and White Haven Centers.

63.     As some cottages close, in some building units, inexperienced and over-worked staff have replaced or will replace experienced staff, resulting in confusion with respect to resident care.

64.     As cottages close, resident housing is being merged or will be merged, creating a dangerous and chaotic environment.  Residents will be physically harmed by other residents as there will be more resident-to-resident and resident-to-staff assaults due to the revised living arrangements.

65.     The Defendants have acted, or failed to properly act, under the color of state law, pursuant to the protections of the Fourteenth Amendment to the Constitution of the United States.

66.     The Defendants have determined that the residents of Polk and White Haven have developmental disabilities and require treatment, services, supports, and care.

67.     The Defendants have failed, or will fail, as a result of the decision to close the developmental centers, to provide the Polk and White Haven residents with reasonably safe conditions in their delivery of treatment, service, supports, and care.

68.     The Defendants' treatment, services, supports, and care, since the decision to close the developmental centers, have substantially departed or will substantially depart from generally accepted professional standards of care.

69.     The Defendants' provision of psychological and behavioral services, since the decision to close the developmental centers, have substantially departed or will substantially depart from generally accepted professional standards.

70.     The Defendants' provision of medical, neurological, and nursing services, since the decision to close the developmental centers, have substantially departed or will substantially depart from generally accepted professional standards.

71.     The Defendants' provision of psychiatric services, since the decision to close the

18

developmental centers, have substantially departed or will substantially depart from generally accepted professional standards.

72.     The Defendants' provision of habilitation and therapy services, including physical and nutritional management, since the decision to close the developmental centers, has substantially departed or will substantially depart from generally accepted professional standards.

73.     The Defendants' provision of protection from harm mechanisms, since the decision to close the developmental centers, has substantially departed or will substantially depart from generally accepted professional standards.

74.     Due to some instances of lack of appropriate treatment, services, supports, and care, since the decision to close the developmental centers, the residents are or will be at significant risk of harm, or have or will have suffered actual harm.

75.     The Defendants have failed or will fail to provide the PC and WHC residents, since the decision to close the developmental centers, with the appropriate level of habilitation training and behavioral training required to protect the residents' liberty interests to protect them from harm and the freedom of undue restraints.

76.     The Defendants seek to compel Plaintiffs' discharge from PC and WHC to other settings, including predominately non-ICF/IID certified settings.

77.     The Defendants' policies and procedures have interfered with or usurped the ability of Plaintiffs' treating professionals to make independent and sound professional judgments.  The treating professionals are now often following a political or administrative agenda rather than accepted professional standards.

78.     The Defendants' policies and procedures have unduly influenced or compelled Plaintiffs' treating professionals to recommend transfer or discharge of Plaintiffs to settings that are not the most appropriate for Plaintiffs' needs, solely for the purpose of conforming to Defendants' political policy decisions.

79.     In some cases, staff has exaggerated, or will exaggerate, the residents' personal care abilities in order to deceptively document the appropriateness of a community placement.

80.     All Plaintiffs are medically and developmentally most appropriately served at the Polk or White Haven Centers instead of any alternative setting.

81.     All Plaintiffs are physically, mentally, and emotionally fragile and are most appropriately served at the Polk or White Haven Centers instead of any alternative setting.

82.     All Plaintiffs are in need of continuous care by multidisciplinary teams of professionals as are currently serving them at the Polk or White Haven Centers.

83.     The services provided to Plaintiffs cannot be reasonably replicated in alternative residential settings.

84.     Non-ICF/IID-certified settings are not able to reasonably provide the same level of care as an ICF/IID-certified facility.

85.     Services provided to residents at the Polk and White Haven Centers are uniquely tailored to the needs of the residents of those Centers.

86.     None of the Plaintiffs have given informed consent for their discharge from PC and WHC because, among other things, Defendants have precluded treating professionals at those Centers from fully and fairly considering whether those Centers best meet the needs of the Plaintiffs, and have prevented those treating professionals from acknowledging the rights of Plaintiffs to receive treatment and services at Polk or White Haven Centers, or in another ICF/IID.

87.     Alternative ICF's/IID are not and will not be available.  The two remaining Centers for the developmentally disabled, if Polk and White Haven are closed, do not have the current planned capacity to take any significant number of the Plaintiff Class.  Also, The Defendants have not offered placement in other ICF's/IID.

88.     Alternative ICFs/IID, even if available, are many miles away, and deny guardians, parents, and family members the opportunity to visit on a regular basis.  Many guardians, parents, and family members are elderly and cannot make a long-distance trip to visit a distant ICF/IID.  Such lack of family bonding may cause further harm to the well-being of those being moved and disrupts the family ties.   Family members and guardians contribute positively to the care, treatment, habilitation, and psychological well-being of residents, and residents will suffer great harm if their loved ones cannot participate.

89.     Furthermore, all ICF's/IID are not equal and cannot be easily substituted for each other.  The movement to another ICF/IID would still rip the residents of PC and WHC from their long-time homes with great potential harm.

90.     Plaintiffs also have not had the benefit of their respective treating professionals' independent judgments about whether they should continue to reside at Polk and White Haven Centers or at another state operated ICF/IID.

91.     Defendants have, or will, unduly influence or compel Plaintiffs to receive services in non-ICF/IID facilities.  Those services are inferior to the services provided at Polk and White Haven Centers because, among many other reasons, they will not be provided by an individualized, multidisciplinary team of professionals.

92.     Some Plaintiffs will be unable to even receive services in the community.  Some have already been rejected or will be rejected for admissions to group homes due to their challenging behaviors or due to their extreme care needs.

93.     Persons residing in the type of settings to which Defendants intend to discharge Plaintiffs, are at approximately seventy-five (75) percent greater risk of death, abuse, and neglect as compared to similar persons receiving services at a facility like Polk or White Haven Centers.

94.     Defendants know or should know of the increased danger of death, abuse, and neglect to which Plaintiffs will be subjected if they are discharged from Polk or White Haven Centers, as sought by Defendants' political plan to downsize or close all the Developmental Centers.

95.     Persons residing in the type of "community" settings to which Defendants intend to discharge Plaintiffs are likely to be more secluded from the community immediately surrounding them and be more restricted in their interactions with non-disabled peers as compared to similar persons receiving services at a facility like PC or WHC.

96.     Defendants have announced their plan to "depopulate" and close PC and WHC and discharge residents to non-ICF/IID-certified alternative settings.  The plan is to move the residents to "community" settings such as small group homes, nursing homes, and other settings with smaller populations where they would allegedly have more interactions with the non-

disabled population.  In reality, these residents actually often be more isolated in a small home or apartment than they were at PC and WHC, as both Centers are open to community events and have opportunities for community involvement.

97.     Among the reasons identified by Defendants for their "depopulation" plan was the ostensibly high cost of providing the necessary services for the disabled residents of the Commonwealth's developmental centers.  In reality, the costs for caring for these residents in "community" settings would be equal to or higher than care in these Centers.

98.     Contrary to Defendants' public statements about the alleged general desire for "community" placements, Plaintiffs have not requested discharge or transition from Polk or White Haven Centers.

99.     Defendants have instructed or inappropriately encouraged Plaintiffs' treating professionals to include language in Plaintiffs' Individualized Support Plans indicating that Plaintiffs are capable of being served in settings other than Polk and White Haven Centers regardless of whether Plaintiffs are actually capable of being served in alternative settings.

100.     Defendants have instructed or inappropriately encouraged Plaintiffs' treating professionals to include language in Plaintiffs' Individualized Support Plans indicating that Plaintiffs have requested discharge to settings other than Polk and White Haven Centers regardless of whether Plaintiffs actually communicated such a request.

101.     The treating professionals are likely intimidated and fearful of retaliation, including the possible loss of their jobs, and likely will only be forthcoming with information to support the position of Plaintiffs if protected by or compelled by appropriate discovery in this case.

102.     Because Plaintiffs' treating professionals have not been able to provide independent judgments about the Plaintiffs' ability to be comparatively served in alternative settings, the judgments they have made or will make in that regard are largely unreliable and inaccurate.

103.     Many of the Plaintiffs have not been provided sufficient information to allow them to provide informed consent to any proposed discharge.

104.     Plaintiffs' guardians and family members have been given unclear and conflicting information as to the availability of specific alternative placements. In some cases, since information has not been forthcoming by the State, parents are left to believe speculation of options from other parents. Information being provided or to be provided to guardians and family members by the Commonwealth has been or will be one-sided, promoting only the alleged benefits of community placement.  The State has not made any real effort to address the potential risks of community placement and has not sufficiently attempted to lessen guardians'/family members' fears and concerns.

105.     Defendants made the decision to downsize or depopulate Polk and White Haven Centers without regard to the needs of the individual Plaintiffs, their individual support plans (which are developed in conjunction with their treating professionals), or their rights to receive services in the least restrictive setting appropriate to their needs.

106.     Defendants have prevented or will prevent the meaningful evaluation and consideration of treatment team professionals regarding most integrated residential settings and alternative settings which can serve the needs of such residents.

107.     The decision to close PC and WHC was predetermined before conducting any investigations or making any findings about the individual needs or desires of the Plaintiffs.

108.     The  Defendants have ignored information regarding the large percentages of those at Polk and White Haven who are opposed to community placement; the high level of impairment of the PC and WHC residents (compared to those who can be served in the "community"); and the unavailability of appropriate and adequate alternative placements to match the current level of services provided to PC and WHC residents.

109.     The Defendants rendered opinions and recommendations based on faulty data, including inaccurate cost data, and despite the lack of feasibility of a workable plan to meet the needs of all affected individuals within a three (3)-year time frame.

110.     When appropriate settings in the "community" prove to be unavailable, and the Defendants continue on their course to meet their arbitrary three (3)-year deadline, some Plaintiffs will be forced into unacceptable and harmful nursing homes and psychiatric wards.

111.     Residents of the State's developmental centers, those recommended for closure

and those not recommended for closure, have the right to receive unbiased and objective recommendations from their respective treating professionals regarding the most appropriate setting to meet the needs of such residents.

112.     The Defendants' mandate to close two (2) developmental centers without meaningful evaluation of the residents' needs further evidences that the residents of the developmental centers have not received or will not receive treating professionals' recommendations without unreasonable interference or influence from the State's policies, procedures and agendas.

113.     Plaintiffs currently residing at PC and WHC have been and will be denied access to their current high level of treatment and services if the Defendants continue with their current plan to discharge residents.

## <u>COMMON ALLEGATIONS OF RIGHTS AND DUTIES</u>

114.     As described more fully herein, each Plaintiff has a constitutional right, a life and liberty interest in, and a statutory entitlement to receive treatment and services from the Commonwealth of Pennsylvania in the most appropriate setting for his or her needs.

115.     Interpreting the ADA and the Department of Justice's regulations issued under it, the Supreme Court decision in Olmstead emphasized that there is no "federal requirement that community-based treatment be imposed on patients who do not desire it." Olmstead v. Zimring, et al., 527 U.S. 581, 602 (1999).  The Olmstead Court further stressed that "nothing in the ADA or its implementing regulations condones termination of institutional settings for persons unable to handle or benefit from community settings." Id. at 601-02. "[T]he ADA is not reasonably read to impel States to phase out institutions, placing patients in need of close care at risk." Id. at 605.

116.     In fact, the Olmstead decision recognized that "for [some] individuals, no placement outside the institution may ever be appropriate." Id. (citing and quoting Brief for American Psychiatric Association et al. as Amici Curiae at 22-23 ("Some individuals, whether mentally retarded or mentally ill, are not prepared at particular times—perhaps in the short run, perhaps in the long run—for the risks and exposure of the less protective environment of

community settings"); Brief for Voice of the Retarded et al. as Amici Curiae at 11 ("Each disabled person is entitled to treatment in the most integrated setting possible for that person—recognizing that, on a case-by-case basis, that setting may be in an institution"); Youngberg v. Romeo, 457 U.S. 307, 327 (1982) (Blackmun, J., concurring) ("For many mentally retarded people, the difference between the capacity to do things for themselves within an institution and total dependence on the institution for all of their needs is as much liberty as they ever will know").

117.    By virtue of the ADA and the Olmstead decision, Plaintiffs have a federally protected right to receive sound recommendations from treating professionals as to whether community placement is the most appropriate to meet their needs and to fair consideration of their opposition to that transfer, even if the proposed transfer is from institutional care to an allegedly less restrictive setting.  The only proper mechanism for second-guessing an individual or guardian's decision to oppose a treating professional's recommended transfer to a less restrictive setting is through State law and State Court Rules as to guardianship.

118.    The paradigm created by the Olmstead decision dictates that residents of the Polk and White Haven Centers and their guardians have the benefit of treating professionals' judgments regarding the most appropriate place to receive services.  Only after they have the benefit of that information are residents and guardians required to oppose or consent to continued residence at the facility or discharge to an alternative setting.

119.    The Defendants have ignored and will continue to ignore Plaintiffs' right to have treating professionals render full and fair judgments as to where Plaintiffs' should receive services most appropriate to their needs.

120.    Likewise, Defendants have ignored and will continue to ignore Plaintiffs' rights, as recognized by Olmstead, to oppose discharge from PC and WHC.

121.    Pursuant to 42 U.S.C. § 12134, Defendants are under a constitutional and statutory duty to:

(a)  effectuate the placement of Plaintiffs in the "most integrated setting appropriate to the needs of qualified individuals with disabilities," a setting that "enables individuals with

25

disabilities to interact with nondisabled persons to the fullest extent possible" (28 C.F.R. pt. 35 app. A.);

(b)  not place Plaintiffs in more restrictive or dangerous placements than they currently enjoy;

(c)  effectuate appropriate institutional placement for each Plaintiff;

(d)  propose an ICF/IID-certified institutional discharge appropriate for the Plaintiffs only where medically and therapeutically appropriate upon an impartial multidisciplinary evaluation;

(e)  ensure that Plaintiffs, Plaintiffs' guardians and/or Plaintiffs' families understand their right to receive treatment and care at an ICF/IID-certified facility prior to seeking consent to discharge a Plaintiff from the Center;

(f) obtain the input and informed consent of Plaintiffs, Plaintiffs' guardians and/or Plaintiffs' families for such transfers.

## FIRST CAUSE OF ACTION

## AMERICANS WITH DISABILITIES ACT VIOLATIONS

122.    Plaintiffs' incorporate paragraphs one (1) through one hundred twenty-one (121) herein by reference as though fully set forth.

123.    Defendants are obligated to provide treatment, sports, and services to individuals residing in the Centers consistent with the Americans with Disabilities Act and implementing regulations. 42 U.S.C. §§ 12101-12213; 28 C.F.R. pt. 35 (2006).

124.    Because discharges or transfers are being forced on Plaintiffs without their consent, or the consent of their guardians or families, and without appropriate recommendations from treating professionals, such discharges or transfers violate the Americans with Disabilities Act, 42 U.S.C. §§ 12131 – 12134.

125.    The Plaintiffs are entitled to injunctive and declaratory relief that the Defendants shall not discharge or transfer them from their current residences without meeting the requirements that:

(a)  such discharge or transfer will not result in Plaintiffs receiving treatment and services in a setting more restrictive of their rights than their current residence;

(b)  such discharge or transfer will not be recommended by treating professionals unless the treating professionals independently conclude that such a placement is in the best interests of each Plaintiff and is the most appropriate setting to meet their needs; and

(c)  the Plaintiffs by their guardians or families wish to consent to such discharge or transfer.

142.    Defendants have failed or will fail to provide reasonably safe conditions for the Plaintiffs if they force them into a "community" setting.

126.    The Defendants have failed or will fail to provide a level of habilitation and training, including behavioral and related training programs, necessary to protect the residents' liberty interest and to ensure their safety and freedom from undue or unreasonable restraint, if they force them into a "community" setting.

127.    Forcing the residents of Polk and White Haven into "community" settings will result in treatment, supports, and services that substantially depart from generally accepted professional standards of care, thereby exposing these individuals to significant risk and, in some cases, serious harm and death.

128.    Plaintiffs are entitled to the following additional declaratory and injunctive relief:

(a)  directing Defendants to abide by treatment plans independently prepared by Plaintiffs' respective treating professionals, without regard for the Defendants' political plan to downsize or close any developmental centers, and documented in their respective multidisciplinary evaluations (known as Individualized Support Plans (ISP's), at PC and WHC).

(b)  Permitting each Plaintiff to choose:

(i)  to accept or reject the recommendation of the multidisciplinary evaluation; and

(ii)  to receive treatment in accordance with the independent recommendations of the multidisciplinary evaluation, either at his/her current residence, another state operated ICF/IID facility, or non-ICF/IID certified setting, as each Plaintiff deems appropriate.

## SECOND CAUSE OF ACTION

## REHABILITATION ACT VIOLATIONS

129.    Plaintiffs' incorporate paragraphs one (1) through one hundred twenty-eight (128) herein by reference as though fully set forth.

130.    Section 504 of the Rehabilitation Act states that "[n]o otherwise qualified person with disabilities shall, solely by reason of his or her disability, be excluded from participation in, be denied benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 29 U.S.C. § 794(a).

131.    Each named Plaintiff and class member is a "qualified person with disabilities" within the meaning of Section 504, because they (1) have physical and/or mental impairments that substantially limit one or more major life activities; and (2) meet the essential eligibility requirements for long term care under Pennsylvania's Medicaid program and are thus "qualified."

132.    Regulations implementing Section 504 require that a public entity administer its services, programs and activities in "the most integrated setting appropriate" to the needs of qualified individuals with disabilities. 28 CFR § 41.51(d).

133.    Section 504's regulations prohibit recipients of federal financial assistance from utilizing criteria or methods of administration:

(a)  that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap [or]

(b)  that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program with respect to handicapped persons.

134.    Defendants have required that Plaintiffs be discharged or transferred from Polk and White Haven Centers to other settings in violation of Section 504's integration mandate.

135.    Further, Defendants have utilized criteria and methods of administration that subject Plaintiffs and class members to discrimination on the basis of disability, by (1) failing to

assess properly the services and supports that would enable Plaintiffs to receive services and treatment in the most appropriate settings for their needs, (2) failing to develop proper individualized transition plans, (3) failing to allow guardians to be a meaningful part of the planning process, (4) failing to inform Plaintiffs of all of their options for receiving services, and (5) allocating resources for non-ICF/IID care contrary to the desires and needs of people with disabilities.

136.    The Plaintiffs are entitled to injunctive and declaratory relief that the Defendants shall not discharge or transfer them from their current residences without meeting the requirements that:

(a) such discharge or transfer will not result in Plaintiffs receiving treatment and services in a setting more restrictive of their rights than their current placement;

(b) such discharge or transfer will not be recommended by treating professionals unless the treating professionals conclude that such a placement is in the best interests of the individual Plaintiffs and is most appropriate to meet their needs; and

(c) the Plaintiffs by their guardians or families wish to consent to such discharge or transfer.

137.    Plaintiffs are entitled to the following additional declaratory and injunctive relief:

(a) directing Defendants to abide by treatment plans independently prepared by Plaintiffs' respective treating professionals, without regard for the Defendants' political plan to downsize or close any Centers, and documented in their respective multidisciplinary evaluations (known as ISP's at PC and WHC).

(b)  permitting each Plaintiff to choose:

(i) to accept or reject the recommendation of the multidisciplinary evaluation; and

(ii) to receive treatment in accordance with the independent recommendations of the multidisciplinary evaluation, either at his/her current residence, another state operated ICF/IID facility, or non-ICF/IID certified setting, as the Plaintiff deems appropriate.

**THIRD CAUSE OF ACTION**

**MEDICAID ACT AND REGULATORY VIOLATIONS**

138.    Plaintiffs' incorporate paragraphs one (1) through one hundred thirty-seven (137) herein by reference as though fully set forth.

139.    The Commonwealth of Pennsylvania has voluntarily assumed certain obligations under federal law in return for federal funding under the Medical Assistance Program authorized by 42 U.S.C. § 1396, et seq.

140.    Those obligations include:

(a)  choice of an ICF/IID institutional placement, subject to a hearing, under 42 U.S.C. § 1396n and 42 CFR § 441.302(d);

(b)  provision of ICF/IID services under 42 U.S.C. §§ 1396a(a)(10) and 1396d(a)(l5);

(c)  competent evaluation for placement in an institutional ICF/IID facility under 42 CFR § 483.440(b)(3);

(d)  a continuous active treatment program as defined in 42 CFR § 483.440(a)(1).

141.    All Plaintiffs receive assistance under the Medical Assistance Program and are owed the duties stated in the preceding paragraph.

142.    Defendants have an obligation to ensure that Plaintiffs' needs and preferences are being met in their multidisciplinary plan.

143.    Defendants have failed, or will fail, to ensure that Plaintiffs' needs and preferences are being met in their multidisciplinary plan.

144.    Defendants are violating their duties to Plaintiffs under the Medical Assistance Program by their acts and omissions alleged above.

145.    Plaintiffs are entitled to declaratory and injunctive relief as to the following:

(a)  such discharge or transfer will not result in Plaintiffs receiving treatment and services in a setting more restrictive of their rights than their current placement;

(b)  such discharge or transfer will not be recommended by treating professionals

unless the treating professionals independently and objectively conclude that such a placement is in the best interests of the individual Plaintiffs and most appropriate to meet their needs;

(c) the Plaintiffs by their guardians or families wish to consent to such discharge or transfer; and

(d) the State must comply at the developmental centers with all the regulatory standards contained in Title 42 of the Code of Federal Regulations.

(e) the services and care provided by the State at the developmental centers must meet or exceed accepted professional standards, and must be maintained at a level at least equal to the care and services that preceded the decision to close the developmental centers; and

(f) the State must maintain staffing levels for direct care staff and treating professionals at a level that meets or exceeds accepted professional standards, and at a level at least equal to the staffing that preceded the decision to close the developmental Centers;

(g) the State cannot move residents to other ICF's/IID where their needs cannot be adequately met, including, but not limited to, the State cannot move residents to an ICF/IID that is so significantly distant from their families and guardians that any individual resident will be harmed in his care, treatment, habilitation, or psychological well-being.

(h) the services and care provided by the Commonwealth at the developmental centers must meet or exceed accepted professional standards, and must be maintained at a level at least equal to the care and services that preceded the decision to close the developmental centers; and

146.    Plaintiffs are entitled to the following additional declaratory and injunctive relief:

(a) directing Defendants to abide by treatment plans independently and objectively prepared by Plaintiffs' respective treating professionals, without regard for the Defendants' mandate to downsize or close any developmental centers, and documented in their respective multidisciplinary evaluations (known as ISP's at the PC and WHC).

(b) permitting each Plaintiff to choose:

(i) to accept or reject the recommendation of the multidisciplinary evaluation; and

(ii) to receive treatment in accordance with the independent recommendations

of the multidisciplinary evaluation, either at his/her current residence, another state operated ICF/IID, or non-ICF/IID certified setting, as the Plaintiff deems appropriate.

## FOURTH CAUSE OF ACTION
## CONSTITUTIONAL DUE PROCESS VIOLATIONS

147.     Plaintiffs' incorporate paragraphs one (1) through one hundred forty-six (146) herein by reference as though fully set forth.

148.     At all relevant times, Defendants were "persons" under 42 U.S.C. § 1983.

149.     At all relevant times, Defendants were acting "under color of state law" under 42 U.S.C. § 1983.

150.     At all relevant times, a "special relationship" existed between each of the Plaintiffs and the State and state actors that were responsible for their safety.

151.     The Defendants have demonstrated a pattern or practice of egregious and flagrant acts or omissions which violate federal rights of the WHC and PC residents, rights which are protected by the Fourteenth Amendment to the Constitution of the United States.

152.     The Plaintiff residents will suffer irreparable harm if they are deprived the rights, privileges and immunities provided by the Fourteenth Amendment and federal law.

153.     Defendants, while acting under color of state law, unlawfully, intentionally, unreasonably, maliciously and with deliberate and/or reckless indifference to the Plaintiffs' substantive due process rights secured to Plaintiffs under the Fourth and/or Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. § 1983 et. seq. and similar provisions of federal, state and/or local law, violated Plaintiffs' rights as alleged above and as follows.

154.     The Plaintiffs have significant mental, intellectual, physical and behavioral health issues.  They are unable to verbally articulate their medical and personal needs.  Most of them have very limited mobility, and some have none.  They are unable to care for themselves in even the most basic ways.  They are at the mercy of the persons who provide them with care.  Without

the regulatory guarantees provided by an ICF/IID facility, they are defenseless against many forms of abuse and neglect which can lead to their injury or death.

155.     Before becoming residents at PC or WHC, some Plaintiffs were abused and neglected in the same types of "community" settings Defendants intend to force Plaintiffs into now.

156.     Defendants know or should know that placing the Plaintiffs in other settings, including non-ICF/IID settings, will substantially increase their likelihood of injury and death from abuse, neglect, error, lack of appropriate services, and other causes.

157.     Defendants' failure to provide adequate safeguards to prevent such harm is a violation of Plaintiffs' constitutional right not to be deprived of life or liberty without due process of law.

158.     Defendants' discharge process and procedure, instituted in the efforts to close PC and WHC, has and will result in harm to the residents.  Loss of services, loss of staff, and reconfiguration of living units has and will result in harm to the residents.  Defendants have failed and will continue to fail to protect residents from harm.

159.     The actions of the Defendants herein have and will significantly contribute to an increase in the vulnerability of the Plaintiffs and create risks that would not have otherwise existed if Defendants complied with their legal duties.

160.     Defendants' actions and inactions constitute a violation of Plaintiffs' federal rights, as protected by the Fourteenth Amendment to the Constitution of the United States and other federal laws.  Unless restrained by this Court, Defendants will continue to engage in their misbehavior, which deprives the Plaintiffs of rights, privileges and immunities secured by the Constitution of the United States and federal law, and will cause irreparable harm to these residents.

161.     The harm ultimately caused or to be caused to the Plaintiffs was and is foreseeable and sufficiently direct.

162.     The acts and omissions of the Defendants in forcing the transfer of residents to the "community" will deny the Plaintiffs and members of the Plaintiff class their constitutional

rights secured by the Due Process Clause of the 14th Amendment to the United States Constitution as follows:

(a) denying an individually controlled and designed habilitation plan and program to help class members maintain self-care skills;

(b) denying a humane and decent existence;

(c) denying habilitation necessary to ensure that residents are safe and free from unnecessary physical, mechanical and chemical restraint;

(d) denying adequate shelter, clothing, nutrition and medical care;

(e) denying a placement that is in the most integrated setting appropriate to their needs, which is in actuality Polk or White Haven where they already reside; and

(f) denying the right to have all placement decisions be made on an individualized basis and implemented in accordance with the recommendations of planning teams composed of friends and family and professionals who know the person with a disability best, and denying proper weight for the choices and decisions of the Plaintiffs and their guardians.

163.    Plaintiffs are entitled to declaratory and injunctive relief directing that:

(a)  such discharge or transfer cannot result in Plaintiffs receiving treatment and services in a setting more restrictive of their rights than their current placement;

(b)  such discharge or transfer will not be recommended by treating professionals unless the treating professionals independently and objectively conclude that such a placement is in the best interests of the individual Plaintiffs;

(c)  such discharge or transfer will not occur unless the Plaintiffs, by their guardians or families, wish to choose or consent to such discharge or transfer;

(d) the services and care provided by the Commonwealth at the developmental centers must meet or exceed accepted professional standards, and must be maintained at a level at least equal to the care and services that preceded the decision to close the developmental centers; and

(e) the State must maintain staffing levels for direct care staff and treating professionals at a level that meets or exceeds accepted professional standards, and at a level at least equal to the staffing that preceded the decision to close the developmental centers;

(f) the State cannot move residents to other ICF's/IID where their needs cannot be adequately met, including, but not limited to, the State cannot move residents to an ICF/IID that is so significantly distant from their families and guardians that any individual resident will be harmed in his care, treatment, habilitation, or psychological well-being.

164.     Plaintiffs are entitled to the following additional declaratory and injunctive relief:

(a)  directing Defendants to abide by treatment plans independently and fairly prepared by Plaintiffs' respective treating professionals, without regard for the Defendants' political plan to downsize or close any developmental centers, and documented in their respective multidisciplinary evaluations (known as ISPs at PC and WHC).

(b)  permitting each Plaintiff to choose:

(i)  to accept or reject the recommendation of the multidisciplinary evaluation; and

(ii)  to receive treatment in accordance with the independent recommendations of the multidisciplinary evaluation, either at his/her current residence, another state operated ICF/IID facility, or non-ICF/IID certified setting, as the Plaintiff deems appropriate.

## CONCLUSION

WHEREFORE Plaintiffs seek:

(a) Declaratory and injunctive relief as set forth herein.

(b) An award to Plaintiffs' of reasonable attorneys' fees, litigation expenses, and costs; and

(c) Any other relief this Court deems just and proper.

Respectfully submitted,

Thomas B. York
PA Attorney I.D. No. 32522
tyork@yorklegalgroup.com

251 Woodland Drive
Kitty Hawk, NC 27949

70 North Yale Street
York, PA 17403

Attorney for Plaintiffs

Date:  January 24, 2020