## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RUSSEL "JOEY" JENNINGS,                  :          Civil No. 3:20-CV-148
*by and through his parents/guardians,*  :
*Richard and Susan Jennings*, et al.,    :
                                         :
   **Plaintiffs,**                       :
                                         :
v.                                       :          **(Magistrate Judge Carlson)**
                                         :
TOM WOLF, et al.,                        :
                                         :
   **Defendants.**                       :

## <u>MEMORANDUM OPINION</u>

### I.    <u>Introduction</u>

This case, which comes before us for consideration of a motion for class certification and two motions for preliminary injunction, (Docs. 19, 81, 125), stands at the confluence of profound cross currents in the law, science, medicine, and public policy relating to the care and treatment of the severely intellectually disabled. This lawsuit also entails a profound and profoundly moving human component as care-givers, state officials, family, and loved ones strive to provide these disabled individuals with lives that are safe, fulfilling, and marked by dignity and decency. Finally, in its current posture this case presents a series of intractable challenges for

all, challenges thrust upon the parties by the imperfect nature of the available alternatives.

This is a putative class action brought by the named plaintiffs on behalf of themselves and others similarly situated against Governor Tom Wolf and other Commonwealth of Pennsylvania officials and agencies. This action was brought on behalf of the named plaintiffs, who are individuals with profound and severe intellectual disabilities residing in state-run residential facilities in the Commonwealth, by their guardians or decisionmakers. The complaint alleges that the defendants have violated and continue to violate the plaintiffs' and other putative class members' civil rights, in that the Commonwealth is closing two of these residential facilities—Polk Center and White Haven Center—and transferring the residents to other facilities in the Commonwealth without their consent.

The parties in this case consented to magistrate judge jurisdiction, and the case was assigned to the undersigned on September 20, 2022. (Doc. 135). At that time, despite the diligent efforts of the court, the parties, and counsel, a number of time-sensitive and significant issues remained to be resolved. These pending questions included a motion to certify the plaintiff class as well as two motions seeking preliminary injunctive relief. (Docs. 19, 81, 125). By the time that the parties consented to magistrate judge jurisdiction, there was an immediate exigency to these

issues since state's announced deadline for closure of the White Haven Center and Polk Center was November 30, 2022.

Mindful of this deadline, we set exacting benchmarks for the parties to ensure a timely, but thoughtful, consideration of these important and exigent issues. Thus, we immediately scheduled a conference with counsel to set a pathway and timetable for expedited resolution of these motions. (Doc. 139). We then entered a series of orders directing an expedited hearing in this case. (Docs. 141, 143). As part of this expedited process, we instructed the parties to agree upon a hearing schedule by October 7, and submit pre-hearing memoranda no later than October 14, 2022. (Id.) Further, while we were undertaking this expedited review, we directed the Commonwealth to refrain from transferring any putative class members from Polk Center or White Haven Center. (Doc. 140).

Counsel responded to our instructions with commendable skill and alacrity, enabling us to commence a hearing on all pending motions on October 18, 2022. At this hearing we endeavored to provide all parties with a full and fair opportunity to present evidence relating to the questions of class certification and injunctive relief, taking testimony from twenty lay and expert witnesses. We also received and considered numerous exhibits tendered by the parties. (Docs. 150-57). This hearing concluded on October 28, 2022. Accordingly, these motions, which were previously briefed by the parties, are now ripe for resolution.

For the reasons set forth below, the motion for class certification will be granted, but the motions for preliminary injunction will be denied.

## II.   <u>Statement of Facts and of the Case</u>[1]

In this case we are presented with a dispute between two sets of sincere and sincerely well-meaning parties,[2] who have diametrically opposed views regarding the proper future course for some 158 severely intellectually disabled residents housed at two state intermediate care facilities ("ICFs"), Polk Center and White Haven Center. While the litigants profoundly disagree on how best to meet the needs of this population, we find that the evidence shows that both the state officials who care for these individuals, and the family members who deeply care about their loved ones, share a common interest in doing what is best; they simply have deep disagreements regarding what is the best path forward for those that are in their care. These disagreements, in turn, are cast against the backdrop of difficult decisions

---

[1] This statement of facts is derived from the parties' pleadings and the evidence presented at the combined preliminary injunction and class certification hearing conducted by the court between October 18 and October 28, 2022. This narrative represents the Court's findings of fact in this case.

[2] On this score, we find that all parties in this case are sincere and acting in good faith pursuing what they believe to be the best and true course for the residents of Polk Center and White Haven Center. We make this finding because the plaintiffs' counsel in closing arguments on the pending motions suggested that the state actions were driven by some malign political influences. We reject this suggestion. Instead, we find that the state officials charged with these difficult ICF placement decisions, like the plaintiffs' families, are striving to find the best path forward for those in their care as they confront some stark demographic and budgetary realities.

thrust upon both the state officials and the families of these disabled ICF residents by factors beyond their control, including the shrinking demographics of this population. These demographic changes in the state ICF resident population force difficult choices upon all and these choices are made all the more challenging due to the fact that there are no simple or universally acceptable options available to the parties. Thus, the parties and the Court are presented with a dispute that justifiably invokes profound emotional concerns but admits of no easy answers.

### A. **Historical Background**[3]

This litigation is emblematic of a longer, longstanding national conversation regarding the proper role of the state in caring for the most vulnerable in our society, the developmentally disabled. Over time, our understanding of the state's role in caring for the intellectually disabled and our perceptions of how best to fulfill this mandate of care have dramatically changed and evolved.

One dark aspect of the Age of Enlightenment, the 17th and 18th century intellectual movement that formed the philosophical underpinning of this nation, was this movement's unenlightened and discriminatory attitude toward the intellectually disabled. As one scholar has noted:

---

[3] Our understanding of the historic context of these policies has been greatly informed by the decision in <u>Martin v. Taft</u>, 222 F. Supp. 2d 940, 965 (S.D. Ohio 2002), and we gratefully acknowledge the insights provided by the court in <u>Martin</u>.

The history of discriminatory treatment towards the mentally disabled has deep roots. John Locke wanted full citizenship to be denied them [asserting that the intellectually disabled] are not born into the "full state of Equality" because they rely on others to "seek and procure their good for them." According to John Stuart Mill, the principle of freedom from interference does not apply to those "still in a state to require being taken care of by others." For these people, according to Mill, despotism was a legitimate form of government.

Forward to Fundamental Alteration: Addressing ADA Title II Integration Lawsuits After Olmstead v. L.C., 24 Harv. J.L. & Pub. Pol'y 695, 706 (2001). Thus, prior to the mid-1800s "the care of mentally disabled individuals was left to families, jails, poorhouses, and ad hoc community arrangements." Id. However, by the 1850's there was a growing awareness of the need for the state to play some active role in protecting the health, safety, and well-being of those with intellectual disabilities. Thus, in 1848, Massachusetts established the first public facility for persons with intellectual disabilities. "Don't Tread on the ADA": Olmstead v. L.C. Ex Rel. Zimring and the Future of Community Integration for Individuals with Mental Disabilities, 40 B.C. L. Rev. 1221, 1224 (1999).

While the model for this form of care for the intellectually challenged was initially educationally based with states providing short-term training for young people to enable them to return to the community, id., "[b]y the end of the nineteenth century, however, the school model was being abandoned in favor of asylums providing long-term care, as medical professionals and academics of the time advocated the need to protect society." Martin, 222 F. Supp. 2d at 965. This

institutional model, which focused upon the need to confine and isolate those with disabilities rather than provide them with compassionate care and treatment fostered its own series of abuses; persons with differing degrees of impairment were often essentially warehoused in facilities whose primary purpose was to detain rather than treat their residents. Moreover, these commitment decisions were often made with little regard for the myriad levels of disability presented by these individuals. Thus, slight consideration was given to the notion that many developmentally disabled persons could live lives of dignity and independence outside an institutional setting. Ultimately these abuses led to efforts to supplant the large institutional model with community care options. This reform movement began in earnest in the mid-1950s and has continued in force in the 1960s and 1970s through to this day. Forward to Fundamental Alteration: Addressing ADA Title II Integration Lawsuits After Olmstead v. L.C., 24 Harv. J.L. & Pub. Pol'y 695, 707 (2001). Since the 1960s, approximately 1.5 million people have been released from institutional to community settings. Id.

Moreover, as discussed below, this social movement has become enshrined in decisional case law, which recognizes a right for the intellectually disabled to reside in the least restrictive setting consistent with their medically determined needs.

B. **The Shifting Demographics of Pennsylvania's Intellectually Disabled Population: Challenges and Choices.**

Pennsylvania's experience caring for the intellectually disabled population housed in state facilities has paralleled these national trends. In fact, several witnesses testified about this trend both in Pennsylvania and across the country to deinstitutionalize the intellectually disabled. "The policy of deinstitutionalization was based on the proposition that quality of life (QoL) of individuals with intellectual disabilities (ID) will improve as a result of being moved from institutions to community-based care settings."[4] The decreasing number of institutionalized intellectually disabled individuals in Pennsylvania is reflected by the declining census in state operated ICFs and the small fraction of state operated ICFs that remain open today.

Thus, Kristin Ahrens, Deputy Secretary for the Office of Developmental Programs ("ODP") for the Pennsylvania Department of Human Services ("DHS") testified that presently approximately 57,000 Pennsylvania residents are eligible for ICF level care. The largest population of these 57,000 individuals—37,000 individuals—are enrolled in a home or community-based setting ("HCBS") also

---

[4] Chowdhury, M. and B. Benson, Deinstitutionalization and quality of life of individuals with intellectual disability: a review of the international literature. [Abstract] Journal of Policy and Practice in Intellectual Disabilities, 2011. 8(4). This source was cited by plaintiffs' expert, Dr. Wachtel, in her expert report. (Plaintiffs' Exhibit 2, at 28).

known as waiver-funded services or waiver programs. Thus, the vast majority of Pennsylvanians with intellectual disabilities are now cared for in community or home settings, and institutionalized care has become the exception, rather than the rule in terms of care and treatment for the intellectually disabled.

Indeed, out of the 57,000 residents eligible for ICF level care, only approximately 2,250 residents currently reside in ICFs. The 2,250 residents in ICFs are comprised of 556 residents in state operated ICFs and approximately 1,700 residents in privately operated ICFs in Pennsylvania. There are 150 to 160 privately-operated ICFs in Pennsylvania, varying in size from centers with up to 120 beds to centers with 4-10 beds. These state-run and privately-operated ICFs are all subject to the same standards and regulations and all require the same certifications.[5]

This longstanding demographic trend away from care in institutionalized settings, in turn, has led to a dramatic reduction over time in the number of state-run institutions addressing the needs of this population. At one time the Commonwealth of Pennsylvania operated seventeen or nineteen state-run ICFs, only four of which

---

[5] These residential ICFs are operated by the Commonwealth of Pennsylvania and regulated by the Center for Medicare and Medicaid Services and the Commonwealth. To qualify for ICF level care an individual must have substantial difficulty in three major life areas and be diagnosed with an intellectual disability before the age of twenty-two. Most of the residents in these ICFs have an IQ of seventy or lower. Aa a general rule admission into a state operated ICF requires a court order. The state-operated ICFs provide extensive support and 24-hour per day care to their residents.

are open today. The four state centers that presently remain open are Ebensburg Center, Polk Center, Selinsgrove Center, and White Haven Center. The current census at these four-state operated ICFs is approximately 556 residents; these centers are under one third of their total capacity. Of the 556 residents, approximately 109 live at Polk Center and 49 live at White Haven Center. At the time DHS announced the closure of White Haven Center and Polk Center in 2019, there were 1,762 certified vacant beds at these state operated ICFs. Thus, the number of beds in these state-run facilities has for many years far exceeded the number of persons utilizing these state centers for their care, and presently two out of three ICF beds at these state facilities are empty.

The evidence also reveals that these demographic trends will continue or accelerate over time as the state-run ICF population ages. At present, the average age of the census is 63 years old, and the average length of time the residents have lived at an ICF is 43 years. Not considering the closure of Hamburg Center in 2018, there has been a 5-6% decline in census each year in the state operated ICFs, partly due to an average of 40 residents per year passing away across the four state centers.

It was against the backdrop of this remorseless demographic math, which favored consolidation of state facilities, that in August 2019 DHS decided it was no longer sustainable to maintain these four-state operated ICFs and announced the intended closure of Polk Center and White Haven Center. As discussed below, the

decision to close these facilities, while difficult, was the product of a thoughtful deliberative process that took into account budgetary constraints as well as the physical, mental, and emotional needs of Pennsylvania's entire intellectually disabled population. However, the announcement and implementation of this decision has been marked by some missteps and misunderstandings that have fostered this litigation and continue to persist among many of the families affected by this decision.

C. **The Proposed Closures of White Haven Center and Polk Center: Planning and Implementation.**

1. **The Closure Decision and Announcement**

Given this trend toward the deinstitutionalization of the intellectually disabled, as well as a host of factors considered by DHS, a decision was made in January of 2019 to close White Haven Center and Polk Center. According to Ms. Ahrens part of the rationale for this decision was the decline in census in these facilities, as well as the undeniable fact that these centers were operating at about one-third of the total capacity of 1,762 beds. Ms. Ahrens testified that the census of these ICFs was steadily declining between 5 and 6 percent every year, as residents passed away or moved into the community, and there were fewer court-ordered admissions to ICFs. Notably, while Pennsylvania initially had 17 or 19 state-operated ICFs, by 2019, only four remained—Selinsgrove Center, Ebensburg Center, Polk Center, and White Haven Center.

11

The statistics provided to the Court during the course of the hearing indicated that while there are about 57,000 individuals in Pennsylvania who qualify for ICF level of care, roughly 37,000 of those individuals have chosen placement in a home or community-based setting ("HCBS"). Approximately 2,250 residents are currently in ICF care, including a number of individuals who chose placement in privately operated ICFs, of which there are roughly 150-160 in the state of Pennsylvania. Ms. Ahrens testified that at present, all four state-operated ICFs are under roughly one-third of their total capacity, which is 1,762 certified beds. According to Ms. Ahrens, currently the total number of ICF residents in all four state-operated facilities is 556 residents, with Polk Center housing 109 residents, and White Haven Center housing 49 residents.[6] Indeed, the continuing demographic trend reflecting the steady reduction in the state-run ICF population is illustrated by a fact developed at the preliminary injunction hearing. Ms. Ahrens reported that under the current consolidation plan, the two state operated ICFs that will remain open, Ebensburg Center and Selinsgrove Center, have a total available bed space of approximately 960 beds. Yet, at present, the state-run ICF population is only 556 persons.

---

[6] We note that during the course of this hearing, different witnesses provided us with slightly different numbers regarding the current census at various ICFs in Pennsylvania. It was explained that these small census variations are a function of the fact that this census is a dynamic process which changes in minor ways from day to day. In our view, none of these minor daily census variations fundamentally alter our legal analysis in this case.

Therefore, even with these closures and consolidations the remaining centers will be operating at only 59% of their total capacity.

In addition to the decline in census of ICF residents, Ms. Ahrens testified to the financial aspects of keeping all four state-operated centers open. She explained that these centers are funded, in part, through the Medicaid program, which provides roughly 50% of the funding. This funding applies not only to the ICFs but to the HCBS waiver program as well. Ms. Ahrens stated that while the funding for each individual resident varies, the average cost per resident is approximately $582,000 annually for White Haven Center and $445,000 annually for Polk Center. In contrast, the average annual expense of care in a community setting or privately operated ICF is only a fraction of the average expense associated with these state centers. On average, a community or home placement costs $190,000 per resident per year. Placement of an intellectually disabled person in a privately run ICF, on average, entails an annual expense of $240,000.

These budgetary differences are, in part, a function of the high fixed costs associated with operating state facilities, particularly the Polk Center and White Haven Center. Polk Center is the oldest facility currently in operation in Pennsylvania having been established 125 years ago in 1898. While White Haven Center is a more modern facility, opened in 1956, the infrastructure costs to run these two facilities are substantial. Both White Haven Center and Polk Center are large

13

facilities encompassing several hundred acres of property. Both facilities have centralized infrastructure, including water, sewer, and HVAC systems. Thus, there is a significant cost to maintain this infrastructure regardless of how many residents the facility houses.

Due to these fixed costs, the budgetary impact of maintaining both centers in operation indefinitely into the future is significant and substantial. In 2019, when the decision was made to close Polk Center and White Haven Center, the Commonwealth estimated based upon the closure of the Hamburg Center in 2018 that it would save $45,000,000 to $46,000,000 annually through the closure and consolidation of these ICFs. This initial estimate assumed, based upon the state's experience with the closure of the Hamburg Center in 2018, that roughly half of the residents would choose to transfer into community settings. However, after learning that many residents of Polk Center and White Haven Center did not want to transfer into a community setting and would rather continue residing in an ICF setting, the state reevaluated its estimates. Nonetheless, even this revised estimate reveals that this proposed closure and consolidation would yield substantial savings for the Commonwealth totaling approximately $21,000,000 annually.

Yet these budgetary considerations, while significant, tell only part of the story. These closure decisions, while difficult, are not merely an exercise in budgetary arithmetic. These decisions were also influenced by considerations

14

relating to the health, safety, well-being, and social needs of Pennsylvania's disabled population.

At the outset, and significantly, it is undisputed that the Polk Center has experienced Legionella[7] in its water system for several years and has been unable to permanently fix this problem to date. Thus, for all of the residents at the facility, a cadre of approximately 109 people who represent two thirds of this putative plaintiff class, and particularly the largely aging population at Polk Center, many of whom suffer from a series of medical co-morbidities, the presence of legionella on campus constitutes a real and on-going health hazard.

A second medically grounded concern taken into consideration by the Commonwealth in making this decision was the quality of life of the residents of these facilities were they to remain open in the face of the steadily declining ICF population. Ms. Ahrens testified that if the current residents at these two centers who do not wish to leave were permitted to live out their days at these centers, their quality of life and quality of care would eventually diminish significantly. Ms. Ahrens noted that these centers currently offer activities and outings but would likely cease many of these activities and outings if only a handful of residents remained.

---

[7] According to the Center for Disease Control and Prevention (CDC) "legionella bacteria can cause a serious type of pneumonia (lung infection) called Legionnaires' disease." See https://www.cdc.gov/legionella /about/ index.html.

Moreover, and importantly, the medical services and specialists that are currently offered onsite would likely need to be outsourced to offsite providers, as it is likely that DHS would be unable to provide onsite specialist support if only a few residents remained. Ms. Ahrens also testified to the reality of staffing concerns that would need to continue to be met if only a few residents remained at these facilities. In addition, Ms. Ahrens opined that the quality of life of these residents is, in some part, bolstered by the presence of other residents and the activity going on within the center, which would significantly diminish as the number of residents declined over time.

Finally, and more fundamentally, there was a direct health and safety component to the annual estimated $21,000,000 budget savings that would accrue from the closure of Polk Center and White Haven Center. Ms. Ahrens testified that under state law, the money saved from the closures must be put into a fund that will be used by DHS exclusively to provide housing support, direct support to professionals, and other services to those with intellectual disabilities on the waiting list for services.[8] Thus, the moneys saved through these closures and consolidations must be used to assist the intellectually disabled community. Given this provision of state law, this closure analysis presented state officials with a stark choice: they could maintain Polk Center and White Haven Center at an annual estimated cost of

---

[8] 72 P.S. § 1729-E(b)(4) (Effective July 11, 2022).

$21,000,000 for the benefit of a shrinking population of 158 persons, or they could close these underpopulated centers, and reallocate $21,000,000 annually to address the needs of the 57,000 Pennsylvanians who struggle with intellectual disabilities. Viewed in this light, the closure and consolidation decision can be seen as a difficult, but necessary, exercise in providing the greatest good to the greatest number of those facing these disabilities.

Yet, while the decision to close and consolidate the state-run ICFs was thoughtful in its conception, it was flawed in its execution. Residents, guardians, and staff of the Polk Center and White Haven Center were first notified of the intended closures in August of 2019, some eight months after the initial closure decisions had been made. At the time of the announcement, the state was anticipating that the closures would take 36 months to complete. This projection was based upon the state's experience in 2018 with the Hamburg Center closure, which was estimated to take 18 months to complete and actually took 19 months to complete. While the initial closure date was projected for August of 2022, the current date for closure of these two facilities was later extended to November 30, 2022.

The Commonwealth's announcement of this closure and subsequent steps to implement and start the process was far from perfect. At the outset, the announcement of the closures to the staff, residents and their guardians at these two facilities was roughly eight months after the decision was made, and was made

without any warning or indication that the facilities would close. The nature of this announcement fostered concern, suspicion, and distrust among the affected families, distrust which persists to this day. In addition, the informational meetings that were held at each facility with guardians, family members, residents, and staff may have compounded this confusion and distrust. Several guardians of these residents testified that at these meetings, Commonwealth personnel emphasized information concerning transfers to group homes and community settings. While state officials testified that this emphasis was designed to comply with federal integration mandates and advise families of resources that were not available to many when the initial state placements were made, the state's emphasis on community placements led many families to believe that their loved ones would be forced into a community setting rather than given the option to continue to reside in an ICF. This was particularly troubling for many of the guardians who testified at the hearing, as many of their loved ones have resided in these ICF settings for several decades. Additionally, many of the guardians testified that their loved ones could not live in community settings because of their behavioral issues and mental capacities.

Kevin Dressler, the Director of ODP's Bureau of State Operated Facilities, testified that information about community settings was given to the residents at this initial informational meeting because many of them did not have such options available to them at the time they were admitted to these ICFs, and these residents

and their guardians were very familiar with the ICF setting. Thus, Mr. Dressler testified that the goal was to give guardians and residents information concerning all of options available to them, not just information regarding ICFs. However, it is clear that the information given at these initial meetings sparked outrage, confusion, and fear among guardians of the residents, as well as staff at the facilities, who voiced their concerns regarding some of the residents being placed into the community. These concerns persist to this day, despite the fact that the Commonwealth's current placement plan would allow for the transfer of all of the residents of Polk Center and White Haven Center into other state-run ICFs.

## 2. **Implementing a Transition Policy and the Transfer Process**

Like the decision to close and consolidate these facilities, the planning for patient placements during these closures was thoughtful in its conception, but uneven in its execution. Mr. Dressler, the state official charged with this transition responsibility, testified regarding the implementation of the closures and transitioning the residents to new facilities or community-based settings. Mr. Dressler has been employed by the Commonwealth for 30 years, with 23 years of experience at Selinsgrove Center as a residential manager, quality assurance director, and facility director at that ICF.[9] Mr. Dressler testified that while he was

---

[9] Given Mr. Dressler's longstanding affiliation with Selinsgrove Center, and his spouse's employment at the center, he was questioned at the preliminary injunction hearing regarding whether his affinity for Selinsgrove Center affected the decision-

not part of the decision to close White Haven Center and Polk Center, as the Director of the Bureau of State Operated Facilities he revised and implemented the transition discharge planning policy, which was finalized in March of 2021. (Def. Ex. 10). Mr. Dressler testified that there had been a policy in place, but this policy was revised following the closure of Hamburg Center to reflect changes based on lessons learned from that closure process.

As conceived by state officials, the transfer policy envisioned a carefully sequenced, collaborative, inter-disciplinary process, which entailed full participation by family and guardians, and was designed to achieve the least restrictive, medically appropriate placement for each resident, consistent with the family's desires. The transition discharge planning policy contains procedures for any transfer, whether it be transfer from an ICF to a community setting or transfer from one ICF to another. Regarding discharge from an ICF to another state-operated ICF, the policy provides for a three-phase discharge plan. First, after a guardian or resident makes the decision to transition to another facility, the resident's social worker must update or create discharge-related documents, including an Essential Lifestyle Plan ("ELP"); a One Page Summary ("OPS"); a State Center Discharge Planning Checklist; and other

---

making process, which closed Polk Center and White Haven Center but left Selinsgrove Center open. Mr. Dressler testified without contradiction that the decision regarding which centers to close was made by other, more senior state officials.

related documents as needed, which are then sent to the facility to which the person is transitioning. (Id., at 32-33). Mr. Dressler testified that several residents decided to transition to Selinsgrove Center or Ebensburg Center following the closure announcement, and those residents' documents were sent to those facilities in order to prepare for the transition process.

The second phase of the transition process is participation in a series of inter-disciplinary discharge planning meetings. (Id., at 35-39). Mr. Dressler testified that no single person makes transition decisions, and that family members are encouraged to be involved in this planning process. Indeed, some of the guardians who testified at the hearing spoke about the transition planning process. The policy provides for an initial discharge planning meeting, the goal of which is to establish the roles of each planning team member, an overview of the planning process, schedules and expectations for future planning meetings, and the process and schedule for visits. (Id., at 35-36). The policy then provides for bi-weekly update meetings and destination center visits, as well as a final discharge planning team meeting prior to the actual discharge. (Id., at 37-39). Throughout this process, each resident would be provided a discharge planning checklist in order to ensure that all of the resident's documents and information were up to date prior to discharge. (Def. Ex. 5)

The transition policy then calls for a final discharge planning team meeting to occur no more than two weeks prior to the resident's selected move date. (Def. Ex. 10, at 39). The policy states that at this time, a majority, if not all of the discharge planning checklist should be completed. Further, the resident's first post-discharge monitoring appointment should be scheduled at this time. (Id.) Finally, the policy provides for a final discharge preparation meeting 24-48 hours prior to the move date to ensure the logistics of the transfer and that personal possessions and medications of the resident are packed and marked. (Id., at 40). On the day of discharge, medications and personal property are inventoried, and a day-of-discharge checklist is completed. (Id., at 42). Once an individual is discharged to a new facility, under the Commonwealth's plan a period of post-discharge monitoring takes place. Mr. Dressler described this process as a sort of "wellness check" to ensure that the resident is getting acclimated to his or her new facility and to address any concerns regarding the resident's wellbeing. The first meeting takes place one week after the discharge, with subsequent meetings over the next 30, 60, 90, 180, and 365 days. This final phase of the transfer process was described as a state-of-the-art practice by the defendant's expert witness, Dr. Mark Diorio.

Both Ms. Ahrens and Mr. Dressler testified that the planning of a transfer is individualized and tailored to the needs of the specific resident. Included in the transfer planning are considerations such as the individual's medical needs;

proximity to loved ones and the ability to facilitate visits with loved ones; and the opportunity of familiar staff to transfer to the new facility or to have familiar staff visit with the resident during the transition process. Mr. Dressler also testified that he attends meetings at both Polk Center and White Haven Center every other week since residents have transferred to other facilities, and he addresses any concerns that are brought by the residents, their guardians, or staff. He testified that to his knowledge, no resident has suffered physical harm as a result of a transfer.

Although, the transition planning procedures represent a carefully considered approach to the challenging issue of moving this aging and fragile population while minimizing transfer trauma, in practice the transfer procedures have not always fully met policy expectations in the eyes of affected families. With respect to this discharge planning process, several of the guardians had concerns throughout the process. These concerns included errors on some of the discharge documents, as well as concerns about the destination center visits. Unfortunately, and beyond any person's control, some destination center visits were impeded by the COVID-19 pandemic, which restricted access to areas of the centers' facilities. These restrictions led to concerns regarding the residential areas at these facilities— Selinsgrove Center and Ebensburg Center—as well as a general concern regarding

COVID cases at the facilities.[10]   With respect to the plaintiffs and putative class members in this case, several guardians also expressed concerns regarding the adequacy of care that their loved ones would receive at Selinsgrove Center and Ebensburg Center as opposed to Polk Center and White Haven Center, as well as concerns about trauma resulting from a transfer generally. Indeed, many of the witnesses who testified at the hearing, both expert witnesses and fact witnesses, testified to the phenomenon of "transfer trauma." The consensus was that individuals with profound and severe intellectual disabilities and autism, like the plaintiffs and putative class members here, have a high risk for trauma when taken out of familiar environments and placed in an unfamiliar environment. Additionally, several guardians testified regarding their concern that their loved ones would end up in a psychiatric ward if the receiving facility was unable to treat or control their behaviors.

Mr. Dressler testified that while there are some differences between the amenities available at the four state-operated centers, the core regulations under which the facilities operate are the same, as is the training of staff. Additionally, the

---

[10] While the unpredictable course of the coronavirus pandemic has doubtless been a further complicating factor in the implementation of these transfers, standing alone COVID concerns do not clearly militate against further transfers since the evidence indicates that, over time, all state facilities have experienced episodes of COVID infection. Indeed, the highest rate of COVID fatalities has been reported at White Haven Center, one of the facilities slated for closure.

Commonwealth's expert witness, Dr. Mark Diorio, visited each of the four facilities

and opined that all four facilities, including Selinsgrove Center and Ebensburg

Center, have appropriate services to meet the needs of individuals with profound

intellectual disabilities.[11] Furthermore, state officials have pledged to provide

comparable resident services at Ebensburg Center and Selinsgrove Center, as

specific needs are identified during this transition process.

---

[11] Dr. Diorio's participation in this hearing was the subject of some belated
controversy between the litigants. This controversy stemmed from the fact that the
plaintiffs asserted that Dr. Diorio's expert report was released to them on or about
June 7, 2022, shortly after the deadline for expert report supplementation. According
to the plaintiffs this belated disclosure of the Diorio report was particularly
prejudicial since the report was disclosed after the supplementation deadline, and
was not a proper supplemental report since Dr. Diorio had not previously issued an
initial report. Therefore, the plaintiffs sought to preclude this evidence entirely.
Notably, the plaintiffs who had possessed the Diorio report for more than four
months by the time of the preliminary injunction hearing first chose to raise these
discovery issues on the eve of the hearing itself. (Doc. 147).

Upon consideration we exercised our discretion and denied this request to
completely preclude Dr. Diorio's report and testimony for reasons that are set forth
in greater detail in a separate opinion, reasoning that we would benefit from
obtaining all relevant evidence and finding that the plaintiffs had not justified the
most severe of sanctions, preclusion of evidence, which had been disclosed to them
months earlier. Nonetheless, we authorized the plaintiffs to elicit expert testimony
from their witnesses critiquing the Diorio report, and the plaintiffs took full
advantage of this opportunity at the preliminary injunction hearing.

Moreover, having conducted this hearing, we find that Dr. Diorio's testimony was
merely corroborative of the evidence provided by state officials, which we have
credited. Therefore, admission of the Diorio testimony and report did not materially
alter the quantum of proof here and we would have reached the same conclusions
with respect to these motions even in the absence of this contested testimony.

Thus, on balance the evidence reveals that the four remaining state centers are highly regulated and provide comparable levels of care. Moreover, while the centers are not identical in their amenities the state is committed, as it must be, to ensuring that the care and services provided at Ebensburg Center and Selinsgrove Center meet the same high standards formerly provided to residents at Polk Center and White Haven Center.

### 3. The Transfer of Residents out of Polk Center and White Haven Center

Following the closure announcement, these families and residents were put to the difficult decision of placing their loved ones in a community setting or transferring them to either to a private ICF or to another state-operated ICF. According to Mr. Dressler, approximately 40 to 50 residents of the 158 total residents at Polk Center and White Haven Center have chosen to be placed into a community setting and have been placed on the state's Planning List to be moved into a community setting; 77 residents have firmly indicated that they do not wish to move from either White Haven Center or Polk Center; and another subset of residents and guardians have not yet decided where they would like their loved one to be transferred. In June of 2022, Mr. Dressler sent a letter to all families and/or guardians who had not yet made a decision, urging them to make a final decision as to where their loved one should be transferred when Polk Center and White Haven Center close. Unfortunately, this correspondence, which referred to the closure

decision as final despite the ongoing litigation, failed to have its intended effect of encouraging collaboration. Instead, for some families it simply increased their enmity, since they viewed the letter as dismissive of the concerns they raised in this lawsuit.

Currently, the Commonwealth has announced an aspirational closure date for these facilities of November 30, 2022. The evidence, however, convincingly demonstrates that this is not a realistic closure date, and the Commonwealth conceded as much during the closing arguments on the pending motions. Given that many residents have not yet been transferred, and many more have not yet made a decision and or even begun the transition planning process, this November 30 deadline simply is not feasible if the Commonwealth conducts the collaborative, inter-disciplinary transfer process, which it has committed to undertake for each resident in its care.

Indeed, every Commonwealth witness said as much. Thus, Ms. Ahrens and Mr. Dressler conceded that adhering to this deadline would be very difficult. Dr. Diorio, in response to a hypothetical posed by the Court, indicated that it would be "extremely difficult" to complete these transfers within the one-month time period that remains. Accordingly, all planning moving forward must operate on the assumption which was acknowledged by Commonwealth counsel that at least 60 to 90 days will be necessary to fully engage in this interactive process.

## D. **This Litigation: Class Certification and Injunctive Relief**

Following the closure announcement, several residents or their guardians expressed a desire to remain at White Haven Center and Polk Center, with some refusing to even begin the transition planning process. This appeared to be, at least in part, due to the confusion surrounding placement of individuals following the closure; as we have noted, many residents and guardians were under the impression that the residents would be forced to move into a community setting rather than an ICF. Thus, the instant lawsuit was filed on January 29, 2020, by 13 named plaintiffs—residents or guardians/decisionmakers of residents who currently reside at Polk Center or White Haven Center—as a proposed class action on behalf of themselves and others similarly situated. (Doc. 1). The plaintiffs brought this action against Governor Tom Wolf; Theresa Miller, the Secretary of the DHS; Kristin Ahrens, the Deputy Secretary of ODP; Sue Rodgers, the facility director at Polk Center; Mark Georgetti, the facility director at White Haven Center; DHS; ODP; Polk Center; and White Haven Center.

The complaint asserts claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, the Rehabilitation Act ("RA"), 29 U.S.C. § 794(a), the Medical Assistance Program authorized by 42 U.S.C. § 1396 *et seq.*, and the United States Constitution. These claims stem from the premise announced by the United States Supreme Court in Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581

(1999), in which the Court held that individuals with intellectual disabilities have a right under the ADA to receive services in the least restrictive setting. As to these plaintiffs and putative class members, the complaint alleged that closing these two ICFs and placing these individuals in community-based settings violates the ADA because for these individuals, the least restrictive setting is either Polk Center or White Haven Center.

Read as a whole, the principal thrust of the plaintiffs' complaint was their belief that the state closure plans were forcing families to make a hard and inappropriate choice to place their loved ones, who require a high degree of ICF care, in less secure and medically inappropriate community or home environments. However, in passing the plaintiffs seemed to acknowledge in their complaint that this transfer process entailed a broader array of choices and options since the plaintiffs also sought the opportunity "to receive treatment in accordance with the independent recommendations of the multidisciplinary evaluation, either at his/her current residence, another state operated ICF/IID facility, or non-ICF/IID certified setting, as each Plaintiff deems appropriate." (Doc. 1, ¶ 128(b)(ii)). Thus, the relief sought by the plaintiffs, in part, involved precisely what the Commonwealth is currently offering to do; namely, to work with families to either facilitate (1) a community placement; (2) a transfer to a private ICF; or (3) a transfer to one of the remaining state operated ICFs.

The plaintiffs then filed a motion to certify a class. (Doc. 19). This motion asserted that there were, at that time, 248 residents of Polk Center and White Haven Center that were opposing the closure of the centers and placement into a community setting. Prior to the motion for class certification, the defendants had filed a motion to dismiss the complaint, and thus, the district court stayed the motion for class certification pending resolution of the motion to dismiss. (Doc. 65). The motion to dismiss was subsequently denied. (Docs. 71, 72).[12]

Following the denial of the motion to dismiss, the plaintiffs filed their first motion for a preliminary injunction. (Doc. 81). The plaintiffs averred that the Commonwealth defendants began pressuring residents at Polk Center and White Haven Center to begin the transition planning process, and that the state had doubled down on its efforts to begin moving residents out of Polk Center and White Haven Center at that time. (Doc. 82). The motion further asserted that staffing levels at the facilities were decreasing, which led to a concern that the residents were not being

---

[12] We note that the denial of this motion to dismiss does not in any way dictate the outcome of our review of the plaintiffs' motions for preliminary injunction. At the motion to dismiss stage the court is simply tasked with determining on the face of the complaint whether the plaintiff has stated a plausible claim for relief. In contrast, when we are examining motions for preliminary injunction we must go beyond the pleadings and delve into the facts. We must then assess whether the plaintiffs' claims go beyond the merely plausible and ascertain whether the plaintiff can show a substantial likelihood of success on the merits. Additionally, we are mandated to weigh and balance the competing interest of the parties and the public, while also evaluating the degree of harm which may flow from the grant or denial of extraordinary interim relief.

or would not be adequately cared for. (Id.) The plaintiffs requested that the Court direct the defendants to provide adequate staff at Polk Center and White Haven Center; to cease pushing the closure date of August 2022; and to stay consideration of all moves, even of those residents who had consented, until an investigation was undertaken to determine if such consent had been unduly coerced. (Id.)

This motion was briefed extensively. (Docs. 82, 92, 98). Additionally, the plaintiffs filed a motion to expedite a ruling on the class certification motion, which was also extensively briefed. (Docs. 114, 115, 117, 118). In the interim, this case was referred to mediation (Doc. 93), although mediation efforts were ultimately unsuccessful.[13] Before the Court ruled on the motion for a preliminary injunction, a second motion for a temporary restraining order and preliminary injunction was filed. (Doc. 125). This second motion asserted that residents of Polk Center and White Haven Center and their guardians/decisionmakers had been informed that they must choose a location to be transferred to—Selinsgrove Center or Ebensburg Center—and that all residents were to be moved by November 30, 2022. The motion

---

[13] Counsel for the plaintiffs attested to a side agreement that was allegedly reached during these mediation efforts, which entailed the Defendants' agreement to halt any transfers of named plaintiffs or proposed class members who had been identified during the pendency of the preliminary injunction motion. While we noted for counsel that the mediator's report of an unsuccessful mediation barred us from considering any motion to enforce such an agreement if one had been reached, we further noted that since the undersigned was assigned to this case, we have ensured that any transfers of named plaintiffs or putative class members who had been identified were stayed pending the resolution of the pending motions.

averred that the residents did not consent to such a transfer, as they believed these two state centers were not the least restrictive setting and could not adequately meet their needs. Similarly, this motion was extensively briefed. (Docs. 127, 130, 134).

The case was ultimately assigned to the undersigned on September 20, 2022. (Doc. 135). Following the assignment of this case to the undersigned, the plaintiffs filed a motion to expedite rulings on the pending motions for preliminary injunction and temporary restraining order. (Doc. 138). Realizing the exigency of the pending motions, with the November 30 closure date rapidly approaching, we scheduled a conference with counsel on September 27, 2022, to discuss scheduling of these matters. (Doc. 139). Thereafter, we granted the motion to expedite in part, and ordered counsel to provide us with the earliest possible dates for an evidentiary hearing on the pending motions.[14] (Doc. 141). We subsequently scheduled a hearing to begin on October 18, 2022. (Dc. 143).

The hearing took place over a period of seven days. During this time, we heard testimony from four expert witnesses retained by the plaintiffs. Much of this expert testimony focused upon the notion that wholesale placement of the plaintiffs and

---

[14] During this conference, we were informed that there had been a putative class member identified that was scheduled to be moved from Polk Center on September 28, 2022. Given that we had received information that this individual was a putative class member and did not consent to be moved, we stayed this transfer pending the resolution of the pending motions for class certification and for preliminary injunctive relief. (Doc. 140).

other severely disabled residents of Polk Center and White Haven Center into community settings would be inappropriate. This testimony had limited value for us since it is clear that the Commonwealth's current placement policy does not force this stark binary choice upon these residents. Instead, the Commonwealth is committed to working with families to either facilitate (1) a community placement; (2) a transfer to a private ICF; or (3) a transfer to one of the remaining state operated ICFs. Nonetheless, the plaintiffs' experts also provided a critique of the overall transfer policy and planning, which has helped inform our analysis of these motions. In particular, these experts described the phenomenon of transfer trauma, a condition that is especially grave for the intellectually disabled, who often rely upon continuity and routine for their well-being.

We also received testimony from many guardians of named plaintiffs and putative class members.[15] These family members underscored the human dimension of this process for their loved ones. Their testimony reflected familial devotion to these disabled individuals, which was inspiring, and in some instances spanned generations. We learned of the many trials and triumphs experienced by the residents at Polk Center and White Haven Center and their families over the years. While each family's story was unique, several common elements emerged from the testimony

---

[15] The testimony of the guardians and family members is summarized and attached as Appendix A.

of these witnesses. Thus, in many instances family members and guardians continued to harbor a fear that their loved ones would be placed in a community setting that they were ill equipped to address. This was a common concern despite the fact that the evidence revealed the state has the ICF capacity to fully accommodate all Polk Center and White Haven Center residents even after the closure of these facilities. The families also provided a sharp critique of certain aspects of the transition process, underscoring the need for greater communication and transparency. Further, these witnesses voiced their fears that their family members would suffer from transfer trauma if Polk Center and White Haven Center were closed, and we learned that for the sake of their loved ones all family and guardians would prefer that they remain where they currently reside.

Finally, we also heard testimony from the Commonwealth's witnesses, including their independent expert and the state officials tasked with the difficult job of overseeing this transition. The hearing concluded on October 28, 2022.

After a thorough consideration of all of the evidence presented, and recognizing that this situation presents a series of intractable challenges for all, challenges thrust upon the parties by the imperfect nature of the available alternatives, for the following reasons, we will grant the motion for class certification but deny the motions for a preliminary injunction.

III.   **Discussion**

    A. **The Development of the Law of Disability Rights: Olmstead and its Progeny.**

Any evaluation of a motion for preliminary injunction necessarily involves a predictive assessment of the merits of the moving party's legal claims. So it is here. Accordingly, we begin our consideration of these motions with an examination of the contours of federal disability law and how this law has developed over the past forty years.

The national trend toward the deinstitutionalization of individuals with intellectual disabilities in the 1960s and 1970s inspired legislative initiatives by Congress, including the enactment of the Rehabilitation Act ("RA") and the Americans with Disabilities Act ("ADA"). See 42 U.S.C. § 12132, 29 U.S.C. § 794(a). Taken together, these two statutes largely frame the discussion of disability rights in federal court. On this score, it has been noted that:

> The ADA largely mirrors Section 504 of the RA, which states as follows:
>
>> No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.
>
> 29 U.S.C. § 794(a). We have construed the provisions of the RA and the ADA in light of their close similarity of language and

purpose. <u>See Helen L. v. DiDario</u>, 46 F.3d 325, 330–32 (3d Cir.), <u>cert. denied</u>, 516 U.S. 813, 116 S.Ct. 64, 133 L.Ed.2d 26 (1995).

The ADA and RA's anti-discrimination principles culminate in their integration mandates, which direct states to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). "[T]he most integrated setting appropriate to the needs of qualified individuals with disabilities" is "a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. pt. 35, App. A, p. 450 (1998). In short, where appropriate for the patient, both the ADA and the RA favor integrated, community-based treatment over institutionalization.

<u>Frederick L. v. Dep't of Pub. Welfare of Com. of Pennsylvania</u>, 364 F.3d 487, 491–92 (3d Cir. 2004).

This legislation, in turn, led to the seminal Supreme Court decision in <u>Olmstead v. L.C. ex rel. Zimring</u>, 527 U.S. 581 (1999). In <u>Olmstead</u>, the plaintiffs—two intellectually disabled individuals who had been institutionalized in the early 1990s—brought suit under the ADA to challenge their continued institutionalization. <u>Id.</u> at 593. The plaintiffs asserted that their continued placement in an institution, rather than a community-based setting, constituted discrimination based on their disability in violation of Title II of the ADA. <u>Id.</u> at 594-95.

The Supreme Court held that continued placement in an institutional setting, when such placement is medically unjustified, constitutes disability discrimination in violation of the ADA. <u>Id.</u> at 597. In doing so the Court first recognized two

judgments that inevitably led to the conclusion that clinically unjustified isolation is

a form of discrimination:

> First, institutional placement of persons who can handle and benefit
> from community settings perpetuates unwarranted assumptions that
> persons so isolated are incapable or unworthy of participating in
> community life. Cf. Allen v. Wright, 468 U.S. 737, 755, 104 S.Ct. 3315,
> 82 L.Ed.2d 556 (1984) ("There can be no doubt that [stigmatizing
> injury often caused by racial discrimination] is one of the most serious
> consequences of discriminatory government action."); Los Angeles
> Dept. of Water and Power v. Manhart, 435 U.S. 702, 707, n. 13, 98
> S.Ct. 1370, 55 L.Ed.2d 657 (1978) (" 'In forbidding employers to
> discriminate against individuals because of their sex, Congress
> intended to strike at the entire spectrum of disparate treatment of men
> and women resulting from sex stereotypes.' ") (quoting Sprogis v.
> United Air Lines, Inc., 444 F.2d 1194, 1198 (C.A.7 1971)). Second,
> confinement in an institution severely diminishes the everyday life
> activities of individuals, including family relations, social contacts,
> work options, economic independence, educational advancement, and
> cultural enrichment. See Brief for American Psychiatric Association et
> al. as Amici Curiae 20–22. Dissimilar treatment correspondingly exists
> in this key respect: In order to receive needed medical services, persons
> with mental disabilities must, because of those disabilities, relinquish
> participation in community life they could enjoy given reasonable
> accommodations, while persons without mental disabilities can receive
> the medical services they need without similar sacrifice. See Brief for
> United States as Amicus Curiae 6–7, 17.

Id. at 600-01. The Court went on to note that the Developmentally Disabled

Assistance and Bill of Rights Act of 1975 provides that "[t]he treatment, services,

and habilitation for a person with developmental disabilities . . . *should be* provided

in the setting that is the least restrictive of the person's personal liberty." Id. at 599

(quoting 42 U.S.C. § 6010(2)). In doing so the Court explicitly acknowledged the

national trend towards deinstitutionalization and integration of disabled persons into

society whenever such integration is medically feasible. Thus, the Court concluded that under the ADA, states are required to provide community-based services "when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." Id. at 607. The Olmstead Court, however, recognized another undeniable truth that "[f]or [some] individuals, no placement outside the institution may ever be appropriate." Id. at 605. Indeed, the Court noted that absent a reasonable assessment from a professional indicating that a person is eligible for a community-based program, "it would be inappropriate to remove a patient from the more restrictive setting." Id. at 602.

Thus, Olmstead recognized a statutory right on the part of the disabled to be housed and treated in the least restrictive, medically-appropriate setting. However, this statutory right is narrowly framed and in practice is only triggered when the following conditions are satisfied:

> [1] the State's treatment professionals have determined that community placement is appropriate, [2] the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and [3] the placement can be reasonably accommodated, taking into account [a] the resources available to the State and [b] the needs of others with ... disabilities.

Doxzon v. Dep't of Hum. Servs., No. 1:20-CV-00236, 2020 WL 3989651, at *10 (M.D. Pa. July 15, 2020) (quoting Frederick L., 364 F.3d at 492 ). At bottom,

38

Olmstead and its progeny recognize a right to patient autonomy, which encompasses an ability to receive medically appropriate care in the least restrictive, reasonably available setting. Accordingly, Olmstead confers to the disabled a conditional ability to dictate the level of their care, consistent with sound medical judgment and available resources. However, nothing in Olmstead endorsed the notion advanced here that disabled persons have an unqualified right to dictate the precise terms, conditions, and venue for their care and treatment. Quite the contrary, Olmstead expressly recognized "the State generally may rely on the reasonable assessments of its own professionals in determining whether an individual 'meets the essential eligibility requirements' for habilitation in a community-based program." Olmstead, 527 U.S. at 602. Likewise the state is entitled "to show that, in the allocation of available resources, immediate relief for the plaintiffs would be inequitable, given the responsibility the State has undertaken for the care and treatment of a large and diverse population of persons with mental disabilities." Id. at 604.

These principles apply with particular force to state decisions to transfer disabled individuals between comparable facilities. In Pennsylvania, the discretion to transfer intellectually disabled persons between institutions providing a comparable level of care is expressly recognized by statute, specifically, 50 Pa. Stat. Ann. § 4416(a) which provides that: "The department may, upon application by the

director of any state operated facility, transfer a mentally disabled person to any other state operated facility under its jurisdiction."

Nonetheless, in the instant case, the plaintiffs invite us to take an unprecedented action. In particular, they urge us to enjoin the state from engaging in transfers of patients between state operated ICFs and ask us to dictate that the state maintain four such facilities indefinitely despite the demographic evidence which suggests that such a course would be improvident. In urging us to follow this course, the plaintiffs encourage us to consider what some courts have called an "obverse Olmstead" argument—the contention that intellectually disabled persons have the right to remain in an institution, and specifically the institution of their choice, under the ADA rather than be forced to live in a community setting. This argument was rejected by one court in this circuit in Sciarrillo ex rel. St. Amand v. Christie, 2013 WL 6586569 (D.N.J. Dec. 13, 2013). In Sciarrillo, the plaintiffs challenged New Jersey's decision to close two state-run residential facilities for the developmentally disabled. Id. at *1. The plaintiffs asserted that they were forced to choose between being placed in a community setting or at another facility over 100 miles from the other centers. Id. The plaintiffs relied on Olmstead for the proposition that they had the right to oppose the state's decision to move them from an institutional setting to a community-based setting. Id.

The district court rejected this argument, holding that placement in a community setting did not qualify as discrimination under the ADA. Id. at *3-4. On this score, the court joined other federal district courts in rejecting the "obverse Olmstead" argument:

> Plaintiffs' interpretation of Olmstead is untenable. Simply put, "there is no basis [in Olmstead ] for saying that a premature discharge into the community is an ADA *discrimination* based on disability." Richard S. v. Dep't of Developmental Servs. of the State of Cal., No. 97–cv–219, 2000 WL 35944246, at *3 (C.D. Cal. Mar.27, 2000) (emphasis in original). Indeed, "[t]here is no ADA provision that *providing* community placement is a discrimination. It may be a bad medical decision, or poor policy, but it is not discrimination based on disability." Id. (emphasis in original). This Court will therefore join the numerous other federal courts have rejected similar "obverse Olmstead" arguments in circumstances where a State has decided to close treatment facilities for the developmentally disabled or relocate such disabled individuals to community settings. See, e.g., Richard C. ex rel. Kathy B. v. Houstoun, 196 F.R.D. 288, 292 (W.D. Pa. 1999) (rejecting interpretation of Olmstead identical to the one proffered in this case and finding that "it does not logically follow [from Olmstead ] that institutionalization is required if any of the three Olmstead criteria is not met"); Ill. League of Advocates for the Developmentally, Disabled v. Quinn, No. 13–cv–1300, 2013 WL 3168758, at *5 (N.D. Ill. June 20, 2013) (noting, in case brought to enjoin the State of Illinois from closing development centers, that "[u]njustified isolation constitutes discrimination under the ADA, but" Olmstead does not mean the converse is true).

Id. at *4.

More fundamentally, the relief sought here—a federal court order directing the state to operate two ICF centers which it has determined should be closed even though there are available ICF beds in other state-run facilities—is acknowledged

by all to be entirely unprecedented. Thus, the plaintiffs have candidly admitted that no court has adopted this invitation and granted this form of relief in the past. Moreover, the practical experience described by multiple experts in the course of the preliminary injunction hearing strongly suggested that this proposal runs contrary to the growing state practice throughout the nation. Thus, Ms. Ahrens testified to the fact that eleven or twelve states no longer operate any ICF centers and attested to her personal experience with ICF closures both in Oregon and previously in Pennsylvania. Similarly, Mr. Thomas and Dr. Diorio described the closure of state ICFs in New Jersey and Virginia.

More fundamentally, the idea that <u>Olmstead</u> and its progeny implicitly authorize federal courts to enjoin the closure of specific state ICFs when other comparable facilities are available within the state to disabled persons has been consistently rebuffed by the courts. Thus, other federal circuit and district courts have rejected this argument, holding that a transfer from an institution to a community placement does not qualify as discrimination under the ADA. <u>See e.g.,</u> <u>Ricci v. Patrick</u>, 544 F.3d 8 (1st Cir. 2008) (denying request to reopen consent decree to enjoin state transfers of residents from one state facility to another as part of a closure plan); <u>Lane v. Kitzhaber</u>, 2014 WL 2807701, at *3 (D. Or. June 20, 2014) ("[N]either the ADA nor the Rehabilitation Act creates a right to remain in the program or facility of one's choosing"); <u>D.T. v. Armstrong</u>, 2017 WL 2590137, at

*7-8 (D. Idaho June 14, 2017) (denying a preliminary injunction and holding that the plaintiffs were not likely to succeed on their claim that the closure of an ICF and placement of a resident into a community setting "would violate the integration mandate of the ADA and Rehabilitation Act and result in unlawful discrimination").

Further, while a number of these cases dealt with transfers from an ICF to a community-based setting, our research has not yielded any authority, and the parties have not provided us with any authority that recognizes an ADA violation based on the transfer of an intellectually disabled person from one state-operated ICF to another comparable ICF. Indeed, in our view, it would seem unlikely that such a transfer—an ICF to another ICF—would violate the ADA if the transfer from an ICF to a community setting has been held not to violate the ADA.

Thus, the relief sought here is truly extraordinary. It would contradict and contravene existing state law, which authorizes the transfer of patients between state-run ICFs. It would go beyond anything expressly or implicitly authorized by Olmstead, and it would fly in the face of a rising tide of case law that has refused to enjoin states from closing institutions and transferring persons to other comparable facilities.

It is against this legal and factual backdrop that we now consider the pending motions for class certification and preliminary injunction.

43

## B. <u>Class Certification Standard of Review</u>

Turning first to the question of class certification, it is well settled that:

> The class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." <u>Califano v. Yamasaki</u>, 442 U.S. 682, 700–701, 99 S.Ct. 2545, 61 L. Ed. 2d 176 (1979). In order to justify a departure from that rule, "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." <u>East Tex. Motor Freight System, Inc. v. Rodriguez</u>, 431 U.S. 395, 403, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977) (quoting <u>Schlesinger v. Reservists Comm. to Stop the War</u>, 418 U.S. 208, 216, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974)).

<u>Wal-Mart Stores, Inc. v. Dukes</u>, 564 U.S. 338, 348–49 (2011). Because class action litigation is an exception to the general rule favoring litigation of individual claims by specific plaintiffs: "[t]o determine whether the putative class has satisfied . . . all applicable Rule 23 [class action certification] requirements[], the District Court must conduct a 'rigorous analysis' of the evidence and arguments presented." <u>In re Lamictal Direct Purchaser Antitrust Litig.</u>, 957 F.3d 184, 190–91 (3d Cir. 2020).

Motions for class certification are governed by Rule 23 of the Federal Rules of Civil Procedure, and entail a multi-faceted analysis. At the outset, the party seeking class certification must satisfy the threshold requirements of Rule 23(a) which sets the following four prerequisites for class certification:

(a) **Prerequisites.** One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

    (1) the class is so numerous that joinder of all members is impracticable;

**(2)** there are questions of law or fact common to the class;

**(3)** the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

**(4)** the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

Each of these four threshold requirements—numerosity, commonality, typicality and adequacy—are, in turn, defined by case law to require specific and exacting showings. For example, with respect to Rule 23's numerosity requirement, the Court of Appeals counsels us that:

> Under Rule 23, the proposed class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). This "rule prevents putative class representatives and their counsel, when joinder can be easily accomplished, from unnecessarily depriving members of a small class of their right to a day in court to adjudicate their own claims." Marcus, 687 F.3d at 594–95. As with every Rule 23 requirement, plaintiffs must show the class is numerous enough by a preponderance of the evidence. Steak 'n Shake, 897 F.3d at 483–84. We presume joinder is impracticable when the potential number of class members exceeds forty. Id. at 486. This is a guidepost: showing the number of class members exceeds forty is neither necessary nor always sufficient. Marcus, 687 F.3d at 595. "The text" of Rule 23(a)(1) is "conspicuously devoid of any numerical minimum required for class certification." In re Modafinil Antitrust Litig., 837 F.3d 238, 249 (3d Cir. 2016). But while a class of forty-one does not automatically satisfy Rule 23(a)(1), a putative class that size faces a relaxed burden under our precedent. By contrast, the "inquiry into impracticability should be particularly rigorous when the putative class consists of fewer than forty members." Id. at 250.

In recent opinions, we have given the numerosity requirement "real teeth." Steak 'n Shake, 897 F.3d at 484. When plaintiffs cannot directly identify class members, they "must show sufficient circumstantial evidence specific to the products, problems, parties, and geographic areas actually covered by the class definition to allow a district court to make a factual finding. Only then may the court rely on 'common sense' to forgo precise calculations and exact numbers." Marcus, 687 F.3d at 596. And "where a putative class is some subset of a larger pool, the trial court may not infer numerosity from the number in the larger pool alone." Hayes v. Wal-Mart Stores, Inc., 725 F.3d 349, 358 (3d Cir. 2013).

Allen v. Ollie's Bargain Outlet, Inc., 37 F.4th 890, 895–96 (3d Cir. 2022).

Further:

A class may  be certified only  if "there  are  questions  of  law  or fact common to   the   class." Fed.   R.   Civ.   P.   23(a)(2). "Commonality requires  the  plaintiff  to  demonstrate  that  the  class members have suffered the same injury. This does not mean merely that they have all suffered a violation of the same provision of law." Dukes, 564 U.S. at 349–50, 131 S.Ct. 2541 (citation and quotation marks omitted).    Instead,    the    claims    "must    depend    upon a common contention." Id. at 350, 131 S.Ct. 2541. "That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Id. This test ensures that the "claims can productively be litigated at once." Id. When deciding whether the class raises a common question, "the court cannot be bashful. It must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits—including disputes touching on elements of the cause of action." Marcus, 687 F.3d at 591 (quotation marks omitted).

Id., at 900. With respect to this commonality requirement, "[w]hat matters to class certification . . . is not the raising of common 'questions'—even in droves— but rather, the capacity of a class-wide proceeding to generate common *answers* apt

46

to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." <u>Ferreras v. Am. Airlines, Inc.</u>, 946 F.3d 178, 185 (3d Cir. 2019) (quoting <u>Wal-Mart Stores, Inc.</u>, 564 U.S. at 350)) (emphasis in original).

Moreover, under Rule 23(a), the party seeking to certify a class action must show both that the claims of the representative plaintiff are typical of those of the class as a whole, and that the representative party will adequately advance and protect the interests of this putative class. These two factors are frequently considered together since as a practical matter, oftentimes "[t]he adequacy-of-representation requirement 'tend[s] to merge' with the commonality and typicality criteria of Rule 23(a)." <u>Amchem Prod., Inc. v. Windsor</u>, 521 U.S. 591, 626, 117 S. Ct. 2231, 2251, 138 L. Ed. 2d 689 n. 20 (1997). "The requirement of typicality is imposed to prevent certification when 'the legal theories of the named plaintiffs potentially conflict with those of the [class] absentees.'" <u>Boley v. Universal Health Servs., Inc.</u>, 36 F.4th 124, 133 (3d Cir. 2022). Moreover,

> To avoid conflict, typicality seeks to ensure "the interests of the class and the class representatives are aligned 'so that the latter will work to benefit the entire class through the pursuit of their own goals.' " <u>Newton</u>, 259 F.3d at 182–83 (quoting <u>Barnes v. Am. Tobacco Co.</u>, 161 F.3d 127, 141 (3d Cir. 1998)). In evaluating typicality, we focus on whether the class representatives' legal theory and claim, or the individual circumstances on which those theories and claims are based, are different from those of the class. <u>In re Schering Plough Corp. ERISA Litig.</u>, 589 F.3d 585, 597–98 (3d Cir. 2009).

Id.
!

In addition, Rule 23(a) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). In practice, the primary purpose of Rule 23(a)'s adequacy requirement is:

> "[T]o determine whether the named plaintiffs have the ability and the incentive to vigorously represent the claims of the class." In re Cmty. Bank of N. Va. Mortg. Lending Pracs. Litig., 795 F.3d 380, 393 (3d Cir. 2015). Thus, for a class representative to be adequate, she must "have a minimal degree of knowledge about the case and have no conflict of interest with class counsel and members of the class[.]" In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig., 967 F.3d 264, 272 (3d Cir. 2020) (cleaned up).

Duncan v. Governor of Virgin Islands, 48 F.4th 195, 209 (3d Cir. 2022).

However, satisfying these four threshold prerequisites for class certification is only the first step in the multi-faceted analysis required by law. Once Rule 23(a)'s initial class certification criteria are met, the Court must also consider the provisions of Rule 23(b), which sets further limits on class certification, stating that:

**(b)** A class action may be maintained if Rule 23(a) is satisfied and if:

**(1)** prosecuting separate actions by or against individual class members would create a risk of:

**(A)** inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

**(B)** adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other

members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

**(2)** the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

**(3)** the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

> **(A)** the class members' interests in individually controlling the prosecution or defense of separate actions;

> **(B)** the extent and nature of any litigation concerning the controversy already begun by or against class members;

> **(C)** the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

> **(D)** the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b).

Parties seeking class certification frequently rely upon Rule 23(b)(3)'s "predominance" requirement to satisfy their burden of proof and persuasion under Rule 23(b). " 'To assess predominance, a court ... must examine each element of a legal claim through the prism of Rule 23(b)(3)' by determining whether each element is 'capable of proof at trial through evidence that is common to the class rather than individual to its members.' " In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig., 967 F.3d 264, 269 (3d Cir. 2020)

(citations omitted). Therefore, "[t]he predominance requirement 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.' " <u>Ferreras</u>, 946 F.3d at 185. In practice:

> The commonality and predominance requirements are closely linked. But the Rule 23(b)(3) predominance requirement is "far more demanding than the commonality requirement" found in Rule 23(a). <u>In re Hydrogen Peroxide</u>, 552 F.3d at 311 (internal quotation marks omitted). In fact, "where an action is to proceed under Rule 23(b)(3), the commonality requirement is subsumed by the predominance requirement." <u>Danvers Motor Co., Inc. v. Ford Motor Co.</u>, 543 F.3d 141, 148 (3d Cir. 2008) (internal quotation marks omitted). If the commonality requirement cannot be met, then the more stringent predominance requirement obviously cannot be met either. <u>Cf. Amchem Prods., Inc. v. Windsor</u>, 521 U.S. 591, 623-24, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) ("Even if Rule 23(a)'s commonality requirement may be satisfied. . . , the predominance criterion is far more demanding.").

<u>Id.</u>

> Finally, when making a class certification determination, we are enjoined that:

> Class "certification is proper only if the trial court is satisfied, after a rigorous analysis" that all of the necessary Rule 23 requirements have been fulfilled. <u>Wal-Mart Stores, Inc. v. Dukes</u>, 564 U.S. 338, 350-51, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011). The Rule "does not set forth a mere pleading standard." <u>Id</u>. at 350, 131 S.Ct. 2541. . . . A rigorous analysis requires that factual determinations be made by a preponderance of the evidence. <u>Mielo v. Steak 'n Shake Operations, Inc.</u>, 897 F.3d 467, 483-84 (3d Cir. 2018). Thus, although a trial court has "broad discretion to control proceedings and frame issues for consideration under Rule 23[,]" "a class may not be certified without a finding that each Rule 23 requirement is met." <u>In re Hydrogen Peroxide</u>, 552 F.3d at 310. Prior to certifying a class, a district court

> must resolve every dispute that is relevant to class certification. <u>Id</u>. at
> 320.

<u>Id.</u> at 183.

This exacting burden for class certification means that class certification decisions cannot rest upon speculation or supposition. Instead, the scope and nature of the proposed class must be readily ascertainable based upon the evidence. In this regard: "[i]n determining whether the ascertainability requirement is satisfied, [the court] must determine that the plaintiff has (1) 'defined [the class] with reference to objective criteria,' and (2) identified a 'reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.' " <u>Kelly v. RealPage Inc.</u>, 47 F.4th 202, 222 (3d Cir. 2022).

## C. <u>The Motion for Class Certification will be Granted.</u>

Over time, the plaintiffs' descriptions of the putative class which they seek to certify have shifted somewhat. To some degree these changing class descriptions have responded to what the plaintiffs have perceived to be revisions in the state's transfer plans. Specifically, these revised proposed class definitions have reflected an increased awareness by the plaintiffs of the changed focus in this litigation from a binary choice between state-run ICF and community or home placements, to a more multi-facetted series of care options including both state and private ICFs as well as home and community resources.

The current iteration of the proposed class definition is as follows:

> All current and future residents of White Haven Center and Polk Center who are not on the Planning List and who do not want to be placed in a "community" setting or in another ICF because they believe that their current placements at Polk Center or at White Haven Centers are the least restrictive environments that are available that can meet all their needs.

(Doc. 146, at 22). In the course of the hearing we conducted in this case, Kevin Dressler, the Director of the Bureau of State Operated Facilities for ODP, testified regarding the size and scope of this proposed class stating that seventy-seven individuals had been identified as members of this putative class. The parties' pre-hearing submissions, in turn, provided varying, but numerically significant, estimates of the number of putative class plaintiffs in this case. For example, plaintiffs' counsel has estimated that number as falling between 80 and 100 individuals. The defendants' pre-hearing memorandum contained a more modest, but still significant, estimate of approximately 50 putative plaintiffs who fit this class definition. (Doc. 145, at 2-3).

Having conducted the rigorous legal and factual analysis mandated by law, upon consideration we find that the plaintiffs' proposed class satisfies the requisites of Rule 23. Therefore, we will grant this motion for class certification.

Turning first to the threshold class certification requirement of numerosity, we acknowledge that a numerosity determination is not merely an exercise in arithmetic. Rather, we must assess both the number of putative class members and the feasibility of joinder of the individual plaintiffs when evaluating numerosity. On

52

this score, "[w]e presume joinder is impracticable when the potential number of class members exceeds forty." Allen, 37 F.4th at 895–96. However, it is also well settled that: "This is a guidepost: showing the number of class members exceeds forty is neither necessary nor always sufficient." Id. Judged by these guideposts, we find that Rule 23's numerosity requirement is fully satisfied here. Indeed, there is a consensus among all parties that the number of putative class members well exceeds forty, the presumptive numerosity benchmark prescribed by the Court of Appeals. Moreover, while the Commonwealth argues that joinder of all putative plaintiffs is not impossible and decry the failure of putative class members to join this lawsuit at earlier stages of the litigation, we find that the number of potential plaintiffs—which may well exceed 80—makes individual joinder a cumbersome and unwieldy process. Further, we decline the defendants' invitation to draw some sort of adverse inference from the failure of individuals to join the lawsuit at an earlier stage of the litigation because we believe that these putative class members could have reasonably elected to await a class certification ruling from the court before choosing this course.

In addition, while we find that the scope of the putative class has not been precisely defined, we conclude that the size of this class is clearly ascertainable. On this score: "[i]n determining whether the ascertainability requirement is satisfied, [the court] must determine that the plaintiff has (1) 'defined [the class] with reference

to objective criteria,' and (2) identified a 'reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.' " Kelly, 47 F.4th at 222. Here, we are presented with a finite universe of potential class members, the approximately 158 current residents at Polk Center and White Haven Center. Moreover, the class definition relies upon objective criteria to determine the full scope of the class; namely, identifying class plaintiffs as persons who are not on the Planning List and who do not want to be placed in a community setting or in another ICF because they believe that their current placements at Polk Center or at White Haven Center are the least restrictive environments that are available that can meet all their needs. Therefore, the proposed class, while not yet fully ascertained, is completely ascertainable.

Recognizing that the primary purpose of Rule 23(a)'s adequacy requirement is "to determine whether the named plaintiffs have the ability and the incentive to vigorously represent the claims of the class[]" In re Cmty. Bank of N. Va. Mortg. Lending Pracs. Litig., 795 F.3d at 393, we further find that this prerequisite for class certification is also fully satisfied here. Plaintiffs' counsel is highly skilled and fully informed regarding the law in this field, the plaintiffs' claims, and the factual underpinnings of this litigation. Moreover, no conflicts among or between members of this proposed class have been identified for us. Indeed, we note that the defendants have conceded that this class certification requirement is satisfied given plaintiffs'

counsel's skill and tenacity. Thus, Rule 23's adequacy requirement is met in the instant case.

In our view, the issue of whether there are common class claims that predominate over the individual concerns of specific class members presents a somewhat closer question. To be sure, each resident at Polk Center and White Haven Center presents with a very specific and unique set of physical, mental, emotional, and social concerns all of which must be considered when making care and placement decisions. Yet, these individual qualities, while doubtless important for specific care decisions, are subordinated to a large array of common interests in the context of this litigation which seeks to forestall the closure of Polk Center and White Haven Center. With respect to the question of whether federal law authorizes the court to order these state-run facilities to remain open, the common interests of the plaintiffs as a class predominate. All putative class members reside at these facilities. Indeed, in many instances Polk Center and White Haven Center have been the plaintiffs' homes for decades and may be the only home they have ever known. Further, all of the putative class members would suffer similar harms were the facilities to be closed. These are material, common elements to the claims of all putative class members. Recognizing that Rule 23's commonality analysis and "[t]he predominance requirement 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common,

aggregation-defeating, individual issues[]' " <u>Ferreras</u>, 946 F.3d at 185, we find that these common interests have greater weight and predominance in this case where we are invited to make a determination regarding whether federal law compels the state to operate these specific ICFs even though other comparable state-run ICFs are able to accommodate the plaintiffs.

Finally, concluding that these common interests of the putative class predominate over their individualized concerns, we also find that Rule 23's typicality requirement is satisfied here. As we have noted, "[t]he requirement of typicality is imposed to prevent certification when 'the legal theories of the named plaintiffs potentially conflict with those of the [class] absentees.'" <u>Boley</u>, 36 F.4th at 133. Moreover, in practice there is often a significant overlap between Rule 23(a)'s commonality and typicality criteria. <u>Amchem Prod., Inc.</u>, 521 U.S. at 626. So it is here. The named plaintiffs' concerns regarding transfers of these residents from Polk Center and White Haven Center are typical of the common concerns of all class members. Therefore, a rigorous analysis of Rule 23's class certification requirements weighs in favor of class certification in this case.

We note that we are not alone in finding that a class of intellectually disabled persons who may allegedly suffer a common injury due to some state action may be properly certified under Rule 23. Quite the contrary, courts that have considered similar putative class claims have frequently certified these cases as class actions.

See e.g., Frederick L., 364 F.3d at 489; S.R., by & through Rosenbauer v. Pennsylvania Dep't of Hum. Servs., 325 F.R.D. 103, 105 (M.D. Pa. 2018). Therefore, we will certify this case as a class action.

## D. **Preliminary Injunctions – The Legal Standard**

Having decided that this case is properly brought as a class action, we turn to the question of whether the plaintiffs are entitled to a preliminary injunction. Motions for preliminary injunctions are governed by Federal Rule of Civil Procedure 65 and are judged by exacting legal standards. In order to obtain a preliminary injunction, the moving party must show (1) a substantial likelihood of success on the merits; (2) irreparable injury to the moving party if relief is not granted; (3) that a balance of equities favors the movant's request for injunctive relief; and (4) that a preliminary injunction is in the public interest. Benisek v. Lamone, 138 S. Ct. 1932, 1943-44 (2018) (quoting Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 24 (2008)). The first two elements are critical, and are set forth in the conjunctive, as the Court of Appeals for the Third Circuit has held that "[a] failure to show a likelihood of success or a failure to demonstrate irreparable injury must necessarily result in the denial of a preliminary injunction." Instant Air Freight, Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 800 (3d Cir. 1989) (quoting In Re Arthur Treacher's Franchisee Litigation, 689 F.2d 1137, 1143 (3d Cir. 1982) (internal quotations omitted)). In this regard, it is well settled that:

The movant must, as a threshold matter, establish the two "most critical" factors: likelihood of success on the merits and irreparable harm. <u>Reilly v. City of Harrisburg</u>, 858 F.3d 173, 179 (3d Cir. 2017). Under the first factor, the movant must show that "it can win on the merits." <u>Id.</u> This showing must be "significantly better than negligible but not necessarily more likely than not." <u>Id.</u> The second factor carries a slightly enhanced burden: the movant must establish that it is "more likely than not" to suffer irreparable harm absent the requested relief. <u>Id.</u> Only if these "gateway factors" are satisfied may the court consider the third and fourth factors, which aim to balance the equities by examining the potential for harm to others if relief is granted and whether the public interest favors injunctive relief. <u>Id.</u> at 176, 179. The court must then balance all four factors to determine, in its discretion, whether the circumstances warrant injunctive relief. <u>Id.</u> at 179.

<u>Camacho Lopez v. Lowe</u>, 452 F. Supp. 3d 150, 157 (M.D. Pa. 2020).

In weighing these factors, we are cautioned that: "How strong a claim on the merits is . . . depends on the balance of the harms: the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief." <u>Reilly v. City of Harrisburg</u>, 858 F.3d 173, 179 (3d Cir. 2017) (citations omitted). Ultimately, with respect to this threshold preliminary injunction showing of a likelihood of success on the merits what is called for is "a reasonable probability of eventual success." <u>Id.</u>, n. 3.

Further, a preliminary injunction is "never awarded as of right." <u>Benisek</u>, 138 S. Ct. at 1943. Rather, when considering a motion for a preliminary injunction, we are reminded that "a preliminary injunction is an extraordinary and drastic remedy,

one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948, pp. 129–130 (2d ed. 1995)). As such, the Third Circuit has long observed that "upon an application for a preliminary injunction to doubt is to deny." Madison Square Garden Corp. v. Braddock, 90 F.2d 924, 927 (3d Cir. 1937).

Our assessment of a motion for preliminary injunction entails a threefold analysis. First, we must draw legal conclusions regarding the viability of the plaintiffs' claims. We must then make factual determinations regarding the harms that may result from the grant or denial of the injunction. Finally, we engage in an exercise of sound discretion in deciding whether to issue some extraordinary form of injunctive relief under the applicable law and facts. Each of these determinations, in turn, is subject to a different standard of review on appeal. Thus, "[w]hen reviewing a district court's [resolution] of a preliminary injunction, [the court of appeals] review[s] the court's findings of fact for clear error, its conclusions of law de novo, and the ultimate decision ... for an abuse of discretion." Reilly, 858 F.3d at 176 (quoting Bimbo Bakeries USA, Inc. v. Botticella, 613 F.3d 102, 109 (3d Cir. 2010)).

### E.  **The Motions for Preliminary Injunction will be Denied.**

####  1.  **The Plaintiffs Have Not Demonstrated a Substantial Likelihood of Success on the Merits.**

In our view, the plaintiffs' motions for preliminary injunction founder upon the first obstacle they must meet, Rule 65's requirement that the movants show a substantial likelihood of success on the merits. To clear this hurdle the plaintiffs must show "a reasonable probability of eventual success." Reilly, 858 F.3d at 179 n. 3. While we feel great sympathy for the sincerely held concerns voiced by the plaintiffs, we are constrained to conclude that they have not shown a reasonable probability of success on the merits of their claim that they are entitled as a matter of law to enjoin the closure of the Polk Center and White Haven Center, or prohibit the transfer of the residents at Polk Center and White Haven Center to other, comparable state operated ICFs.

The relief sought here is truly unprecedented. Moreover, granting this relief would require us to contravene and set aside a state statute which specifically authorizes the transfer of patients between state facilities. Such a course should not be taken lightly. Further, we believe that the plaintiffs' claims stem from a factual misunderstanding regarding the state's proposed course of action, as well as a fundamental misreading of the seminal Olmstead decision.

First, as a factual matter much of the plaintiffs' case and requests for preliminary injunction rests upon a straw man argument, the assertion that the state

is attempting to compel all residents at Polk Center and White Haven Center into medically inappropriate community settings. This simply is not the case.  Instead, the Commonwealth is currently offering to work with families to facilitate either (1) a community placement; (2) a transfer to a private ICF; or (3) a transfer to one of the remaining state operated ICFs. Moreover, it is clear that the remaining ICFs have the capacity to fully accommodate all putative class members in an ICF setting. Thus, the options offered by the Commonwealth precisely parallel one form of relief sought by the plaintiffs in their complaint; namely, the opportunity "to receive treatment in accordance with the independent recommendations of the multidisciplinary evaluation, either at his/her current residence, another state operated ICF/IID facility, or non-ICF/IID certified setting, as each Plaintiff deems appropriate." (Doc. 1, ¶ 128(b)(ii)). Further, while we find that the various state ICFs are not identical, we conclude that in their material respects they are comparable, and state officials have pledged to ensure that individual needs are accommodated to the greatest extent possible. On these facts, the plaintiffs cannot show a substantial likelihood that they are entitled to enjoin these transfers and compel the state to keep Polk Center and White Haven Center open indefinitely.

Nor can Olmstead and its progeny be read to confer a right upon the plaintiffs to command this course of action by the state. Quite the contrary, while Olmstead allowed disabled persons a limited degree of autonomy in determining the level of

61

their care, subject to the exercise of medical judgment and reasonable practical constraints, Olmstead simply does not give any individual the right to dictate where they would receive this care or require the state to maintain the facility of their choice in the face of other comparable, available care options.

Moreover, a rising tide of case law has rejected the arguments advanced here and refused to enjoin states from closing institutions and transferring persons to other comparable facilities. See e.g., Ricci, 544 F.3d 8 (denying request to reopen consent decree to enjoin state transfers of residents from one state facility to another as part of a closure plan); Lane, 2014 WL 2807701, at *3 ("[N]either the ADA nor the Rehabilitation Act creates a right to remain in the program or facility of one's choosing"); D.T, 2017 WL 2590137, at *7-8 (denying a preliminary injunction and holding that the plaintiffs were not likely to succeed on their claim that the closure of an ICF and placement of a resident into a community setting "would violate the integration mandate of the ADA and Rehabilitation Act and result in unlawful discrimination").

Simply put, this unprecedented application for extraordinary injunctive relief goes far beyond anything that has been recognized by the courts; is inconsistent with state law; and is unsupported by federal statutory or case law. Accordingly, we cannot conclude that these requests for preliminary injunction are supported by "a reasonable probability of eventual success." Reilly, 858 F.3d at 179 n. 3. Finding

that this threshold requirement for Rule 65 relief is not satisfied, we will deny these motions for injunctive relief.

**2.** **The Balancing of the Remaining Rule 65 Factors Does Not Favor Extraordinary Injunctive Relief.**

While our determination that the plaintiffs have not shown a likelihood of success on the merits forecloses preliminary injunctive relief at this time, since "[a] failure to show a likelihood of success or a failure to demonstrate irreparable injury must necessarily result in the denial of a preliminary injunction," Instant Air Freight, Co., 882 F.2d at 800, we are addressing the remaining Rule 65 factors. We follow this course because we are inviting the parties to seek further review of this decision if they choose, and we believe that a more fulsome discussion made aid all in assessing this vitally important question.

Turning first to the potential for harm to the plaintiffs, we find that any transfers of this largely elderly, and fragile, population may potentially result in significant transfer trauma for some residents of Polk Center and White Haven Center. Transfer trauma is a real and universally recognized phenomenon and the intellectually disabled, who rely upon continuity to maintain their emotional moorings, are particularly susceptible to this trauma. Therefore, we concede that this course of action creates a real risk of some degree of harm to some members of this

population, even though the state's proposed collaborative, inter-disciplinary approach to these transfers is designed to minimize this trauma.[16]

Nonetheless there are other countervailing considerations and concerns regarding the prospects of other harms to the 158 residents at Polk Center and White

---

[16] During closing arguments at this preliminary injunction and class certification hearing, the plaintiffs endeavored to identify another potential harm which they have suffered, arguing that they were irreparably injured by the alleged failure of the defendants to make more fulsome discovery. We have given this argument only modest weight in our consideration of the pending preliminary injunction motions for several reasons.

First it has been represented without contradiction that the defendants have produced some 32,600 pages of material in the course of discovery. Given the reported scope of this discovery, we simply are not in a position to assess the degree to which any harm has been visited upon the plaintiffs.

Second, we note that the docket is devoid of any motions seeking to compel further discovery from the defendants. Thus, we are not presented with a timely, well-documented, and more complete effort to secure additional discovery. Instead, the issue of alleged discovery defaults was presented to us at the close of the preliminary injunction and class certification hearing in the form of argument by counsel.

Third, as a practical matter preliminary injunctions are routinely sought by parties at a time when discovery is not complete. Therefore, typically the alleged failure to provide complete discovery would not, standing alone, constitute an unusual circumstance which would compel relief for the movant.

Yet while we have not endeavored to factor these discovery questions into our analysis of the merits of these preliminary injunction motions, we urge all parties to promptly notify us of any previously undisclosed and unresolved discovery issues so we can work cooperatively with counsel to address these outstanding questions.

Haven Center as well as to the larger intellectually disabled community throughout Pennsylvania. In short, while following this course and closing Polk and White Haven presents a risk of harm, failing to act leads to other real and identifiable harms. These harms include the risk that the Polk Center residents may be exposed to the legionella, which persists at this facility. In addition, as the population housed at Polk Center and White Haven Center inevitably ages and declines, the essential community quality of those facilities inevitably deteriorates, leading to a loss of the socialization which the residents have enjoyed in the past. These, too, are real physical and emotional harms which could flow from a failure to consolidate these facilities.

Finally, as we have noted, maintaining these facilities for an indefinite time into the future at a projected annual cost of $21,000,000 has a profoundly adverse impact upon the entire 57,000 person community of intellectually disabled individuals who qualify for ICF level of care in Pennsylvania. Since the closure of these facilities would enable the state to use these moneys to fund other state programs and services, the issuance of a preliminary injunction would compel the state to maintain Polk Center and White Haven Center at an annual estimated cost of $21,000,000 for the benefit of a shrinking population of 158 persons, instead of closing these underpopulated centers, and reallocating $21,000,000 annually to

address the needs of the other 57,000 Pennsylvanians who confront the challenges of intellectual disabilities daily.

Thus, the balancing of these countervailing public and private interest reveals a Hobson's choice, a necessary choice between competing, imperfect options, each of which entails some significant risk of harm. Mindful that the exercise of our discretion in this field is guided by the concept that: "How strong a claim on the merits is . . . depends on the balance of the harms: the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief[]" Reilly, 858 F.3d at 179, we find that the harms that may flow from denying a preliminary injunction are largely offset by the harms that would flow from granting this unprecedented preliminary injunction. In this setting, where the competing equities stand in equilibrium, we are reminded that "upon an application for a preliminary injunction to doubt is to deny." Madison Square Garden Corp., 90 F.2d at 927. Therefore, the plaintiffs' motions for preliminary injunction will be denied.[17]

---

[17] In denying these motions we note that one remaining speculative concern voiced by the plaintiffs was a fear that the Ebensburg and Selinsgrove Centers would also be closed by the state at some time in the future. This concern, however, was advanced without any supporting evidence and the state officials who testified uniformly indicated that there were no current plans to close either of these facilities while candidly acknowledging that they could not speak for future administrations. In the absence of any proof we cannot base a preliminary injunction upon speculation regarding what may take place in the future. Instead, we can only address those

## F.  **Appealability**

As we reach these conclusions, we recognize that for all parties there is a sense of urgency to this litigation, coupled with a need for finality. Recognizing these dual and competing impulses, we encourage any party aggrieved by our rulings to seek further review of these decisions.

On this score at this juncture we believe that the denial of preliminary injunction relief can be appealed immediately under 28 U.S.C. § 1292(a)(1). Section 1292(a)(1) provides that "the courts of appeals shall have jurisdiction of appeals from: (1) Interlocutory orders of the district courts of the United States … granting, continuing, modifying, refusing or dissolving injunctions . . . ." 28 U.S.C. § 1292(a)(1). According to section 1292(a)(1), the portions of our order denying these preliminary injunctions is appealable because it is a recognized exception to the basic rule that interlocutory orders are not appealable. Kershner v. Mazurkiewicz, 670 F.2d 440, 448-49 (3d Cir. 1982); Hoxworth v. Blinder, Robinson & Co., Inc., 903 F.2d 186, 208 (3d Cir. 1990) ("The order granting a preliminary injunction was immediately appealable, however."). Further, while the class certification portion of the order may not be reviewable under § 1292(a)(1), an interlocutory appeal of this class certification decision is permitted under Rule 23(f) of the Federal Rules of Civil

concerns if and when they become real. See D.T. v. Armstrong, 2017 WL 2590137, at *9

Procedure. Rule 23(f) provides that: "A court of appeals may permit an appeal from an order granting or denying class-action certification under this rule, but not from an order under Rule 23(e)(1)." Fed. R. Civ. P. 23(f).

## IV.   **Conclusion**

We conclude this opinion as we began, with an acknowledgment that demographic factors beyond the control of all parties present a series of intractable challenges for all, challenges thrust upon the parties by the imperfect nature of the available alternatives. In this decision we have endeavored to steer the path dictated by the law based upon the facts before us, but we recognize that the difficult dilemma presented to the parties means that no easy solutions exist in this litigation.

However, we commend one thought to all parties. Sometimes litigation highlights what separates us, emphasizing the scope of our disagreement. But often, upon reflection, we may see that we share some common ground. In this case, the parties have many profound disagreements regarding how best to meet the needs of the remaining residents at Polk Center and White Haven Center, but both the state officials who care for these individuals, and the family members who deeply care about their loved ones, share a common interest in doing what is best for these individuals. Therefore, even as the parties litigate the issues which divide them, we urge all parties to endeavor to work cooperatively in ensuring to the best of their abilities that these plaintiffs have lives that are safe and marked by dignity.

An appropriate order follows.

/s/ *Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED: November 2, 2022

# APPENDIX A

**Summary of Lay Witness Testimony
at Hearing on Class Certification and Preliminary Injunction**

**Kathryn Miller**

Kathryn Miller testified on behalf of her son, Joshua Miller, a resident of Polk Center since December 2010. Joshua was diagnosed with autism, is nonverbal, and suffers from explosive behaviors. He also has a plethora of life-threatening food allergies. Joshua lived with his mother until he was admitted to Western Psychiatric in March of 2010. Joshua stayed at Western Psychiatric for five months, during which time Ms. Miller visited him every day. He was eventually released to a group home, where he began to exhibit explosive and destructive behaviors to the extent that the home requested Ms. Miller remove her son from that setting. Joshua was again admitted to Western Psychiatric but was ultimately released in October 2010. Following an incident at Barnes N' Noble, during which Joshua had a "meltdown" and 9-1-1 was called, Joshua was taken to the psychiatric ward at St. Clair hospital, after which he received court-ordered admission to Polk Center.

Ms. Miller testified that Joshua has done well at Polk Center. He has a very extensive Individual Support Plan ("ISP"), which includes a cooking program due to his multiple life-threatening food allergies. Joshua is able to function somewhat independently at Polk Center, including doing his own laundry. Ms. Miller further

testified that Joshua's residence at Polk Center, which is an apartment-like setting, enables him to have his own refrigerator so that he can avoid any potential contact with foods he is allergic to. Overall, Ms. Miller believes that Polk Center saved her son's life.

**Susan Jennings**

Susan Jennings testified on behalf of her son, Russell "Joey" Jennings, the lead named plaintiff and a resident of White Haven Center. Joey, who is now 29 years old, was diagnosed with developmental delay and autism at a young age, after he began displaying behavioral meltdowns, as well as injurious behavior toward himself and others. His behavior was so concerning that Joey's father would take him on business trips to alleviate any concerns regarding Mrs. Jennings' safety. Mrs. Jennings testified that she finally called social services after an incident in which she attempted to prevent Joey from harming himself and he pushed her to the ground.

After several failed placements in group home settings, where Joey was in and out of psychiatric wards due to his behavior, Mrs. Jennings obtained a lawyer, and Joey obtained court-ordered admission to White Haven Center. Mrs. Jennings stated that Joey has been "thriving" since his admission to White Haven Center.

**Joseph Lambo**

Joseph Lambo testified on behalf of his daughter, Beth Lambo, who is a named plaintiff and a resident of Polk Center since 1969. Mr. Lambo testified that

Beth displayed abnormal behavior, such as banging her head on things, from the time she was 8 months old. Mr. Lambo stated that he and his wife became concerned when Beth's sibling started emulating her self-injurious behavior. Beth was diagnosed with autism by the Children's Hospital of Pittsburgh, and she was admitted to Polk Center in December of 1969 after an emergency hearing. Since her placement at Polk Center, Beth has been diagnosed as nonverbal autistic and has atypical bipolar disorder symptoms, and she suffers from various physical conditions as well.

Mr. Lambo testified that Polk Center is able to give Beth the one-on-one care that she needs, which entails 24/7, around the clock care, in order to prevent Beth from harming herself. Beth's caregivers are able to read her body language and nonverbal cues in order to determine her needs, and Mr. Lambo testified that he was very pleased with the continuity of care Beth has received at Polk Center for over 53 years.

**<u>Kimberly Schroeder</u>**

Kimberly Schroeder testified on behalf of her daughter, Amanda, a resident of Polk Center. Amanda's behavioral issues began when she was one year old, and she was diagnosed with autism and intellectual disabilities at the age of two. Amanda, who was initially nonverbal, gained the ability to speak at 5 years old with assistance she received from the Barber Center, and Ms. Schroeder testified that

Amanda lived a relatively normal life until she was 12 years old. At that point, Amanda's behavior became aggressive, angry, and injurious to herself and her siblings.[18] Ms. Schroeder testified that Amanda was hospitalized 18 times in a 15-month period. The Barber Center took Amanda in, but after several instances in which Amanda was assaultive toward staff, which at one time resulted in criminal charges, Amanda was admitted to Western Psychiatric and ultimately Polk Center.

Since her placement at Polk Center, Ms. Schroeder stated that Amanda's behavior has improved, she has fewer behavioral outbursts, she is happy, and she is able to safely make home visits with staff from the Polk Center.

## Robin Mason

Robin Mason testified on behalf of her aunt, Linda Tregellas, a resident of White Haven Center since in 1965. Ms. Mason became a co-guardian of Linda in 2009. Linda was diagnosed at the young age of 18 months old with profound intellectual disabilities with her ISP indicating she has the mental capacity of a two- or three-year-old. She also suffers from dissociative identity disorder.

Linda was placed at White Haven Center in 1965, where she has resided since. Ms. Mason testified that since Linda's placement at White Haven Center, she has been able to attend various field trips with White Haven Center staff, such as going

---

[18] Ms. Schroeder testified that she has six children, three of which, including Amanda, have been diagnosed with autism and other intellectual and medical disabilities.

to plays and movies, and going shopping and for milkshakes. Ms. Mason testified that despite Linda's disabilities, she is leading a happy and fulfilled life.

## Luciana Dudich

Luciana Dudich testified on behalf of her brother, Rinaldo Scruci, a named plaintiff in this case and a resident of Polk Center since 1964. Rinaldo was diagnosed at a young age with extreme cerebral palsy, and he lived at home until he was nine years old. At that time, there was an incident that led his parents to be concerned for the safety of Rinaldo's younger brother. Rinaldo was admitted to Polk Center in December of 1964 and has resided there since.

Ms. Dudich testified that Rinaldo works on a loom at Polk Center with his friend John and makes rugs. Ms. Dudich stated that the staff at Polk Center are particularly helpful regarding Rinaldo's ability to feed himself. Rinaldo has attended several field trips with the staff at Polk Center, including going to church, baseball games, and other events.

## Arthur Ciullo

Aurthur Ciullo testified on behalf of his son Gabriel, a resident of White Haven Center for the past 44 years. Gabriel is nonverbal, and at eleven years old, Gabriel was placed in a group home setting. However, Gabriel engaged in self-injurious behaviors, and after three years in this group home, his parents were told that the group home could no longer provide Gabriel with the services he needed. Gabriel was admitted to White Haven Center in 1978.

Mr. Ciullo testified that Gabriel wears a helmet and hand pads, is nonverbal, and has lost his ability to walk. Mr. Ciullo stated that his son has the mental capacity of a one-year-old. Mr. and Mrs. Ciullo visit their son regularly at White Haven Center, and Mr. Ciullo stated that Gabriel has improved since his placement at White Haven Center.

## Ann D'Amico

Ann D'Amico testified on behalf of her cousin, Rosemary "Rosie" Delaney, a resident of White Haven Center. Ms. D'Amico testified that Rosie has severe cerebral palsy and is profoundly intellectually disabled. She is also wheelchair bound and nonverbal. Rosie's parents passed away in 1963 and 1975, and in 1975, Rosie was admitted to White Haven Center when she was 32 years old.

Rosie, who is now 79 years old, has done well at White Haven Center, and she is very fond of the staff that have taken care of her since her admission in 1975. White Haven Center regularly plays polka music, which is Rosie's favorite, and Rosie enjoys the many activities that White Haven Center is able to provide.

## Georgine Jorda

Georgine Jorda testified on behalf of her sister, Maureen, a resident of White Haven Center. Maureen suffers from cerebral palsy due to an incident during her birth. She cannot walk and she is nonverbal. Maureen was in an automobile accident at the age of 5, and also during her childhood she underwent a surgery in hopes of

helping her walk that did not go as planned and had detrimental results. In April of 1970, when she was 13 years old, Maureen was admitted to White Haven Center, where she has resided since.

In addition to her developmental disabilities, Maureen also suffers from several physical impairments, including lung disease and osteoporosis, and she is on a feeding tube. Maureen's only interests are family and music. Ms. Jorda testified that the staff at White Haven Center understand Maureen's nonverbal cues and have given her great care for the 52 years she has resided there.

### Carol Jean Boord

Carol Boord testified on behalf of her sister, Joyce Shibilsky, a resident of Polk Center since 2008. Ms. Boord testified that Joyce lived at home until she was about 8 years old, when she was placed into a facility due to her disabilities. Joyce was moved around to several facilities, and she was eventually placed at Ebensburg Center, where she resided for about 30 years. Ms. Boord stated that toward the end of Joyce's stay at Ebensburg Center, there were incidents which resulted in Joyce's placement at Western Psychiatric for a period of time. When she returned to Ebensburg Center, Joyce had lost her ability to ambulate, and she had lost weight. After another placement in Western Psychiatric, Joyce was ultimately placed at Polk Center in 2008.

Following her placement at Polk Center, Joyce regained her ability to ambulate, and she gained weight. Ms. Boord testified that Joyce has a good quality of life at Polk Center, and that the staff is able to deal with her change in moods, as well as her physical needs.

## Beverly Sea

Beverly Sea testified as the co-guardian of her cousin, Deborah "Debbie" Gissindanner, a resident of White Haven Center. Ms. Sea testified that Debbie was placed in White Haven Center when she was 12 years old due to her profound intellectual disabilities and cerebral palsy. Ms. Sea stated that Debbie would wander off and her family would be unable to find her at times. Debbie has been a resident of White Haven Center for 59 years.

Ms. Sea testified that initially, Debbie would have home visits with her family, but that Debbie was more comfortable at White Haven Center, so her family began to visit her there instead. At White Haven Center, Debbie is engaged in activities, and Ms. Sea testified that she attended camp prior to the Covid-19 pandemic. Ms. Sea stated that she always brings fried chicken and a radio when she visits Debbie at White Haven Center, two of Debbie's favorite things. While Debbie is currently wheelchair bound, Ms. Sea testified that she is engaged and living a full life at White Haven Center.

**<u>Deborah Blake</u>**

Deborah Blake testified on behalf of her sister, Juliette "Julia" Papay, a resident of White Haven Center. Julia is profoundly intellectually disabled, with an IQ of 20, and suffers from anxiety disorder. She is also a breast cancer survivor. Ms. Blake testified that Julia lived at home until she was 18 years old. She was taken care of by a nanny, and when the nanny passed away, she was placed in the Hamburg Center and ultimately placed at White Haven Center in 2018.

While she has resided at White Haven Center, Julia has been able to go to plays, including a Christmas musical. Ms. Blake testified that Julia's family is able to visit her at White Haven Center, and that Julia has lived a wonderful life since she was placed at White Haven Center.

**<u>Elizabeth Fry</u>**

Elizabeth Fry testified on behalf of her son, Douglas Fry, a resident of Polk Center. Ms. Fry testified that Doug spoke normally until about age 3, when he began making noises and staring at the ceiling. She stated that around puberty, Doug became violent and would attack others, including her. Ms. Fry testified that Doug would grab her hair and slam her head, and that on one occasion, he bit her so hard she ended up in the hospital. Initially, Doug was placed in group homes, but he was eventually placed in Polk Center in 1990.

Ms. Fry stated that following his placement at Polk Center, Doug participated in activities with his brother, who was also a resident there. She testified that the staff at Polk Center were able to care for Doug, in that they would not allow him to hurt other people or destroy things. Ms. Fry believes that Polk Center has been successful in helping Doug.