# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RUSSEL "JOEY" JENNINGS, RINALDO SCRUCI, ROBERT B. CARSON, LAUREN LOTZI, BETH LAMBO, MARIA KASHATUS, DAVID NAULTY, MAUREEN JORDA, JANINE WINSOCK, CYNTHIA MARTIN, TERRY D. HETRICK, SHARON MCCABE, *and* VIOLA "VIANNE" CAYE, | : : : : : : : : : : : : | No. 3:20-CV-0148 |
| Plaintiffs | : : | Judge Mannion |
| v. | : : | Electronically Filed Document |
| TOM WOLF, TERESA D. MILLER, KRISTIN AHRENS, SUE RODGERS, MARK J. GEORGETTI, PENNSYLVANIA DEPARTMENT OF HUMAN SERVICES, PENNSYLVANIA OFFICE OF DEVELOPMENT PROGRAMS, POLK CENTER, *and* WHITE HAVEN CENTER, Defendants | : : : : : : : : : : : | *Complaint Filed 01/29/20* |

## PLAINTIFFS' RENEWED MOTION
## FOR TEMPORARY RESTRAINING ORDER AND
## FOR PRELIMINARY INJUNCTION

And now, come the Plaintiffs, by their attorney, Thomas B. York, and file this renewed request for a temporary restraining order and for a preliminary injunction, and aver the following:

1. The continuing imminent moves of residents should be restrained or enjoined because they will result in irreparable harm, including even possibly death; because some residents are being moved to a location with a high number of COVID cases which places them at great risk of infection; because they are in violation of the rights of guardians; and because they will moot

the issues raised by the valid causes of action contained in the Complaint before a full judicial review can be completed.

2. The Plaintiffs have been informed that moves of residents, whose guardians, authorized representatives, and families (hereinafter collectively referred to as "guardians") do not consent to a move out of White Haven Center or out of Polk Center, are being scheduled and completed immediately and on an ongoing basis, and will largely be completed for all residents at White Haven by January 23 and for all residents of Polk by early March.[1] These moves will result in residents being placed in more restrictive environments that cannot meet their needs, which is imminent and irreparable harm to the named Plaintiffs and to the recently certified Plaintiff class members.[2]

3. Residents' guardians have been advised that they must choose either Ebensburg Center or Selinsgrove Center, or one of these will be chosen for them, with or without their consent. For example:

    a. The following class members were moved this week:

        Gabriel Ciullo
        Edward Enright, Jr.
        Ernest Freeman
        Douglas Fry
        Marilyn Gildea
        Robin Gill
        David Hadfield
        James McConnell
        Beatrice McKinley
        John Perosky
        David Polin
        Joyce Shibilsky
        Cynthia Yoder

---

[1] The movement of so many residents in such a short period of time is at best problematic and is probably extremely dangerous. The Defendants appear determined to meet their arbitrary deadlines.
[2] The recent certification of a class is rendered largely meaningless if the class members will be moved before all class members can even be identified and all class members can fully participate in the litigation.

    b. The following class members are scheduled to move next week or soon thereafter:

    Linda Tregellas- Monday, December 12 (her guardians have recently given up and consented)
John Perosky- next week but no date provided
Thomas Fahey- next week but no date provided
Deborah Turner- next week but no date provided
Virgil McLaughlin- next week but no date provided
John Niedzialek- next week but no date provided
Michael Crowley- next week but no date provided
Gilbert Harnish- next week but no date provided
Joanne Piccotti- December 13
Nancy O'Toole- December 14
Charles Cheeseborough- December 19
Fred Evans- December 19
Mitchell Wilson- December 19
Joe Nowacki- December19
Rosemary Delaney- December 20
Jill Papay- December 20

The Plaintiffs have advised Plaintiffs' counsel that they have pleaded with the Defendants to delay moves until at least after Christmas, but the Defendants have responded coldly in the negative. The emotional trauma to the Plaintiffs is increased by conducting moves in the middle of the holiday season.

    4. All of the aforementioned individuals in paragraph 3, have asked to be represented by Plaintiffs' counsel, and are part of the certified Plaintiff class. None of them have been provided with a full and fair opportunity to participate in the class action.[3]

    5. The Plaintiffs are deeply concerned about recent deaths or bad results as to residents who have already transferred. The following are summaries of the information as to each individual as best could be obtained without access to official records (full names can be provided upon request):

---

[3] The Defendants opposed two motions to expedite rulings on the certification of the class, and otherwise delayed the case, so any prejudice from the delayed rulings should not be placed solely on the Plaintiffs.

a. J.B.--She was moved on August 3, 2022 to Ebensburg and died on Nov 19, 2022. She was medically fragile, but she had been at Polk since 1990 and did not die there. It was only after she moved that she died.
b. J.W.--He was moved to Ebensburg on Sept 21, 2022, and died on Nov 21, 2022. They had taken him to the hospital for pneumonia but they found pancreatic cancer and they could do nothing for him
c. R.A.--She was moved to Ebensburg on Oct 5, 2022, and was pronounced dead on Oct 31, 2022. The cause of her death was possibly a fall/head trauma.
d. D.D.--He was moved to an ICF in Illinois on Nov 8, 2021, and died on Mar 30, 2022, just 5 months after being moved, from aspiration. Again, he had been at Polk since 1969 and did not die from aspiration.
e. L.H.-- She moved to a group home on April 20, 2021, and died on Sept 1, 2021. She was a difficult feed which simply means that she had dysphagia and it took time and knowledge on how to feed her without the use of a feeding tube. Once she was moved, the group home convinced the family that she needed to have a feeding tube because she was no longer eating. She had been at Polk since 1969 and the staff knew how to get her to eat and did not have any issues feeding her. But once moved, either out of laziness or staff shortages, it is easier to get a feeding tube than exert the effort necessary to avoid a feeding tube. They inserted the feeding tube incorrectly so that the fluid was not going where it should be going and that created a lot of complications that could not be overcome. If she had remained at Polk, she would not have needed the feeding tube in the first place, but, even if she did, that is handled by a nurse who would have seen the signs that the tube was not inserted correctly.
f. N.N.--Moved to Ebensburg on Oct 27, 2022, and, by Oct 31, 2022, she was in intensive care at a hospital.
g. E.L.--Moved to a group home on Oct 5, 2022, and a couple weeks later eloped from the facility and was missing for about 4 days. (She also went missing at another group home in 2018). Once they found her, they put her in a psych ward. She was returned to a group home. She was "sexting" with an underage boy either before or during her eloping this last time and criminal charges were being brought against her. They later dropped the charges due to her not being competent to attend trial. She just eloped again, but this time the police were called quickly and they picked her up quickly. However, they "302'd" her to the psych ward again. This individual was supposed to be on 2 to 1 supervision so it is not understandable why they kept losing her.
h. Transition Update after move report notes: P.C. moved to community (UCIP)-- Concerns included her not being herself and, while exhibiting similar behaviors as at Polk, Polk had more intense care than at the group home where she was moved to on 5/6/22. They had stopped tracking her behavior, it got worse, and now they are playing catch-up. Their actions were to add behavior support and ruled out medical issues. Their last update was that the provider almost forgot about the meeting and did not have much to contribute. At least until recently, they still did not have an approved behavior support plan that had been implemented and were unsure what they were doing for support while a plan was being developed.

i. Transition Update report notes: J.P. moved to community (ACHC)-- Concerns included her behavior becoming more of an issue. She slapped a family member,. attacked a staff member, and trashed a doctor's office. They asked for hospital admission, but did not get her admitted. They tried to get Polk to call in a script but they did not check until late. A 90-day meeting was scheduled for 12/5/22.
  j. Transition Update report notes: D.R. (Selinsgrove)--Concerns included that her wound is still not healing and she has had it for about 2 years. Selinsgrove does not track wound care and it is concerning that they do not do that and this could cause issues moving forward, including sepsis and death.
  k. W.R.- Transferred from White Haven to Selinsgrove on September 22, 2021, and died June 7, 2022. He had no pre-existing serious health conditions before Selinsgrove.

The Plaintiffs believe that these cases should be reviewed and considered by the Court before there are more forced moves out of White Haven and Polk.

6. The Plaintiffs are aware of situations where residents are being moved without the prescribed number of visits to the receiving facility and without the stated number of overnight stays at the receiving Center, and in contradiction of general statements such as that the transition should be "gradual," as described in the records. Residents are instead being moved after only one or two visits and no overnight stays, which is contrary to the recommendations of the treating professionals. For example, a recent ISP for Ann D'Amico's loved one prescribed 5 day visits and 2 or 3 overnight stays, but there had only been 2 visits and no overnight stays. This is not consistent with Your Honor's directions to the Defendants that they take the necessary time to follow normal procedures, and to do so in a careful and planned manner. The Defendants are avoiding their normal procedures as recommended by the treating professionals in a rush to meet new arbitrary deadlines. Plaintiffs have heard that plans for transition are being changed, without input from the individual Plaintiffs' guardians, and outside the normal interdisciplinary process, to remove any requirements that might delay immediate moves. For example, the Plaintiffs have obtained an email to transition staff, on which Mark Georgetti is copied, that directs changes to transition plans such as to "use general language," to remove references to "gradual transitions,"

to remove references to "#/types of visits," to replace words like "extensive," to "remove visit with community psychiatrist required prior to move," and so on. A copy of this email is attached, although we could not obtain the second page. This action by the Defendants was forewarned by the Plaintiffs who alleged in their Complaint that decisions on transitions by the Defendants would not be based upon sound professional judgments, but would rather be based upon an agenda to meet a closure deadline. This Court should stop all moves until Plaintiffs can verify that the transition plans have not been unilaterally changed by the Defendants, and until the Plaintiffs can verify that the original plans have been carried out as written in the normal interdisciplinary process. The Defendants are placing their arbitrary deadlines ahead of the best interests of the residents, and this is not what the Plaintiffs believe the Court envisioned in its ruling.

7. The Court appears to have significantly relied upon the alleged $21,000,000 in savings from the closures of White Haven and Polk in denying the first motion for injunctive relief that requested that moves of non-consenting residents be postponed. The Court specifically held that this alleged savings "has a profoundly adverse impact upon the entire 57,000 person community of intellectually disabled individuals who qualify for ICF level of care in Pennsylvania." Memorandum Opinion at 65. However, the figure of $21,000,000 is highly suspect and should be subjected to critical review. Declaration of William Harriger (hereinafter "Harriger"), attached hereto, at paragraph 9. Also, the figure of $21,000,000 is a relatively insignificant amount compared to the overall $5,000,000,000 budget for these services, and therefore would not result in a profound adverse impact. Harriger at para. 9.a. As stated by Harriger:

> a. I strongly question that there is any sound basis for this claim. There has not been any itemization of the quoted $21M closure savings so that it can be critically reviewed. I am willing to conduct such a critical review if the

    Commonwealth will share the information on which it bases this claim of savings of $21M.
  b. Much of the cost of care for residents is based on the individual staffing needs of the residents being served. If the needs remain the same, staffing is the same and costs are largely the same regardless of whether the subject Centers are closed.
  c. Much of the State Centers' budgets include items like "Retired Employees Health Program" costs which will not go away regardless of where residents are served.
  d. Retirement Contributions make up a lot of the State Centers cost structure, with as much as 30% of salary being reported as the annual cost. (Why is so much being charged to the State Center programs? Is this an underfunding catchup amount? If so, the historic underfunding will not go away if there are less State Center staff. Wouldn't the retirement underfunding burden be cost shifted to other parts of the State budget?)
  e. Even if the Consolidated Waiver, PFDS Waiver, and Community Living Waiver used to serve Pennsylvanians with intellectual and developmental disabilities would allegedly be the benefactor of the $21M savings, the overall annual budget for those services approximates $5B and therefore $21M represents less than ½ of 1%, which is really a relatively insignificant amount.

At a minimum, the Defendants should be directed to share all information supporting the calculation of this alleged savings, and the Plaintiffs should be allowed a full and fair opportunity to address the claims of any adverse impact.[4]

---

[4] The Court states that Plaintiffs waited until the closing arguments to raise the issue of inadequate discovery responses from the Defendants. Memorandum Opinion at 64, n. 16. This statement misses the focus of the Plaintiffs' objection at closing arguments to the new, previously unrevealed, claim of the Defendants as to an alleged $21 million in savings. Plaintiffs' counsel pointed out that Plaintiffs' request for cost information was objected to by the Defendants as being **"<u>not relevant</u>."** The Defendants should not be allowed to submit cost calculations that they did not provide because they claimed they were not relevant. Plaintiffs' counsel, unlike other objections to other discovery requests, was willing to accept the lack of relevancy of such costs, and he would not have filed a motion to compel as to that objection. The Defendants should be bound by their claim that such cost information was irrelevant. Although Plaintiffs did not have sufficient time to file a motion to compel as to other objections, having only received a voluminous unindexed dump of documents in September and being forced to devote all time to an abruptly scheduled hearing in October, that inability to seek a motion to compel before the hearing does not forgive in any manner the Defendants' claim that such information was irrelevant. The Court should reject the admission of evidence that Defendants did not produce because it was to them irrelevant to the case.

6. Additionally, William Harriger points out a possible course of action that might alleviate the harm to the residents of Polk and White Haven, and might help reduce the extreme fears of the Plaintiffs. Mr. Harriger states:

> 10. On another note, ODP has responded positively to Verland selecting as many as 32 residents to ultimately move into the new Verland homes to be built largely with RACP funding. They have also responded positively to a plan that would have those 32 residents remaining at Polk after the State closes it by renting it to Verland indefinitely to allow for the construction of those homes. There may be a way to expand the number of Polk residents, beyond the 32, that remain at Polk while nearby homes are created. A similar program could possibly be implemented at or near White Haven Center.
>
> 11. Any plan to utilize current staff at White Haven and Polk to create nearby group homes or to create group homes on the current campuses, and to have residents remain at White Haven and Polk while those homes are constructed, would reduce transfer trauma, would improve continuity of services, and would result in superior placements to simply moving residents to Ebensburg or Selinsgrove Centers.

Harriger at paras. 10-11. The Plaintiffs deserve a full and fair consideration of all possible and superior options before they are severely harmed by forced transfers to Ebensburg and Selinsgrove. At the scheduling conference call with the Court on November 30, this matter was raised by Plaintiffs' counsel, and His Honor asked Attorney Skolnik to follow-up on this possible consideration. To date, Attorney Skolnik has not advised Plaintiffs' counsel of any such follow-up. This concept of using current staff of Polk and White Haven to create homes on or near White Haven and Polk would not only be preferable to coerced moves to Ebensburg and Selinsgrove, but it might very well spare the great personal injury or death of some residents. Also, this alternative, might be just as cost effective, or even more cost effective, than moving residents to Ebensburg and Selinsgrove. It most certainly would avoid the risk that the Plaintiffs are moved first to Ebensburg and Selinsgrove, and then moved again in a relatively short period of time if Ebensburg and Selinsgrove are closed. The Court and the parties may miss a great

opportunity to reach a somewhat mutually satisfactory resolution of this case if the Defendants are allowed to continue their rush to move all residents by an arbitrary deadline.

12. The Court appears to have placed significant weight on the "harm" that "include[s] the risk that the Polk Center residents may be exposed to the legionella, which persists at this facility." Memorandum Opinion at 65. Frank Korinko, facility maintenance manager has advised that the XL Reporter, that was to solve this "issue," was being installed a few days ago.   There is a reliable process in place to keep everyone safe.  **There has never been any reported case of Legionnaires disease at Polk, except for maybe one person who contracted the disease outside of Polk.  No one has ever gotten sick from or died from Legionnaires at Polk.**

!3.  Gregory Smith, a healthcare professional who serves on the Board of Trustees of White Haven Center has recently written:

> I am writing to the Division of Intermediate Care Facilities, Department of Health through you to report issues of imminent risk and illness to people currently served at the White Haven Center.
>
> Since we last spoke, the number of people who have died at the center now stands at 34 or 30% of the original 112 who were at the Center when the closure was announced in August 2019.  Of this number, at least 7 people died directly attributed to COVID-19. As you know, the Board of Trustees request for an independent investigation of the first 30 deaths was declined by WHC leadership. It was not until we reported the high number of deaths to your group that the state Office of Developmental Programs relented and authorized a review of the deaths. We were told the review was done by someone within the DOH but only a short summary was verbally reported to us.
>
> Now, with everything we have learned about COVID and the need to take all necessary precautions, ODP/White Haven Center is transitioning/moving residents, as part of its closure activities to Selinsgrove Center in Snyder County.  <u>Currently, Selinsgrove is experiencing a significant surge in COVID cases</u>. As I write they are reporting, through the state webpage, 13 active cases involving residents and 31 cases involving staff. These numbers have increased since last week. WHC is reporting no positive cases in either group at this time. The link below will take you to this public report I reference:
>
> https://www.dhs.pa.gov/providers/Providers/Pages/Coronavirus-State-Facility-Data.aspx

The Defendants are ignoring very significant risks of COVID infections at Selinsgrove Center to move residents there at this time. The Plaintiffs believe that the incidence of COVID is still high at Selinsgrove, when it is not presently high at White Haven and Polk.

14. A temporary restraining order and other preliminary injunctive relief is necessary to avoid imminent extreme permanent harm, and even the potential death of the residents. The residents are being forced to participate in transition visits to Selinsgrove Center and are being forced to move to Selinsgrove Center despite their objections, in order to meet an arbitrary deadline imposed by the Defendants, and in violation of their rights. The Defendants are seeking to deny the Plaintiffs any final ruling on their meritorious causes of action by moving all residents before the case can be fully heard and decided.

12. If immediate temporary restraint and preliminary injunctive relief is not granted, the named Plaintiffs and the Plaintiff class members will be irreparably harmed, which harm could even include their death.

13. If the Defendants are successful in moving residents without the consent of their guardians, they will have eliminated for the Plaintiffs the viable and superior option of ICF/IID care, and will thereby unfairly defeat the Plaintiffs' meritorious claims before they are even heard. Essentially, the Defendants will have "run out the clock," as the Plaintiffs' counsel has repeatedly warned while he awaited court rulings, before the Plaintiffs can fully litigate the protection of their rights.

14. The Court has recently approved the following class definition:

> All current and future residents of White Haven Center and Polk Center who are not on the Planning List and who do not want to be placed in a "community" setting or in another ICF because they believe that their current placements at Polk Center or at White Haven Center are the least restrictive environments that are available that can meet all their needs.

The Plaintiffs merely seek a full and fair opportunity to litigate a class action after the class has now been certified. The Defendants had previously objected to discovery as to proposed class members, so there was no opportunity to develop the case as it relates to the entire class.

15. The Plaintiffs have already requested relief in their Complaint from the adverse consequences of the improper conduct of the Defendants. The Defendants are creating plans that support moves out of the Centers solely based upon an agenda to close all ICF's/IID, rather than based upon sound professional judgments. This illegal and dangerous effort to follow a biased arbitrary plan, without any foundation in fairness and reality, has and will cause imminent irreparable harm to the named Plaintiffs and to Plaintiff class members.

> All Plaintiffs have had, or imminently will have, their rights to receive ICF/IID level services at Polk or White Haven Centers denied. The policies and practices of the Commonwealth have or will deceive, frighten, and coerce residents of PC and WHC into inappropriately surrendering their rights to receive this superior level of care.

Complaint at para. 59. The Plaintiffs and the potential Plaintiffs are being deceived, frightened, and coerced into accepting moves out of the Centers by the Defendants by false statements that the closure is "final" and a "done deal" that they must accept. If the Defendants succeed, whether negligently or intentionally, in moving residents who do not consent to the moves, there will be no least restrictive alternative at the Centers to provide for the needs of the Plaintiffs.

16. As stated in the Complaint, the Plaintiffs have objected to the transfer to even other state operated ICF's, such as Selinsgrove Center and Ebensburg Center:

> The Defendants seek to compel Plaintiffs' discharge from PC and WHC to other settings, **including** predominately non-ICF/IID certified settings.

Complaint at para. 76 (emphasis added). This was referring also to ICF's being proposed for moves.

> All Plaintiffs are medically and developmentally most appropriately served at the Polk or White Haven Centers **instead of any alternative setting**.
>
> All Plaintiffs are physically, mentally, and emotionally fragile and are most appropriately served at the Polk or White Haven Centers **instead of any alternative setting**.
>
> The services provided to Plaintiffs **cannot be reasonably replicated in alternative residential settings**.

Complaint at Paras. 81-83 (emphasis added). Alternative settings included other ICF's.

> Alternative ICFs/IID, even if available, are many miles away, and deny guardians, parents, and family members the opportunity to visit on a regular basis. Many guardians, parents, and family members are elderly and cannot make a long-distance trip to visit a distant ICF/IID. Such lack of family bonding may cause further harm to the well-being of those being moved and disrupts the family ties. Family members and guardians contribute positively to the care, treatment, habilitation, and psychological well-being of residents, and residents will suffer great harm if their loved ones cannot participate.
>
> Furthermore, **all ICF's/IID are not equal and cannot be easily substituted for each other. The movement to another ICF/IID would still rip the residents of PC and WHC from their long-time homes with great potential harm.**

Complaint at paras. 87-88 (emphasis added). The forced choice of another State Center, the forced transition visits to other Centers, and the permanent move to another Center is unduly and unfairly compelling residents and their families to accept other state-operated ICF settings.

> …**the State cannot move residents to other ICF's/IID where their needs cannot be adequately met**, including, but not limited to, the State cannot move residents to an ICF/IID that is so significantly distant from their families and guardians that any individual resident will be harmed in his care, treatment, habilitation, or psychological well-being.

Complaint at para. 163(f) (emphasis added). The Plaintiffs can and will demonstrate at a hearing or trial that all state-operated ICF's are not the same and are not equal. As further stated:

> …**the State cannot move residents to other ICF's/IID where their needs cannot be adequately met**, including, but not limited to, the State cannot move residents to an ICF/IID that is so significantly distant from their families and

guardians that any individual resident will be harmed in his care, treatment, habilitation, or psychological well-being.

Complaint at para. 145(g)(emphasis added). The needs of the Plaintiffs cannot be met at Selinsgrove Center and at Ebensburg Center.

> Defendants know or should know that placing the Plaintiffs in other settings, including [ICF and] non-ICF/IID settings, will substantially increase their likelihood of injury and death from abuse, neglect, error, lack of appropriate services, and other causes.

Complaint at para. 156. The Plaintiffs will be placed at greater risk of injury, abuse, neglect, and other harm if transferred to other state-operated ICF's.[5] The Plaintiffs have always argued that their current placements at White Haven and Polk are the least restrictive environments that can meet their needs, even as compared to other state-operated ICF's, and they stated that the Defendants were:

> …denying a placement that is in the most integrated setting appropriate to their needs, which is in actuality Polk or White Haven where they already reside….

Complaint at para. 162(e). The Defendants should not be allowed to escape a determination as to the least restrictive environment where needs can be met by merely alleging that all Centers are identical.

    17. The legal standards were outlined in the Complaint:

---

[5] The Defendants know full well that that the Plaintiffs also oppose moves to other ICF's/IID that are more restrictive and cannot meet the needs of the Plaintiffs. The Plaintiffs have clearly stated that all ICF's are not equal and that the moves to other state-operated ICF's are only temporary as the Defendants intend to eventually close all state-operated ICF's. The offer to move all residents to other state-operated ICF's is only illusory, and is a ploy to avoid any ruling on the causes of action raised in this case. The Defendants know that it is only a matter of time, probably a few months or a few years, before these very same issues will need to be addressed as they seek to close any remaining state-operated ICF's. This fact is evident by their political philosophy that all ICF's should be closed and by their refusal to commit to any time period whatsoever that the other ICF's will remain open. This attempted deception of the Court is far more damaging than merely delaying the ruling on the causes of action to a later case. In the interim, the residents would be torn from their homes of many years and placed in an inferior temporary home at a new ICF, only to soon again be traumatized by yet another move when the Defendants close the remaining state-operated ICF's. The Court should not be deceived by the Defendants that their offer of another ICF has any real value, and, in fact, the offer is a disingenuous ploy to move the Commonwealth one more step towards closing all state-operated ICF's no matter the harm to the Plaintiffs.

> Interpreting the ADA and the Department of Justice's regulations issued under it, the Supreme Court decision in Olmstead emphasized that there is no "federal requirement that community-based treatment be imposed on patients who do not desire it." Olmstead v. Zimring, et al., 527 U.S. 581, 602 (1999). The Olmstead Court further stressed that "nothing in the ADA or its implementing regulations condones termination of institutional settings for persons unable to handle or benefit from community settings." Id. at 601-02. "[T]he ADA is not reasonably read to impel States to phase out institutions, placing patients in need of close care at risk." Id. at 605.
>
> In fact, the Olmstead decision recognized that "for [some] individuals, no placement outside the institution may ever be appropriate." Id. (citing and quoting Brief for American Psychiatric Association et al. as Amici Curiae at 22-23 ("Some individuals, whether mentally retarded or mentally ill, are not prepared at particular times—perhaps in the short run, perhaps in the long run—for the risks and exposure of the less protective environment of Case 3:20-cv-00148-MEM Document 1 Filed 01/29/20 Page 24 of 36 25 community settings"); Brief for Voice of the Retarded et al. as Amici Curiae at 11 ("Each disabled person is entitled to treatment in the most integrated setting possible for that person—recognizing that, on a case-by-case basis, that setting may be in an institution"); Youngberg v. Romeo, 457 U.S. 307, 327 (1982) (Blackmun, J., concurring) ("For many mentally retarded people, the difference between the capacity to do things for themselves within an institution and total dependence on the institution for all of their needs is as much liberty as they ever will know").

Complaint at paras. 117-118. The Defendants seek to ignore *Olmstead* and the related law to enable them to close the long-term homes of the residents at Polk Center and White Haven Center, thereby placing these residents at risk, in contradiction to the statements by the Supreme Court.

18. The Plaintiffs even touched upon the violation of guardian rights when they stated:

> By virtue of the ADA and the Olmstead decision, Plaintiffs have a federally protected right to receive sound recommendations from treating professionals as to whether community placement is the most appropriate to meet their needs and to fair consideration of their opposition to that transfer, even if the proposed transfer is from institutional care to an allegedly less restrictive setting. **The only proper mechanism for second-guessing an individual or guardian's decision to oppose a treating professional's recommended transfer to a less restrictive setting is through State law and State Court Rules as to guardianship.**

Complaint at para. 119 (emphasis added). The Defendants have instead simply ignored guardianship rights under state law to oppress the residents. The Defendants think that their arbitrary political deadline to close these Centers outweighs everyone's legal rights. This Court should reject such outrageous disregard of guardianship rights.

19. The Court must consider the following factors in determining whether a preliminary injunction should be issued:

   (a) the likelihood that the moving party will succeed on the merits;

   (b) the extent to which the moving party will suffer irreparable harm without injunctive relief;

   (c) the extent to which the nonmoving party will suffer irreparable harm if the injunction is issued; and

   (d) the public interest.

*Liberty Lincoln-Mercury v. Ford Motor Company*, 562 F. 3d 553, 556 (3rd Cir. 2009). "The decision whether to enter a preliminary injunction is committed to the sound discretion of the trial court." *Angstadt v. Midd-West School District*, No: 4:CV-02-0145 at 1 (M.D.Pa. 2002). Based upon these considerations, the Court should grant preliminary injunctive relief to the Plaintiffs in its sound discretion.

20. Having survived the Motion to Dismiss, and considering the legal arguments raised in the Complaint, it is likely that the Plaintiffs will succeed on the merits at least as to some, if not all, of their causes of action. The testimony of the guardians and family members, who know the residents the best, has overwhelmingly supported the residents' continued placement in the least restrictive environments that can meet their needs at White Haven Center and at Polk Center. Also, the Defendants presented four (4) healthcare professionals who all testified in favor of the

Plaintiffs' causes of action. The Defendants should not be allowed to sabotage the Plaintiffs' claims by "running out the clock" before the causes of action can even be fully litigated. The legal arguments of the Plaintiffs are very strong and demonstrate sufficient merit to warrant the granting of a temporary restraining order or other preliminary injunctive relief at this stage of the proceedings.

21. The existence of imminent irreparable harm is obvious under the circumstances of this case, and was and will be supported by testimony and other evidence. The losses of physical and mental health of the individual residents, and even the likely deaths of some of the residents, are clearly irreparable harms. The waiving of rights by the Plaintiffs to an ICF/IID-level of care in the most integrated setting that is available to meet their needs, which is their current Centers, when they are deceived or coerced into accepting moves Centers, is irreparable harm, in itself, as they will never regain those rights.

22. The Defendants will not suffer irreparable harm simply because they must expend some additional reasonable funds[6] and make limited additional reasonable effort to maintain the Centers at this time until there is a final ruling from the Court. The expenditure of funds by the Commonwealth is not irreparable harm.

23. The public interest is unquestionably and clearly served best by protecting the rights, health, and well-being of this most vulnerable population of severely and profoundly developmentally disabled Plaintiffs. The public interest will suffer a great disservice if severely and profoundly developmentally disabled persons are allowed to suffer irreparable harm and even death.

---

[6] There is probably not a significant difference in expenditures to keep the residents at Polk and White Haven Centers as compared to moving them to Selinsgrove or Ebensburg Centers.

24. Additional discovery ends in early 2023. The case has been scheduled for a full trial in February.

25. The Plaintiffs' counsel has not further sought the concurrence of Defendants' counsel in this renewed motion. The Defendants' counsel has repeatedly made clear that the Defendants do not concur in any motion for injunctive relief.

26. The Defendants should be enjoined and directed to perform the following:

(a) Immediately stop emphasizing and referring to any arbitrary and unrealistic closure dates which are obviously not reasonably obtainable in any manner that would meet accepted professional standards or that would ensure the safety, health and well-being of the residents, and which ignores the pending litigation;

(b) Immediately stay all consideration of moves and all recently planned moves until such time that the Court can conduct a full trial, and can issue a final ruling on the causes of action raised in the Complaint;

(c) Immediately direct the Centers to review any pending and recent previous decisions to move residents out of the Centers to be certain that they were not improperly influenced or coerced by the Defendants, and to confirm that the moves fully complied with the original transition plans;

(d) Issue a temporary restraining order or a preliminary injunction to stop the moves of all objecting residents up to the time of a full trial and a full ruling on the merits as to the stated causes of action;

(e) Immediately schedule a further preliminary injunction hearing, or combine such a hearing with the full trial to hear the causes of action raised in the Complaint; and

(f) Immediately order such other relief as the Court deems necessary and appropriate to allow a prompt adjudication of all causes of action before more named Plaintiffs and Plaintiff class members are moved.

WHEREFORE, the Plaintiffs respectfully request that this Honorable Court grant the relief outlined above.

                                                  **Respectfully submitted,**

                                         */s/ Thomas B. York*
                                        **THOMAS B. YORK**
                                        **1205 Argus Road**
                                        **Kill Devil Hills, NC 27948**
                                        **(717) 495-4555**
                                        **tyork@yorklaw.us**

**December 9, 2022**                                                           Counsel for Plaintiffs

# CERTIFICATE OF SERVICE

I, Thomas B. York, hereby certify that on December 9, 2022, I served a true and correct copy of the **PLAINTIFFS' RENEWED MOTION FOR TEMPORARY RESTRAINING ORDER AND FOR PRELIMINARY INJUNCTION,** through electronic filing, on the following:

Matthew Skolnik
Nicole DiTomo
Office of Attorney General
15th Floor, Strawberry Square
Harrisburg, PA 17120

*/s/ Thomas B. York*
**THOMAS B. YORK**

**CERTIFICATE OF NONCONCURRENCE**

    I, Thomas B. York, hereby certify that I had previously communicated multiple times with Defendants' counsel to inquire as to their position as to any request for injunctive relief, and the Defenadnts' counsel have repeatedly noted their opposition to such relief.

*/s/ Thomas B. York*
**THOMAS B. YORK**
