## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RUSSEL "JOEY" JENNINGS, | : | Civil No. 3:20-CV-148 |
| *by and through his parents/guardians,* | : | |
| *Richard and Susan Jennings*, et al., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | (Magistrate Judge Carlson) |
| | : | |
| TOM WOLF, et al., | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

### I.  Introduction

As we have previously noted,[1] for the plaintiffs this has been an emotionally

fraught and protracted journey as they have endeavored to stave off the transfer of

their loved ones from one state facility to another as part of a consolidation of state

mental health facilities providing services to the profoundly disabled. The journey

for the plaintiffs has been long and laden with significant legal obstacles as they have

sought unprecedented and sweeping relief, the ability to dictate the location where

the state provides their family members with intensive care services. Moreover, the

---

[1] <u>Jennings by & through Jennings v. Wolf</u>, No. 3:20-CV-148, 2022 WL 16635644, at *1 (M.D. Pa. Nov. 2, 2022)

terrain of this lawsuit has shifted substantially over time, as the state has completed the transfer of many of the putative plaintiffs, who previously resided at two state-operated ICFs, White Haven Center and Polk Center, to other state facilities.

Throughout the travails of this litigation, the plaintiffs have been represented by counsel who has pursued their interests with zeal, skill, and tenacity. That commitment to these plaintiffs is illustrated in the motion currently pending before the court, a second motion filed by plaintiffs' counsel seeking to preliminarily enjoin the on-going transfers of these individuals from Polk and White Haven to other facilities. While we commend counsel for his commitment to his clients, we are constrained to conclude that this motion, like the plaintiffs' earlier motion for preliminary injunction, does not met the exacting standards necessary for injunctive relief.

This case, a class action lawsuit brought against the former Governor of Pennsylvania and a number of state health officials, involves claims under the Americans with Disabilities Act ("ADA") regarding the continued placement of profoundly intellectually disabled persons in state-operated Intermediate Care Facilities ("ICFs"). The named plaintiffs and class members are intellectually disabled individuals who currently reside in two state-operated ICFs, White Haven Center and Polk Center. In 2019, the state made a decision to close these two ICFs and transfer the remaining residents to either a community placement, a privately-

operated ICF, or one of the two remaining state-operated ICFs—Selinsgrove and Ebensburg.

Thus, the plaintiffs filed this lawsuit, alleging that the closure of these facilities and transfer of the remaining residents to other placements violates their rights under the ADA to be housed in the least restrictive placement that meets their medical needs. (Doc. 1). The class of plaintiffs consists of those who oppose the closures and transfer to either a community placement, private ICF, or another state-operated ICF. They also filed motions to certify the class and for preliminary injunctive relief, requesting that this Court stay the closures of these facilities and transfer of the residents while this litigation is pending. (Docs. 19, 81, 125). We granted the plaintiffs' motion to certify the class but denied the motions for injunctive relief. (Docs. 160, 161). See Jennings by & through Jennings v. Wolf, No. 3:20-CV-148, 2022 WL 16635644, at *1 (M.D. Pa. Nov. 2, 2022.The plaintiffs filed an interlocutory appeal of our order denying injunctive relief to the Court of Appeals, which remains pending. (Doc. 167).

Thereafter, the plaintiffs filed a second motion for temporary restraining order and preliminary injunction, which is now pending before the Court. (Doc. 171). In this motion, the plaintiffs assert that since our order denying the first motion for injunctive relief, many of the class members have been transferred out of White Haven Center and Polk Center. They assert that there have been poor results

following these transfers, such as hospitalizations and deaths, due to the defendants' deficient transition plans that have been rushed to meet what the plaintiffs characterize as arbitrary and unrealistic deadlines. Moreover, among the other concerns voiced by the plaintiffs is a concern that this controversy will become moot if the defendants are successful in their efforts to transfer all of the residents out of White Haven Center and Polk Center before this litigation comes to a close.

We understand and are sympathetic to the plaintiffs' concerns voiced in the instant motion. However, we are constrained to note the following: First, nothing in the latest submissions, in our view, compels reconsideration of our finding that the plaintiffs have not met the threshold requirement they must satisfy to obtain a preliminary injunction by showing a substantial likelihood of success on the merits. Since a likelihood of success on the merits is an essential prerequisite to a preliminary injunction this shortcoming, by itself, defeats the instant motion.

Additionally we note that many of the concerns raised by the plaintiffs regarding the health of the residents after transfers have actually occurred prior to our November 2, 2022 order, and further, involve placements in community or group home settings rather than the state ICFs in question. Moreover, the plaintiffs' contention that the state's projected savings of $21,000,000 is inaccurate or somehow irrelevant is not supported by any evidence other than the declaration of a previously undisclosed individual, William Harriger, who is the Chief Executive

Officer of Verland Foundation, which operates several privately-owned ICFs. Most significantly, we note that the plaintiffs have provided us with no new evidence since the preliminary injunction hearing and our November 2, 2022 order denying the previous motion for preliminary injunction. Rather, this renewed motion appears to assert the same facts and reasoning underlying the initial motion.

After consideration, and for the reasons set forth below, we will deny the plaintiffs' motion for injunctive relief.

## II.   **Discussion**

### A. **Preliminary Injunctions – The Legal Standard**

Motions for preliminary injunctions are governed by Federal Rule of Civil Procedure 65 and are judged by exacting legal standards. In order to obtain a preliminary injunction, the moving party must show (1) a substantial likelihood of success on the merits; (2) irreparable injury to the moving party if relief is not granted; (3) that a balance of equities favors the movant's request for injunctive relief; and (4) that a preliminary injunction is in the public interest. Benisek v. Lamone, 138 S. Ct. 1932, 1943-44 (2018) (quoting Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 24 (2008)). The first two elements are critical, and are set forth in the conjunctive, as the Court of Appeals for the Third Circuit has held that "[a] failure to show a likelihood of success or a failure to demonstrate irreparable injury must necessarily result in the denial of a preliminary injunction."

Instant Air Freight, Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 800 (3d Cir. 1989)

(quoting In Re Arthur Treacher's Franchisee Litigation, 689 F.2d 1137, 1143 (3d

Cir. 1982) (internal quotations omitted)). In this regard, it is well settled that:

> The movant must, as a threshold matter, establish the two "most critical" factors: likelihood of success on the merits and irreparable harm. Reilly v. City of Harrisburg, 858 F.3d 173, 179 (3d Cir. 2017). Under the first factor, the movant must show that "it can win on the merits." Id. This showing must be "significantly better than negligible but not necessarily more likely than not." Id. The second factor carries a slightly enhanced burden: the movant must establish that it is "more likely than not" to suffer irreparable harm absent the requested relief. Id. Only if these "gateway factors" are satisfied may the court consider the third and fourth factors, which aim to balance the equities by examining the potential for harm to others if relief is granted and whether the public interest favors injunctive relief. Id. at 176, 179. The court must then balance all four factors to determine, in its discretion, whether the circumstances warrant injunctive relief. Id. at 179.

Camacho Lopez v. Lowe, 452 F. Supp. 3d 150, 157 (M.D. Pa. 2020).

In weighing these factors, we are cautioned that: "How strong a claim on the

merits is . . . depends on the balance of the harms: the more net harm an injunction

can prevent, the weaker the plaintiff's claim on the merits can be while still

supporting some preliminary relief." Reilly v. City of Harrisburg, 858 F.3d 173, 179

(3d Cir. 2017) (citations omitted). Ultimately, with respect to this threshold

preliminary injunction showing of a likelihood of success on the merits what is

called for is "a reasonable probability of eventual success." Id., n. 3.

Further, a preliminary injunction is "never awarded as of right." Benisek, 138 S. Ct. at 1943. Rather, when considering a motion for a preliminary injunction, we are reminded that "a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948, pp. 129–130 (2d ed. 1995)). As such, the Third Circuit has long observed that "upon an application for a preliminary injunction to doubt is to deny." Madison Square Garden Corp. v. Braddock, 90 F.2d 924, 927 (3d Cir. 1937).

Our assessment of a motion for preliminary injunction entails a threefold analysis. First, we must draw legal conclusions regarding the viability of the plaintiffs' claims. We must then make factual determinations regarding the harms that may result from the grant or denial of the injunction. Finally, we engage in an exercise of sound discretion in deciding whether to issue some extraordinary form of injunctive relief under the applicable law and facts. Each of these determinations, in turn, is subject to a different standard of review on appeal. Thus, "[w]hen reviewing a district court's [resolution] of a preliminary injunction, [the court of appeals] review[s] the court's findings of fact for clear error, its conclusions of law de novo, and the ultimate decision ... for an abuse of discretion." Reilly, 858 F.3d at

176 (quoting <u>Bimbo Bakeries USA, Inc. v. Botticella</u>, 613 F.3d 102, 109 (3d Cir. 2010)).

### B. <u>To the Extent this Motion Requests Reconsideration of Our Prior Ruling, the Motion will be Denied.</u>

At the outset, we are constrained to note that the instant motion is cast more as a motion for reconsideration than a motion for preliminary injunctive relief. Indeed, the motion presents the same legal arguments and supporting facts as the previous motion for injunctive relief, which we denied. Thus, to the extent the plaintiffs are requesting that we reconsider our prior order denying injunctive relief, this request will be denied.

The legal standards that govern motions to reconsider are both clear, and clearly compelling. "The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence." <u>Harsco Corp. v. Zlotnicki</u>, 779 F.2d 906, 909 (3d Cir. 1985). Typically, such a motion should only be granted in three, narrowly defined circumstances: where there is either "(1) [an] intervening change in controlling law, (2) availability of new evidence not previously available, or (3) need to correct a clear error of law or prevent manifest injustice." <u>Dodge v. Susquehanna Univ.</u>, 796 F.Supp. 829, 830 (M.D. Pa. 1992). As the United States Court of Appeals for the Third Circuit has aptly observed:

> "The purpose of a motion for reconsideration ... is to correct manifest errors of law or fact or to present newly discovered evidence." <u>Max's</u>

> Seafood Café, 176 F.3d at 677 (quoting Harsco Corp. v. Zlotnicki, 779
> F.2d 906, 909 (3d Cir.1985)). "Accordingly, a judgment may be altered
> or amended if the party seeking reconsideration shows at least one of
> the following grounds: (1) an intervening change in the controlling law;
> (2) the availability of new evidence that was not available when the
> court granted the motion for summary judgment; or (3) the need to
> correct a clear error of law or fact or to prevent manifest injustice." Id.
> (citation omitted).

Howard Hess Dental Laboratories Inc. v. Dentsply Intern., Inc., 602 F.3d 237, 251

(3d Cir. 2010).

Thus, it is well settled that a mere disagreement with the court does not

translate into the type of clear error of law which justifies reconsideration of a ruling.

Dodge, 796 F.Supp. at 830. Furthermore, "[b]ecause federal courts have a strong

interest in the finality of judgments, motions for reconsideration should be granted

sparingly." Continental Casualty Co. v. Diversified Indus., Inc., 884 F.Supp. 937,

943 (E.D. Pa. 1995). Moreover, it is evident that a motion for reconsideration is not

a tool to re-litigate and reargue issues which have already been considered and

disposed of by the court. Dodge, 796 F.Supp. at 830. Rather, such a motion is

appropriate only where the court has misunderstood a party or where there has been

a significant change in law or facts since the court originally ruled on that issue. See

Above the Belt, Inc. v. Mel Bohannon Roofing, Inc., 99 F.R.D. 99, 101 (E.D. Va.

1983).

Here, the plaintiffs first assert that the Court's reliance on several factual findings was in error. On this score, the plaintiffs challenge our findings regarding the state's projected savings from the closure of these two facilities. However, the plaintiffs do not present any new evidence that was not previously available with respect to these findings. With respect to the state's projected cost savings, the plaintiffs present a declaration of a previously undisclosed individual, Mr. Harriger, who opines that he is skeptical of the state's projected $21,000,000 savings. (Doc. 171-1). As the defendants point out, there is no indication that Mr. Harriger is qualified to conduct an independent review and opine on the state's budgetary projections. Moreover, the skepticism voiced by Mr. Harriger does not negate our findings that the closure of Polk Center and White Haven Center, as described by Ms. Ahrens at the preliminary injunction hearing, would yield significant savings that would by statute be used for the benefit of the entire the intellectually disabled community through the state. At this juncture, the plaintiffs have presented no new evidence with respect to the state's projected savings, which we relied upon, in part, in denying injunctive relief.

Nor have they presented an intervening change in the controlling law since our November 2, 2022 order. Rather, the plaintiffs merely recast their obverse-Olmstead[2] claim as a straightforward Olmstead claim, arguing that Olmstead

---

[2] Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581 (1999).

protects their right to be housed in the least restrictive setting, which they claim are the ICFs at Polk Center and White Haven Center. We do not dispute this general proposition but continue to agree with the rising tide of caselaw which holds that this broad principle does not confer upon the plaintiffs the ability to dictate the precise manner in which the state must provide these services. As we found in our previous decision denying injunctive relief,

> Nor can Olmstead and its progeny be read to confer a right upon the plaintiffs to command this course of action by the state. Quite the contrary, while Olmstead allowed disabled persons a limited degree of autonomy in determining the level of their care, subject to the exercise of medical judgment and reasonable practical constraints, Olmstead simply does not give any individual the right to dictate where they would receive this care or require the state to maintain the facility of their choice in the face of other comparable, available care options.

> Moreover, a rising tide of case law has rejected the arguments advanced here and refused to enjoin states from closing institutions and transferring persons to other comparable facilities. See e.g., Ricci, 544 F.3d 8 (denying request to reopen consent decree to enjoin state transfers of residents from one state facility to another as part of a closure plan); Lane, 2014 WL 2807701, at *3 ("[N]either the ADA nor the Rehabilitation Act creates a right to remain in the program or facility of one's choosing"); D.T, 2017 WL 2590137, at *7-8 (denying a preliminary injunction and holding that the plaintiffs were not likely to succeed on their claim that the closure of an ICF and placement of a resident into a community setting "would violate the integration mandate of the ADA and Rehabilitation Act and result in unlawful discrimination").

(Doc. 160, at 61-62). This finding constitutes the law of the case,[3] and the plaintiffs have not provided intervening caselaw or new evidence showing that there are unusual circumstances present which would allow this issue to be relitigated.

Finally, while we remain sympathetic to the plaintiffs' concerns we discern no clear error of law in our November 2, 2022 decision denying preliminary injunctive relief which would constitute grounds for reconsideration of our decision. Rather, as we will discuss below, the plaintiffs failed to meet and remain unable to meet the stringent standard for injunctive relief in this setting, and as such, the instant motion will be denied.

## C. **The Motion for Preliminary Injunction will be Denied.**

As we have noted, the plaintiffs have filed this renewed motion for preliminary injunctive relief, requesting that we halt any remaining transfers of the plaintiffs and class members who oppose the transfer until a full merits trial can be conducted in this case. However, as we will discuss, the plaintiffs have not met the exacting showing for preliminary injunctive relief at this time.

As with the plaintiffs' first motion for injunctive relief, we find that the plaintiffs have failed to meet Rule 65's threshold requirement that the movants show

---

[3] The law of the case doctrine dictates that "once an issue is decided, it will not be relitigated in the same case, except in unusual circumstances." Hayman Cash Register Co. v. Sarokin, 669 F.2d 162, 165 (3d Cir. 1981) (internal citations and quotations omitted).

a substantial likelihood of success on the merits. To clear this hurdle the plaintiffs must show "a reasonable probability of eventual success." Reilly, 858 F.3d at 179 n. 3. As we recognized in our prior decision, the relief that the plaintiffs request is unprecedented. The plaintiffs are asking the Court to stay the transfers of the remaining individuals who oppose the closures of White Haven Center and Polk Center, thereby effectively staying the closure of these facilities. This we cannot do.

As we have noted, the plaintiffs contend that Olmstead confers a right upon the plaintiffs to choose the specific facility that they believe is the least restrictive environment that meets their needs. However, the plaintiffs continue to misunderstand the rights protected by Olmstead. On this score, the Supreme Court in Olmstead held that continued placement in an institutional setting, when such placement is medically unjustified, constitutes disability discrimination in violation of the ADA. Olmstead, 527 U.S. at 597. The plaintiffs, then, urge us to read Olmstead as conferring a right to the plaintiffs to remain in the institution of their choosing. As we previously found, and as is the law of the case, Olmstead confers no such right, and this contention has been rejected by several federal circuit and district courts. See e.g., Ricci v. Patrick, 544 F.3d 8 (1st Cir. 2008) (denying request to reopen consent decree to enjoin state transfers of residents from one state facility to another as part of a closure plan); Lane v. Kitzhaber, 2014 WL 2807701, at *3 (D. Or. June 20, 2014) ("[N]either the ADA nor the Rehabilitation Act creates a right to

remain in the program or facility of one's choosing"); <u>Sciarrillo ex rel. St. Amand v. Christie</u>, 2013 WL 6586569 (D.N.J. Dec. 13, 2013) (finding that a transfer from an institutional setting to a community placement did not constitute discrimination under the ADA); <u>see also</u> <u>D.T. v. Armstrong</u>, 2017 WL 2590137, at *7-8 (D. Idaho June 14, 2017) (denying a preliminary injunction and holding that the plaintiffs were not likely to succeed on their claim that the closure of an ICF and placement of a resident into a community setting "would violate the integration mandate of the ADA and Rehabilitation Act and result in unlawful discrimination"). Thus, <u>Olmstead</u> simply does not give an individual the right to dictate where they would receive care or require the state to maintain the facility of their choice in the face of other comparable, available care options.

Further, while we find that the various state ICFs are not identical, we conclude that in their material respects they are comparable, and state officials have pledged to ensure that individual needs are accommodated to the greatest extent possible. The plaintiffs, in an effort to provide an update to the court regarding transfers and highlight the inefficacy of the remaining state ICFs, list a number of individuals who have been transferred from Polk Center or White Haven Center and contend that such transfers have yielded poor results, such as hospitalization or death. (Doc. 171, at 4-5). However, we are constrained to note that a number of these examples given by the plaintiffs simply do not compel the result that they desire.

14

For example, one individual who was transferred to Ebensburg Center in September 2022 passed away in November of 2022, apparently not due to transfer trauma or transfer-related issues, but from pancreatic cancer. Moreover, many of these examples provided by the plaintiffs are alleged to have occurred prior to our November 2, 2022 order and do not constitute new evidence that was previously unavailable to the plaintiffs. On this score, the plaintiffs provide an example of a woman who was transferred from Polk Center in April of 2021 and died five months later; a man who was transferred from Polk Center in November of 2021 and died in March of 2022; a woman who was transferred to a group home in October of 2022 who eloped from the facility a week after her transfer; and an individual who was transferred from White Haven Center to Selinsgrove in September of 2021 and died in June of 2022. While we are sympathetic to the outcomes of these individuals who have been transferred out of Polk Center and White Haven Center, nothing provided by the plaintiffs, other than mere speculation, shows that Selinsgrove or Ebensburg Centers are materially different than White Haven Center and Polk Center such that transfers between these facilities would violate the plaintiffs' rights to be housed in the least restrictive, medically appropriate setting. In addition, a number of the examples provided by the plaintiffs involved transfers to community or group home placements rather than Ebensburg or Selinsgrove Centers.

On these facts, the plaintiffs cannot show a substantial likelihood that they are entitled to enjoin these transfers and compel the state to keep Polk Center and White Haven Center open indefinitely. Finding that this threshold requirement for Rule 65 relief is not satisfied, we will deny this motion for injunctive relief.

While our determination that the plaintiffs have not shown a likelihood of success on the merits forecloses preliminary injunctive relief at this time, since "[a] failure to show a likelihood of success or a failure to demonstrate irreparable injury must necessarily result in the denial of a preliminary injunction," Instant Air Freight, Co., 882 F.2d at 800, we will again address the remaining Rule 65 factors.

At the outset, we again note the potential harm to this class of plaintiffs stemming from transfers to other facilities. The transfer trauma phenomenon was discussed at great length in the prior preliminary injunction hearing, and we concede that there is some degree of risk to this intellectually disabled population. However, as we found in our prior decision, the countervailing concerns, including the risks to these individuals should they remain at Polk Center and White Haven Center, as well as the state's projected savings and reallocation of funds into the intellectually disabled community, weigh against granting preliminary injunctive relief in this case. As we discussed at length, there remains a risk to these individuals if they were to stay at Polk Center and White Haven Center, including but not limited to the quality of care that these centers could provide as the population at these centers

16

naturally declines. Moreover, while the plaintiffs remain skeptical of the state's projected savings, they have presented no evidence to dispute the Commonwealth's budget projections. Rather, the evidence presented to us shows that the state's roughly $21,000,000 in savings will be reallocated to a population of about 57,000 intellectually disabled persons, rather than be used to maintain these two facilities that house a population of 158 persons or fewer.

While we remain sympathetic to the individuals who wish to remain at these two centers and who oppose transfer to another state-operated ICF, we are reminded that "upon an application for a preliminary injunction to doubt is to deny." Madison Square Garden Corp., 90 F.2d at 927. Here, the plaintiffs simply have not presented us with new evidence to show that they are entitled to such sweeping and unprecedented relief. Accordingly, the motion for preliminary injunctive relief will be denied.

In closing we note that the legal and factual terrain in this lawsuit has changed significantly since this matter was assigned to us in 2022. Our decision to decline to preliminarily enjoin patient transfers means that the transfer process has continued to move forward. Therefore, many potential class members have been relocated. Moreover, it was clear from the testimony of a number of plaintiffs at the preliminary injunction hearing that if the process was allowed to proceed, many putative class members and named plaintiffs would opt to cooperate with state officials and make

17

the placement decision which was best for their loved ones rather than pursue further litigation.

Given this rapidly shifting legal and factual background, we believe that as the case moves forward it is necessary and appropriate to determine the remaining scope of this lawsuit. Towards this end we will instruct plaintiffs' counsel to notify us on or before **February 3, 2023** regarding whether any of the named plaintiffs now wish to withdraw from this litigation. In addition, we will instruct plaintiffs' counsel to prepare and distribute to putative class members notices which comply with the requirements of Rule 23(c)(2), along with forms requiring putative class members to affirmatively notify the court that they wish to opt-in to this lawsuit. Those putative class members who wish to join the litigation should return the opt-in forms to plaintiffs' counsel for filing with the court no later than **February 17, 2023**. Armed with this information, we can make a more fully informed decision concerning whether this case is still a viable class action and how best to address the remaining claims in this lawsuit.

### III.  <u>Conclusion</u>

Accordingly, for the foregoing reasons, we conclude that the plaintiffs have not made the requisite showing that they are entitled to preliminary injunctive relief. Thus, the motion for preliminary injunction (Doc. 171) will be denied.

An appropriate order follows.

/s/ *Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED: January  26, 2023

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RUSSEL "JOEY" JENNINGS,** | : | **Civil No. 3:20-CV-148** |
| *by and through his parents/guardians,* | : | |
| *Richard and Susan Jennings*, et al., | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **TOM WOLF, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## ORDER

In accordance with the accompanying memorandum IT IS ORDERED that plaintiffs' second motion for preliminary injunction (Doc. 171) is DENIED. IT IS FURTHER ORDERED that in order to make a more fully informed decision concerning whether this case is still a viable class action and how best to address the remaining claims in this lawsuit in light of the rapidly changing circumstances in this case, **on or before February 3, 2023**, plaintiffs' counsel shall notify the court regarding whether any of the named plaintiffs now wish to withdraw from this litigation. In addition, we instruct plaintiffs' counsel to prepare and distribute to putative class members notices which comply with the requirements of Rule 23(c)(2), along with forms requiring putative class members to affirmatively notify

the court that they wish to opt-in to this lawsuit. Those putative class members who wish to join the litigation should return the opt-in forms to plaintiffs' counsel for filing with the court **no later than February 17, 2023**. Only plaintiffs who complete the opt-in forms will be considered members of this class action.

/s/ *Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED: January  26, 2023